# 25-2413

**IN UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

——————————

DAVID J. NASTRI, ESQ.

*Plaintiff-Appellant*

v.

KATIE DYKES,

*Defendant-Appellee*,

——————————

On Appeal from the United States District Court for the
Connecticut, No. 3:23-cv-00056-VAB

——————————

**BRIEF OF THE PLAINTIFF-APPELLANT**

——————————

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
Fax: (203) 672-6551
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiff-Appellant*

January 14, 2026

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ....................................................................................... 1

JURISDICTION ......................................................................................... 3

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE ................................................................... 3

   I.   Background. ...................................................................................... 4

     A.  Connecticut's ban on carrying firearms in state parks and forests. ............ 4

     B.  David J. Nastri, Esq. ....................................................................... 6

   II.  Procedural History And The Decision Below. ................................. 7

SUMMARY OF THE ARGUMENT ........................................................ 9

ARGUMENT ............................................................................................. 11

   I.   The District Court Erred By Granting Defendant Dykes' Summary Judgment Motion And Denying Nastri's Summary Judgment Motion. ............................... 11

     A.  Standard of review. ........................................................................ 12

     B.  Nastri preserves his argument that the district court erred by looking to both 1791 and 1868 history. ............................... 12

C.   Public parks are not analogous to *Bruen*'s identified list of "sensitive places." ................................................................................................... 15

D.   The Court may, and has an obligation to, reconsider *Antonyuk*'s conclusion that there is a historical tradition of "regulating firearms in quintessentially crowded areas and public forums…." ..................................... 24

E.   *Bruen* requires the Court to construe all historical ambiguities or uncertainties in favor of Nastri. ........................................................................ 26

F.   The district court failed to articulate the unprecedented societal concern that restrictions on publicly carrying handguns for self-defense in public parks and forests ostensibly responded to. ................................................................ 29

G.   There is no historical tradition of prohibiting the bearing of arms for personal self-defense in "quintessential crowded areas or public forums." ...... 32

H.   There is no free-standing historical tradition of prohibiting the carrying of firearms in public parks. ..................................................................................... 43

I.   There is no historical tradition of banning firearms in locations simply because children frequent them. ............................................................................ 47

J.   The Court Should Reverse The District Court's Rejection Of Nastri's Facial Challenge To Conn. Agencies Regs. § 23-4-1(c). .................................. 53

ii

K.   Alternatively, the Court Should Reverse The District Court's Rejection Of Nastri's As-Applied Challenge To Conn. Agencies Regs. § 23-4-1(c) As It Pertains To Sleeping Giant State Park And The Farmington Canal Greenway State Park. .................................................................................54

II.   The District Court Erred By Denying Nastri's Motion For A Permanent Injunction Based On Its Finding That He Failed To Demonstrate Actual Success On The Merits. ...................................................................................56

A.   Standard of review. ...................................................................56

B.   Remand is the appropriate remedy if the Court agrees that Nastri demonstrated actual success on the merits. .......................................57

CONCLUSION ..........................................................................................59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION.......61

CERTIFICATE OF SERVICE ..............................................................62

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)..........................................

........................................................ 1, 8, 12, 24, 25, 29, 33, 37, 38, 41, 49, 54, 55

*Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. 243 (1833).........................14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... 13, 24

*E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92 (2d Cir. 2012) ..........................................57

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) .......................................57

*Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021) ........................21

*Gamble v. United States*, 139 S.Ct. 1960 (2019)........................................................14

*Giambalvo v. Suffolk County, New York*, 155 F.4th 163 (2d Cir. 2025) ..................25

*Hardaway v. Nigrelli*, 636 F.Supp.3d 329 (W.D.N.Y. 2022)...................................17

*Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638 (2d Cir. 1998).......................25

*Koons v. Platkin*, 673 F.Supp.3d 515 (D.N.J. 2023) ................................................44

*Loomis v. ACE American Insurance Company*, 91 F.4th 565 (2d Cir. 2024) ..........12

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................14

*Morse v. Frederick*, 551 U.S. 393 (2007).................................................................52

*NAGR v. Lamont*, 153 F.4th 213 (2d Cir. 2025) ................................................ 20, 29

*Nastri v. Dkykes*, No. 23-2023, 2024 WL 1338778 (2d. Cir. Mar. 29, 2024)...........4

*Nastri v. Dykes*, 2023 WL 4491621 (D. Conn. Jul. 12, 2023)...................................4

iv

*Nastri v. Dykes*, 2023 WL 5276396 (Aug. 16, 2023) ...............................................4

*Nastri v. Dykes,* No. 3:23-cv-00056 (VAB), 2025 WL 2884945 (D. Conn. Sept. 30,

2025) ...............................................................................................................3, 4

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) ............

................................... 1, 2, 11, 13, 14, 15, 21, 27, 28, 30, 31, 32, 37, 47, 48, 49, 51

*North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296, 27 N.E. 54 (1891) .......................52

*Rex v. George Dewhurst and Others*, John Macdonell, ed., *Reports of State Trials*,

new ser., vol. 1, pp. 529-608 (1820) ....................................................................36

*Rex v. Knight*, 87 Eng. Rep. 75 (KB) (1686) ..........................................................36

*Sir John Kinght's Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K. B. 1686) ....................26

*State v. Huntly*, 3 Ired. 418, 25 N.C. 418 (1843) ...................................................39

*State v. Lancaster*, 385 N.C. 459 (2023) ......................................................... 39, 40

*State v. Mizner*, 45 Iowa 248 (1876).......................................................................52

*State v. Pendergrass*, 19 N.C. 365 (1837) .............................................................52

*Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174 (2d Cir. 2021) ............ 57, 58

*United States v. Braunig*, 553 F.2d 777 (2d Cir. 1977) ..........................................58

*United States v. Cruikshank*, 82 U.S. 542 (1875) ..................................................14

**Statutes**

1 LAWS OF NEW JERSEY 36 (Bloomfield ed., 1811)..........................................20

1 LAWS OF NEW YORK 176 (2nd ed., Albany: Websters & Skinner 1807) ......19

1 LAWS OF NEW YORK 532 (2d ed. 1807) ........................................18

1786 Va. Acts 35 Ch. 49 .............................................................37

1869 Tenn. Pub. Acts 23 ............................................................42

1870 Tex. Gen. Laws 63, ch. 46 ..................................................42

1883 Mo. Sess. Laws 76 ............................................................42

2 LAWS OF DELAWARE 984 (Samuel & John Adams, eds., 1797) ..................20

28 U.S.C. § 1291 ...................................................................3

28 U.S.C. § 1331 ...................................................................3

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF

    VIRGINIA 69–71 (1803) .......................................................19

A COMPILATION OF THE LAWS OF GEORGIA 373–73 (1812)....................18

A DIGEST OF THE LAWS OF GEORGIA 471, 473–74, 478 (1800); THE LAWS

    OF MARYLAND (1799)..........................................................19

A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (3d ed.

    1814) ........................................................................19

ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (1784)...........19

ACTS AND RESOLVES OF MASSACHUSETTS 235 (1893) (1786 law)..........19

An Act for Punishment of Crimes and Offences, within the District of Columbia, §

    40 (1816)....................................................................38

Conn. Gen. Stat. § 23-4.............................................................5

vi

Conn. Gen. Stat. § 29-28 ............................................................6

Conn. Gen. Stat. § 29-32 ............................................................5

Conn. Gen. Stat. § 29-35 ..........................................................55

Conn. Gen. Stat. § 51-164n .........................................................5

Conn. Gen. Stat. § 53a-109 ..........................................................5

LAWS OF DELAWARE vol 2., pp. 1100, 1118 (1797).........................................18

LAWS OF DELAWARE vol. 2 1088, 1091 (1797)................................................19

LAWS OF NEW HAMPSHIRE 112–16 (1797) ....................................................19

LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield 1811)...........................19

LAWS OF VERMONT 382, 287 (1808)...............................................................19

PA. ACTS OF ASSEMBLY § 21 (1870) .............................................................45

PA. SESS. LAWS § 1 (1868) .........................................................................45

PENNSYLVANIA STATUTES AT LARGE, Volume X: 1779-81, 378 (Stanley
Ray ed., 1904).................................................................................18

PUBLIC LAWS OF SOUTH CAROLINA 426, 427 (1790)..................................18

*Statute of Northampton*, 2 Edw. 3 (1328) ......................................... 16, 33

THE LAWS OF VERMONT 382, 387 (1808).........................................................18

THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (1798)..............................18

THE PUBLIC LAWS OF SOUTH CAROLINA 271 (Grimke, ed. 1790) .............19

THE PUBLIC LAWS OF THE STATE OF RHODE ISLAND 220, 220 (1798) ..19

vii

THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 386–88 (1790) ....................................................................................................20

THE STATUTES AT LARGE OF PENNSYLVANIA vol. X p. 57 (1904) ..........19

**Other Authorities**

1 Records Of The Governor And Company of The Massachusetts Bay In New England 190 (1853) .............................................................................41

A DIGEST OF THE LAWS OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ..................................................................................................20

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (1796) ..................................................................................................20

ANN. REPORTS OF THE CITY OF ST. PAUL § 6 (1888) ..................................45

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1 (2021) .....44

Blackstone, *Commentaries on the Laws of England 1765-1769*, vol. 4 pp. 148-49 ..........................................................................................................34

*Boston Common*, Nat'l Park Serv ...................................................................44

CITY OF READING, PA. LAWS & ORDINANCES ch. II § 20 (1897) .............45

Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792) ....................................38

Cong. Globe, 39th Cong., 1st Sess., 658 (1866) ........................................51

Conn. Agencies Regs. § 23-4-1 ........................... 4, 5, 17, 21, 22, 23, 24, 49, 54, 57

Conn. Agencies Regs. § 23-4-5 ............................................................................5

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)........................................................................... 48, 51, 52

*Duane Park*, The Hist. Marker Database................................................44

Fed. R. Civ. P. 56 ...................................................................................12

Francois X. Martin, ed., *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina*, 60–61 (New Bern, NC: F. X. Martin, 1792) ...................................................................................38

John Bond, *A Compleat Guide for Justices of the Peace* (Bond, 3rd ed. 1707).......35

JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (1828) ...................................................................18

JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) ............................18

*Laws of the Columbian College in the District of Columbia* (1824).......................50

LAWS OF THE GENERAL ASSEMBLY OF PENNSYLVANIA (1868) ...........46

*Laws of the University of North-Carolina; Established by the Board of Trustees, at Their Session in December 1799* (Gales 1800) ...................................................50

Lyon G. Tyle, ed., *Narratives of Early Virginia, 1606-1625*, p. 273 .....................40

Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE (June 2009) ..................................................43

MD. CONST. art. 1 §§ 3, 14 (1776) .......................................................20

Michael Dalton, *The Country Justice* (1690).........................................35

MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK (1858) ...........................................................................................46

*Records Of The Colony And Plantation of New Haven, From 1638 To 1649*, 486 (1857) ..................................................................................................41

Richard Burn, *The Justice of the Peace and Parish Officer* (16th ed. 1788) .... 34, 35

Richard Wingate, *An Exact Abridgment of all Statutes in Force and Use From the Beginning of Magna Charta, until 1641* (1684) ..................................34

RULES & REGULATIONS, PROSPECT PARK, BROOKLYN (1868) .............46

Serjeant William Hawkins, 1 *A Treatise of Pleas of the Crown, or a System of the Principal Matters relating to that Subject, Digest Under Proper Heads* (1716).34

Sir Edward Coke, *Institutes of the Lawes of England*, 1628 (3 Inst. 158) ..............34

*The Earliest New York City Parks*, N.Y. City Dep't of Parks & Recreation ..........44

*The Lawes of the College Published Publiquely Before The Students of Harvard College* (1655) ......................................................................................49

*The Laws of Rhode Island College, Enacted by the Fellows and Trustees* (Carter 1803) ..................................................................................................50

x

*The Laws of Yale College, in New-Haven, In Connecticut, Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795* (Thomas Green and Son 1800) ....................................................................................50

*The Minutes of the Senatus Academicus, 1799-1842* (Univ. Ga. Lib. 1976) ..........50

Trust for Public Land, *The 150 Largest City Parks* (hereinafter "Largest City Parks") ........................................................................................ 43, 44

## **INTRODUCTION**

Plaintiff David Nastri – a law-abiding veteran and attorney – challenged Connecticut's prohibition on carrying handguns for self-defense in Connecticut state parks and forests as a violation of his Second Amendment rights. The district court accepted cross-motions for summary judgment to resolve the case, and it relied on *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) to hold that Defendant Katie Dykes[1] carried her burden to show a historical tradition of prohibiting the carrying of firearms for self-defense in public parks and forests because they are "sensitive places."

The district court committed the same error *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 30-31 (2022) rejected. It adopted a "sensitive places" definition that permits any government to deprive law-abiding citizens of their Second Amendment rights in almost any public place as long as it is crowded, used for recreation, or frequented by children. "[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 597 U.S. at 31. This argument "would in effect exempt cites from the Second

---

[1] Commissioner of the Connecticut Department of Energy and Environmental Protection (DEEP).

1

Amendment and would eviscerate the general right to public carry arms for self defense…." *Id*. at 31.

None of the district court's nominal limitations on its definition of "sensitive places" are historically sound. Instead, these nominal justifications thinly disguise an effort to do what the Supreme Court forbade: eviscerate the right to publicly carry handguns for self-defense.

The "sensitive places" doctrine does not provide historical support for prohibiting the carry of handguns in Connecticut public parks and forests. Public parks and forests are unlike the "legislative assemblies, polling places, and courthouses" that the Supreme Court held are permissible analogies under the "sensitive places" doctrine. *Bruen*, 597 U.S. at 30. Nor does our nation's history and tradition provide any other analogue.

The Court should reverse the district court's denial of summary judgment to Nastri and grant of summary judgment to Dykes, and remand this case for the district court to enter summary judgment in favor of Nastri and to consider the scope of a permanent injunction enjoining enforcement of Connecticut's prohibition on carrying handguns for self-defense in state parks and forests.

## JURISDICTION

The Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court had federal question jurisdiction under 28 U.S.C. § 1331. Nastri timely filed his notice of appeal on October 2, 2025. App.643.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred by granting Dykes' motion for summary judgment and denying Nastri's motion for summary judgment.

II.   Whether the district court erred by denying Nastri's motion for a permanent injunction.

## STATEMENT OF THE CASE

This is an appeal from an order and judgment of the United States District Court for the District of Connecticut (Bolden, J.) denying summary judgment to Plaintiff David Nastri and granting summary judgment and final judgment to Defendant Katie Dykes. SPA.1;[2] *Nastri v. Dykes,* No. 3:23-cv-00056 (VAB), 2025 WL 2884945 (D. Conn. Sept. 30, 2025).

In this case, Nastri sought declaratory and injunctive relief against Dykes for her enforcement of Connecticut's prohibition on carrying firearms in state parks and forests for any other purpose other than hunting certain species of small game. Nastri filed this lawsuit on January 14, 2023. App.646. The district court (Arterton, J.)

---

[2] SPA citations refer to the Special Appendix filed with Nastri's brief.

3

initially dismissed the lawsuit and denied Nastri's motion for a preliminary injunction in a written decision on July 12, 2023. *See Nastri v. Dykes*, 2023 WL 4491621 (D. Conn. Jul. 12, 2023). Judge Arterton subsequently denied Nastri's motion for reconsideration in a written decision issued on August 16, 2023. *See Nastri v. Dykes*, 2023 WL 5276396 (Aug. 16, 2023).

This Court reversed and remanded for further proceedings. *Nastri v. Dykes*, No. 23-2023, 2024 WL 1338778 (2d. Cir. Mar. 29, 2024). On remand, the parties filed cross-motions for summary judgment. Judge Victor A. Bolden granted Dykes's motion, denied Nastri's, and denied permanent injunctive relief. SPA.1-57; *see Nastri v. Dykes,* No. 3:23-cv-00056 (VAB), 2025 WL 2884945 (D. Conn. Sept. 30, 2025). This appeal timely followed.

## I. Background.

### A. Connecticut's ban on carrying firearms in state parks and forests.

Connecticut prohibits carrying firearms or other weapons in state parks and forests unless authorized by DEEP:

> Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection. All carrying or use of weapons is subject to applicable provisions of the Connecticut General Statutes and regulations adopted thereunder.

Conn. Agencies Regs. § 23-4-1(c).

4

A violator faces two types of direct punishment. First, the DEEP may fine the violator up to $35. Conn. Agencies Regs. § 23-4-5. Second, the DEEP possesses the authority to arrest and evict a violator from a park or a forest for up to twenty-four hours immediately upon their arrest or citation for the infraction. *Id*. If a person is convicted of violating Conn. Agencies Regs. § 23-4-1(c) under the procedures established in Conn. Gen. Stat. § 51-164n, Defendant Dykes can ban the violator from entering a state park or forest for up to one year. Conn. Gen. Stat. § 23-4.

A violator could also face collateral consequences. First, a violator could face a criminal trespass charge under Conn. Gen. Stat. § 53a-109 for entering public land in a manner that they are not licensed or privileged to do so. Second, a violator could face the revocation of their Connecticut pistol permit under Connecticut's "suitability"[3] inquiry. *See* Conn. Gen. Stat. § 29-32(b) (authorizing the Commissioner of Emergency Services and Public Protection to revoke pistol permits upon the "occurrence of any event which would have disqualified the holder from

---

[3] A suitable person is a person "who by reason of his character – his reputation in the community, his previous conduct as a licensee – is shown to be suited or adapted to the orderly conduct of a business which the law regards as so dangerous to public welfare that its transaction by any other than a carefully selected person duly licensed is made a criminal offense." *Stratford Police Dept. v. Bd. of Firearms Permit Examiners*, 343 Conn. 62, 82 (2022) (cleaned up).

5

being issued the state permit…") *and* Conn. Gen. Stat. § 29-28(c) (requiring an assessment of whether a person is "a suitable person" to receive a pistol permit).[4]

This ban on firearms and other weapons in state parks is porous and selective though. Connecticut permits hunting with firearms in some state parks and forests year-round. App.496. It permits hunters to use .22 caliber rimfire handguns to hunt small game. App.496. Connecticut, however, does not permit Connecticut pistol-permit holders to carry handguns for self-defense in state parks or forests. App.493.

**B. David J. Nastri, Esq.**

David J. Nastri is a combat veteran, financial advisor, attorney, and active participant in his community. App.487-88. He holds an Master's in Business Administration (M.B.A.) and a law degree. App.487-88 He is also a licensed financial advisor who is subject to FINRA regulation. App.487, 494.

Nastri has held a Connecticut pistol permit for approximately 30 years, and he completed all of the safety training associated with obtaining it. App.488. He also received comprehensive training from the United States Army during his military service on the use of firearms, including handguns. App.488.

Nastri uses Connecticut state parks and forests on a regular basis throughout the year. App.490-91. He hikes at Sleeping Giant State Park in Hamden,

---

[4] Previously, Conn. Gen. Stat. § 29-28(b), before amendments took effect October 1, 2025.

Connecticut. App.490. He jogs on the Farmington Canal Greenway. App.491. He intends to continue using Connecticut state parks and forests in the immediate and foreseeable future for the same purpose, and he seeks to carry a handgun at those times for self-defense.

## II.   Procedural History And The Decision Below.

Nastri filed this action on January 14, 2023. App.646. On January 17, 2023, he moved for a temporary restraining order and a preliminary injunction. App.647. The district court (Arterton, J.) denied Nastri's motion for a temporary restraining order. App.646. Nastri then filed an amended complaint and an amended motion for a preliminary injunction. App.647. Dykes opposed preliminary injunctive relief and also filed a motion to dismiss claiming Nastri lacked standing, App.648. Before the district court ruled on Dykes' motion, it held an evidentiary hearing on Nastri's preliminary injunction motion. App.649. On July 12, 2023, Judge Arterton granted Dykes's motion to dismiss and denied Nastri's motion for a preliminary injunction. App.650. Nastri appealed, and this Court reversed and remanded the case for consideration of the merits of the case. *Nastri*, 2024 WL 1338778.

On remand, Nastri filed an amended complaint. App.652-53. The parties then filed cross-motions for summary judgment. App.1, 463. The district court (Bolden, J.) held that the plain text of the Second Amended covered Nastri and his intended conduct, shifting the burden to Dykes to demonstrate that the challenged regulation

7

has a "relevantly similar" historical analogue. SPA.33-35. The district court then concluded that Nastri's facial challenge failed because Dykes showed "at least some applications of § 23-4-1(c)" fell within *Antonyuk*'s preliminary injunction ruling finding that there is a well-established tradition of prohibiting firearms in quintessentially crowded places and places that children frequent. SPA.50. The district court also rejected Nastri's as-applied challenge to § 23-4-1(c), where Nastri claimed the law unconstitutionally prohibits him from carrying a handgun in Naugatuck State Forest, Sleeping Giant State Park, and the Farmington River Canal Trail. It held that Nastri lacked standing to pursue his challenge with respect to Naugatuck State Forest.[5] SPA.51-53. As for Sleeping Giant State Park and the Farmington River Canal Trail, the district court concluded that "the prohibition of firearms in both parks passes constitutional muster because the prohibition is within the well-established tradition and history of regulating firearms in sensitive places due to their quintessentially crowded nature and the fact that they are frequented by children." SPA.53. Accordingly, the court granted Dyke's motion for summary judgment, denied Nastri's, denied Nastri's request for a permanent injunction, and entered judgment in favor of Dykes. SPA.57-58.

Nastri appeals.

---

[5] Nastri does not appeal this conclusion.

8

## SUMMARY OF THE ARGUMENT

The district court erred by granting Dyke's motion for summary judgment and denying Nastri's for several reasons.

First, although this Court has endorsed the practice of seeking the historical analogues *Bruen* requires in Reconstruction-Era laws, *Bruen* does not permit courts to discover new historical traditions without at least a preceding Founding-Era analogue. The district court's historical tradition, however, started well after the Second Amendment's adoption, and long after the Supreme Court closed the door on federal review of state statutes restricting the Second Amendment.

Second, public parks are not analogous to the sensitive places *Bruen* identified – e.g., legislative assemblies, polling places, and courthouses. Instead of attempting to reconcile public parks with these narrowly defined sensitive places, the district court placed too much reliance on this Court's decision in *Antonyuk* for the proposition that urban parks are sensitive places. The district court's reliance was misplaced because *Antonyuk* relied on a thinly developed historical record at the preliminary injunction stage, and the more robustly developed historical record does not support the historical conclusions *Antonyuk* reached.

Fourth, the district court ignored *Bruen*'s instruction to construe historical ambiguities in favor of the right to bear arms. Instead of construing the Statute of Northampton and American copycat versions of it as laws targeting conduct that

9

would cause a breach of the peace, the district court ignored this plausible interpretation and endorsed one that ignores the Second Amendment's textual command.

Fifth, the district court failed to articulate the unprecedented societal concern addressed by public parks carry bans. The record in this case clearly established that prohibiting alarm caused by the criminal carrying of firearms was not an unprecedented societal problem, and earlier generations did not ban the lawful carriage of firearms for self-defense to address the problem.

Sixth, the district court ignored the weight of the historical evidence to conclude that there is a longstanding historical tradition of banning firearms in crowded places and in places children frequent. The historical record, however, lacks any such regulations.

Alternatively, the district court erred by finding that Sleeping Giant State Park and the Farmington River Canal Trail are more similar to urban parks than rural parks, so that DEEP may ban firearms in them. The district court's error stemmed from its focus on the number and type of visitors to these parks rather than their design, which this Court instructed is the critical metric.

Finally, because Nastri should have prevailed on the merits, the district court erred by denying permanent injunctive relief when Dykes did not oppose it on any grounds besides success on the merits. This Court should reverse the decision of the

10

district court and remand for it to determine the appropriate scope of injunctive relief.

## **ARGUMENT**

### I. **The District Court Erred By Granting Defendant Dykes' Summary Judgment Motion And Denying Nastri's Summary Judgment Motion.**

*Bruen* established a two-step test for determining the merits of Second Amendment cases. First, Nastri must show that "Second Amendment's plain text covers [his] conduct." *Bruen*, 597 U.S. at 24. If he does, "the Constitution presumptively protects that conduct." *Id*. at 17. Second, "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 24.

The district court correctly concluded that the Second Amendment's plain text protects Nastri's proposed conduct. SPA.34-35. It found that Nastri is a law-abiding adult citizen who holds a Connecticut state pistol permit and carries a handgun in public for self-defense. SPA.34-35. It also found that he sought to carry handguns, which are in common use, in Connecticut state parks and forests for the lawful purpose of self-defense. SPA.34-35. The district court correctly concluded that "Nastri has met his burden at step one of the *Bruen-Rahimi* test and demonstrated that his conduct is presumptively protected under the Second Amendment." SPA.35.

11

Nastri does not seek review of the district court's conclusion in his favor on *Bruen*'s textual step. Instead, he only asks the Court to review the district court's historical analysis.

### A. <u>Standard of review.</u>

The Court reviews "without deference the district court's grant of summary judgment when, as here, the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Loomis v. ACE American Insurance Company*, 91 F.4th 565, 572 (2d Cir. 2024) (cleaned up). Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. <u>Nastri preserves his argument that the district court erred by looking to both 1791 and 1868 history.</u>

The Court has already opined that *Bruen* does not require courts to pick between 1791 and 1868 for the relevant historical analysis. *Antonyuk*, 120 F.4th at 974. Rather, it held that discrepancies between 1791 and 1868 do

> not mean that the right to keep and bear arms was calcified in either 1791 or 1868…. 1701 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation.

*Id*. at 974. The district court understood this to mean that it could look to 1868 and its surrounding history to independently establish a tradition of firearms regulation. SPA.38.

While Nastri recognizes that a panel of the Court may be bound by prior precedents, he preserves his argument why *Antonyuk*'s treatment of Reconstruction-Era history is wrong under *Bruen*.

*Bruen* recognized an academic debate over whether courts should rely on the prevailing understanding of an individual right when the Second Amendment was adopted in 1791 or when the Fourteenth Amendment was ratified in 1868. 597 U.S. at 37. *Bruen* declined to resolve this question because the public understanding of the Second Amendment was the same in both 1791 and 1868 with respect to public carry. *Id.* at 37. *Bruen*, however, did note that Supreme Court precedent universally pegs the scope of the protection of the Bill of Rights, including the Second Amendment, to the public understanding of the right in 1791. *Id.* at 37 (compiling precedents).

*District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Bruen*, therefore, did not treat all history as equal. In particular, *Heller* stated that post-Civil War discussions of the right to keep and bear arms "took place 75 years after ratification of the Second amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614). In other words, the Supreme Court has treated history from around the time of the Civil War "as mere confirmation of what the Court thought had already been

established." *Id.* at 37 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1975-76 (2019)).

1791 and 1868 history, therefore, do not stand as historical equals. 1868 history may only be used to confirm the Second Amendment's 1791 historical understanding.

The wisdom of this rule becomes self-evident after a review of the Bill of Rights' history. *Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. 243 (1833) established that the Bill of Rights did not apply to the states, thus immunizing many state laws from post-Founding Era challenges that could have illuminated the Second Amendment's scope. While the framers of the Fourteenth Amendment intended to incorporate the Bill of Rights against the states, the Supreme Court declined to do so in *United States v. Cruikshank*, 82 U.S. 542 (1875) – a case directly involving the Second Amendment. Thus, because federal courts could not reach the merits of Second Amendment cases challenging state laws, state laws and regulations implicating it flourished unchallenged from 1833 to 2010 when the Supreme Court finally incorporated the Second Amendment against the states. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010).

A historical tradition of limiting the Second Amendment from new laws arising well after the 1791 era is no historical tradition at all because the Second Amendment had no role in the development of those laws. Instead, as illustrated by

14

many of the parks regulations discussed below, laws categorically prohibiting the exercise of Second Amendment rights arose from flights of Romantic and Transcendentalist philosophy, not considered legal judgments that considered or valued the Second Amendment.

Thus, Nastri submits that the role of historical laws post-dating the Second Amendment's 1791 adoption are entitled to less weight and must only be examined to see if they confirm the original understanding of the Second Amendment right. *Bruen*, 597 U.S. at 37 (cleaned up); *see also id.* at 55 (giving little weight to an 1860 New Mexico law because it was an "extreme outlier" adopted by a territory 70 years after the Second Amendment's adoption and was never tested in court).

## C. Public parks are not analogous to *Bruen*'s identified list of "sensitive places."

*Bruen* assumed "it settled" that "legislative assemblies, polling places, and courthouses" were "sensitive places" and instructed courts to analogize to those places "to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. Public parks and forests are far different from the "sensitive places" identified by *Bruen*.

The obvious difference between "legislative assemblies, polling places, and courthouses" and public parks and forests is that the former served, and still serve, as the critical forums where the core decisional processes of our republic's

15

institutions take place. They represented, and still represent, the locations housing the three pillars of American self-government: the election of representatives to make laws, the making of laws by the people's representatives, and the people's enforcement of the rule of law through fair judicial proceedings. Each place created, and still creates, the forum necessary to engage in considered and independent decision-making regarding matters of self-government. Independent decision-making could not, and still cannot, reliably occur if the decisionmakers are not secure from the possibility of violence while they deliberate – the incidents of January 6, 2021 being a recent poignant reminder.

This "why" has endured since Parliament adopted the Statute of Northampton in 1328 to prevent anyone from appearing armed before the King's justices or ministers during their performance of their duties. *Statute of Northampton*, 2 Edw. 3 (1328); *see also* App.8.

Public parks and forests – in Connecticut and elsewhere in both the present day and throughout our nation's history – have never served that role. No functions of deliberative self-government occur in Connecticut state parks and forests or in any other public park or forest across the United States. To the extent that government employees conduct business in Connecticut state parks and forests, they mingle with and interact with the public in the same way that a police officer or any other government employee would interact with them on the streets of New Haven

16

or Hartford – places where carrying handguns is unquestionably constitutionally protected.

Thus, the "why" underlying Conn. Agencies Regs. § 23-4-1(c)'s total ban on carrying handguns in Connecticut's state parks and forests does not remotely resemble the "why" underlying the constitutionally permissible prohibitions against carrying firearms in legislative assemblies, polling places, and courthouses – let alone resemble them in the relevantly similar way required under *Bruen*.

*Bruen* also requires courts to look at "how" the government regulations at issue burdens compared with how analogous historical regulations burden the Second Amendment right. Again, Connecticut state parks and forests bear little, if any, similarity to legislative assemblies, polling places, and courthouses.

Legislative assemblies, polling places, and courthouses all constituted, and still constitute, enclosed, securable locations at the time of the Founding. To enforce the prohibition on carrying weapons within, virtually every state in the Founding Era adopted some sort of law that enforced the categorical prohibition on carrying arms within through government-provided, comprehensive security. *See Hardaway v. Nigrelli*, 636 F.Supp.3d 329, 346 (W.D.N.Y. 2022) (noting that these locations were not places of frequent concourse by the general public, and "uniform lack of firearms is generally a condition of entry").

17

Founding Era examples of comprehensive security in these locations abound. Start with laws pertaining to legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. *See* THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); LAWS OF DELAWARE vol 2., pp. 1100, 1118 (1797) (similar); PENNSYLVANIA STATUTES AT LARGE, Volume X: 1779-81, 378 (Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); PUBLIC LAWS OF SOUTH CAROLINA 426, 427 (1790) (providing for payment of door-keepers for the legislature); 1 LAWS OF NEW YORK 532 (2d ed. 1807) (similar); A COMPILATION OF THE LAWS OF GEORGIA 373–73 (1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (1828) (similar); THE LAWS OF VERMONT 382, 387 (1808) (similar).

Consider laws pertaining to courthouses next. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. See THE PUBLIC LAWS OF SOUTH

18

CAROLINA 271 (Grimke, ed. 1790) ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); LAWS OF DELAWARE vol. 2 1088, 1091 (1797) (similar); LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield 1811) (similar); 1 LAWS OF NEW YORK 176 (2nd ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons. . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); THE STATUTES AT LARGE OF PENNSYLVANIA vol. X p. 57 (1904) (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. See ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (1784); A DIGEST OF THE LAWS OF GEORGIA 471, 473–74, 478 (1800); THE LAWS OF MARYLAND (1799) (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS 235 (1893) (1786 law); LAWS OF NEW HAMPSHIRE 112– 16 (1797); A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (3d ed. 1814); THE PUBLIC LAWS OF THE STATE OF RHODE ISLAND 220, 220 (1798); LAWS OF VERMONT 382, 287 (1808) (1798 law).

Finally, examine laws pertaining to polling places. Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina all enacted laws to provide security at polling places. See A DIGEST OF THE LAWS OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (1796) (similar); MD. CONST. art. 1 §§ 3, 14 (1776) (similar); 1 LAWS OF NEW JERSEY 36 (Bloomfield ed., 1811) (providing security at polling places); 2 LAWS OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 386–88 (1790) (table of fees includes payment to sheriffs for polling-place-related duties).

Governments' treatment of legislative assemblies, polling places, and courthouses in the Founding Era and ever since[6] – the "how" of the *Bruen* historical analysis – has always been a critical indicator of whether a location is a "sensitive place" or not. The uniting features of historical regulations prohibiting the carrying

---

[6] For example, at the last time that the undersigned appeared physically before this Court in *NAGR v. Lamont*, 153 F.4th 213 (2d Cir. 2025) (the undersigned presented oral argument in the consolidated case, *Grant v. Rovella*), the Court's security officers required him and his co-counsel to empty their pockets, remove their belts, and surrender their files for security screening for contraband, including weapons, prior to them permitting them to enter the remainder of the courthouse.

of firearms into legislative assemblies, polling places, and courthouses are twofold: (1) the prohibitions were absolute and categorical, and (2) government's enforcement of the prohibitions required comprehensive security.

Dykes, however, takes a far different approach to enforcing Conn. Agencies Regs. § 23-4-1(c).

First, Conn. Agencies Regs. § 23-4-1(c) is not absolute like prohibitions on carrying firearms into legislative assemblies, polling places, and courthouses. It states: "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by the Department of Energy and Environmental Protection." Conn. Agencies Regs. § 23-4-1(c). Thus, Dykes retains discretionary authority to grant private individuals permission to carry weapons, including handguns, into Connecticut state parks and forests for any reason.[7]

---

[7] Individualized, discretionary authority of this nature has been fatal to government regulations in other contexts such as First Amendment Free Exercise challenges. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021). In the Free Exercise context, individualized, discretionary authority to grant exceptions to a "generally applicable" law deprives it of general applicability and subjects it to strict scrutiny. *Id.* at 533. While *Bruen* forbids means-end scrutiny in Second Amendment cases, *Bruen*, 597 U.S. at 24, *Fulton* is analogous to the historical question in this case because "sensitive places" restrictions throughout history have been categorical, generally applicable, absolute prohibitions on the carrying of firearms in certain places, not schemes where individualized discretion existed to provide exceptions. Put differently, the Second Amendment would be a dead letter if government could provide individualized exceptions to carry restrictions in

21

Second, Dykes' enforcement of Conn. Agencies Regs. § 23-4-1(c) falls far short of the security requirements that are necessary to render a place "sensitive" consistent with historically "sensitive places."

For starters, Dykes does not post anyone to guard the entrances of most Connecticut state parks and forests. App.494. When she does, the uncontradicted evidence shows that she only does so to enforce parking restrictions or alcohol prohibitions. App.494-95. To the extent that her subordinates do conduct random inspections of people's belongings, they only do so to enforce hunting and fishing laws. App.495. Furthermore, they typically only do so when someone is leaving a Connecticut state park or forest, not when they are entering it. App.495.

The only way that Dykes attempts to enforce the firearms prohibition is through public reports of firearms in state parks or forests. App.495. If her subordinates catch a violator, her subordinates typically charge them with violating Conn. Agencies Regs. § 23-4-1(c) unless there are extenuating circumstances. App.495-96.

Dykes' failure to secure Connecticut's state parks and forests deprives them of one of the critical historical elements that characterized a "sensitive place:" comprehensive, government-provided security. That alone prevents Dykes from

---

"sensitive places," but deny the core Second Amendment right to carry for self-defense in those same places.

22

being able to carry her burden to show that Conn. Agencies Regs. § 23-4-1(c) is similar to historical analogues of "sensitive places" on the "how" prong of *Bruen*'s inquiry.

Her failure on the "how" prong does not stop there. As discussed, historical "sensitive places" imposed absolute and categorical prohibitions on the carrying of firearms within their confines. Dykes, however, has, and exercises, broad discretion of whether to permit firearms in Connecticut state parks and forests for a variety of purposes. For instance, she permits hunting with firearms in some Connecticut state parks and forests, including year-round hunting of coyotes with .22 caliber handguns. App.496. From December 1, 2023 until September 24, 2024, Defendant Dykes issued 47,046 hunting licenses allowing individuals to carry weapons in certain Connecticut state parks and forests. App.498. Similar numbers exist back to 2017. App.497-98. Additionally, Connecticut owns four state public shooting ranges in Connecticut state parks and forests, which the public may freely use for target shooting. App.496. Finally, Dykes permitted Civil War reenactors to carry unloaded Civil War-era firearms into a Connecticut state park for use in their reenactment. App.497.

These numerous and widespread loopholes demonstrate that Conn. Agencies Regs. § 23-4-1(c) is not similar to historical "sensitive places" restrictions because it establishes a system of categorical and individualized exceptions that recognize

numerous other lawful purposes for carrying a firearm in Connecticut state parks and forests, but excludes self-defense – the central component of the Second Amendment right. *Heller*, 554 U.S. at 599. That is a far cry from the absolute and categorical prohibitions characterizing historical "sensitive places."

Thus, Conn. Agencies Regs. § 23-4-1(c) and Connecticut state parks and forests do not bear any resemblance to historical "sensitive places" and the firearms prohibitions accompanying them.

### D. **The Court may, and has an obligation to, reconsider *Antonyuk*'s conclusion that there is a historical tradition of "regulating firearms in quintessentially crowded areas and public forums…."**

The district court's heavy reliance on *Antonyuk*'s conclusions was misplaced. *Antonyuk* concluded, on review of the grant of a preliminary injunction, that there was a historical tradition of prohibiting the carry of arms in public forums "quintessentially crowded places." *Antonyuk*, 120 F.4th at 1019. Secondarily and without a thorough analysis, *Antonyuk* also concluded that there was a historical tradition of prohibiting arms-bearing in places that children frequent. *Id*. at 1019 n.80. *Antonyuk*, however, reached these conclusions on a thin historical record that lacked a complete historical presentation. *Antonyuk* also did not explain whether it found an unprecedented societal concern. *Compare id*. at 1017 (describing the district court's findings as to the purpose of New York's proffered laws as to "protect people from the danger and disturbance that may accompany firearms") *with id*. at

24

1018-1024 (discussing only the outcome of the "crowded places" tradition, but not their purpose).

*Antonyuk* itself cautions that it does not inescapably bind future panels of this Court:

> We emphasize that we are here reviewing facial challenges to these provisions at a very early stage of this litigation. A preliminary injunction is not a full merits decision, but rather addresses only the '*likelihood* of success on the merits….' Our affirmance of vacatur of the district court's injunction does not determine the ultimate constitutionality of the challenged CCIA provisions, which await *further briefing, discovery, and historical analysis*, *both in this case as it proceeds and perhaps in other cases.*

*Id*. at 1048 n.126 (emphasis added). This caution is consistent with the Court's past precedents: "Ordinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998). A preliminary injunction decision only binds future panels when it "addresses a pure issue of law that cannot be impacted by further development of the record." *Giambalvo v. Suffolk County, New York*, 155 F.4th 163, 177 n.4 (2d Cir. 2025).

The district court, however, dismissed *Antonyuk*'s caution despite the additional historical evidence that Nastri presented and essentially converted *Antonyuk*'s discussion of public parks into an unshakeable legal conclusion. SPA.41-45. The district court's approach is erroneous in light of *Antonyuk*'s express

25

reservation of the question for further historical analysis, "both in this case as it proceeds and perhaps in other cases." *Antonyuk*, 120 F.4th at 1048 n.126.

This Court is not bound by the district court's approach, and *Antonyuk* has expressly permitted the Court to reexamine its historical conclusions with a more complete historical record. The Court now has that more complete historical record and should freshly consider *Antonyuk*'s historical conclusions as to public parks and forests.

### E. *Bruen* requires the Court to construe all historical ambiguities or uncertainties in favor of Nastri.

*Bruen*'s footnote 11 contains an almost entirely neglected instruction about historical analysis in Second Amendment cases: historical ambiguities or uncertainties must be construed against the government once a plaintiff has demonstrated that the Second Amendment's plain text protects his conduct. This rule carries particular weight when there is more than one plausible reading of a historical statute or case. The district court, however, failed to recognize or apply this rule, and the Court should not make the same error.

Footnote 11 responded to the dissent's criticism of the Supreme Court's treatment of *Sir John Kinght's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686) – a prosecution brought under the Statute of Northampton. The Supreme Court had interpreted *Sir John Knight's Case* and the Statute of Northampton as only prohibiting conduct that would cause an "affray" or a "breach of peace." *Bruen*, 597

U.S. at 43-44. The dissent argued that *Sir John Knight's Case* did not support the "affray" or "breach of peace" interpretation of the Statute of Northampton. *Id*. at 44 n.11.

The Supreme Court acknowledged that there could be "multiple plausible interpretations of *Sir John Knight's Case*," but held that it would "favor the one that is more consistent with the Second Amendment's command." *Id*. at 44, n.11. It explained that its decision required this approach "because the Second Amendment's bare text covers petitioners' public carry, the respondents here should the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope." *Id*. at 44, n.11.

This approach is not a singular treatment of specific historical evidence. *Bruen* plainly connected its treatment of *Sir John Knight's Case* to the burden of proof rule that it had previously announced. *Id*. at 44, n.11. The government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. It may not take refuge in historical ambiguity and receive a construction of that ambiguity in its favor and against the Second Amendment's presumptive protections.

Moreover, the approach is consistent with *Bruen*'s instructions about the use of liquidation as a tool of constitutional interpretation: "We recognize that where a governmental practice has been open, widespread, and unchallenged since the early

27

days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id*. at 36 (cleaned up). "But to the extent later history contradicts what the text says, the text controls. [L]iquidating indeterminacies in written laws is far removed from expanding or altering them." *Id*. at 36 (cleaned up).

These instructions – taken as a whole – do not permit the government to carry its historical burden by inviting courts to select an interpretation of a historical law or case that justifies a narrower view of the Second Amendment's protections if there are other plausible interpretations of the law or case. Instead, the government must point to clear and unambiguous historical laws and cases to justify its regulation.

These principles led *Bruen* to discount much of "English history and custom before the founding" as "ambiguous at best:"

> We interpret the English history that respondents and the United States muster in light of these interpretive principles. We find that history ambiguous at best and see little reason to think that the Framers would have thought it applicable in the New World. It is not sufficiently probative to defend New York's proper-cause requirement.

*Id*. at 39-40.

The district court here relied on much of the same history that *Bruen* found to be ambiguous. SPA.41-45. Instead of discounting that history as *Bruen* instructed it to do, the district court gave it controlling weight and construed it against Nastri to articulate a new, sweeping restriction on the right to publicly carry firearms that essentially authorizes Connecticut to ban the public carry of firearms everywhere.

SPA.46-48. This conclusion endorses such a broad limitation on the Second Amendment right to publicly bear arms that it rewrites the Second Amendment entirely. Thus, the district court did not find a well-established historical limitation on the Second Amendment. It rewrote the Second Amendment entirely.

Rewriting the Second Amendment entirely goes far beyond what the district court is entitled to do, and *Bruen* requires the Court to correct that error.

**F. The district court failed to articulate the unprecedented societal concern that restrictions on publicly carrying handguns for self-defense in public parks and forests ostensibly responded to.**

*Antonyuk* held that courts may apply a "more nuanced approach…." *Antonyuk*, 120 F.4th at 970 (cleaned up). It explained that the "more nuanced approach" is necessary in cases concerning "new unprecedented societal concerns or dramatic technological changes." *Id.* at 970 (cleaned up). As such, courts must clearly identify the "unprecedented societal concerns or dramatic technological changes" so that they may properly reason by analogy. *See, e.g., NAGR v. Lamont*, 153 F.4th 213 (2d Cir. 2025) (identifying technological changes that have placed modern weapons such as the AR-15 in the category of a dramatic technological change and unprecedented societal concern).

No party claimed a dramatic technological change before the district court, and the district court did not clearly define why it found that prohibitions on carrying in public parks and forests implicated an unprecedented societal concern. SPA.39-

29

42. Instead, the district court relied on *Antonyuk* to conclude that the emergence of public parks and forests themselves necessitated the more nuanced approach. SPA.42 It, however, did not explain whether it considered them to present an unprecedented societal concern. Nor does *Antonyuk*.

The district court's approach strays far from *Bruen*'s instructions though. *Bruen* explained that the straightforward approach applies "when a challenged regulation addresses a general societal problem that has persisted since the 18th century…." *Bruen*, 597 U.S. at 26. *Bruen* reinforced that the focus of historical analysis is to examine how a regulation addresses a societal problem when it discussed New York's proper-cause requirement. *Id*. at 27. It focused on "the same alleged societal problem addressed in *Heller*: "handgun violence, primarily in urban areas." *Id*. at 27 (cleaned up). Ultimately, *Bruen* found no historically "comparable tradition of regulation" to address this problem that remotely resembled New York's regulatory choices. *Id*. at 27.

When it introduced the "more nuanced approach," *Bruen* emphasized that the flexibility afforded by its more nuanced test was focused on the "regulatory challenges posed by firearms today" and "the various crises of human affairs." *Id*. at 27-28 (cleaned up). It solidified this focus when it required courts to consider "why" historical regulations burden the right to armed self-defense. *Id*. at 29.

30

The clear takeaway from *Bruen*'s explanation is that historical analysis must focus on the particular problem that a regulation is addressing, not whether the regulation furthers an important government policy. When the focus shifts from the particular problem that a regulation is addressing to what government policy it furthers, courts are no longer conducting historical analysis. Instead, they are engaged in "independent means-end scrutiny under the guise of an analogical inquiry…." *Id*. at 29 n.7. *Bruen* prohibits that approach.

The district court's failure to identify the unprecedented societal problem it thought required the nuanced approach and explain why it was different than concerns present at the Founding and beyond leaves little doubt that Nastri should have prevailed before it under the straightforward approach. The only concerns advanced below were the effect that presence of firearms could have on the general public and the dangers posed by allowing them into areas frequented by children. Neither concern is unprecedented, and both concerns have always been societal concerns.

As explained below, our nation has historically prohibited the government from broadly prohibiting public carry simply because it is concerned with the effect that the presence of firearms could have on the general public and because children are frequently present. Instead, it has permitted narrow public carry regulations in narrowly defined categories of "sensitive places."

31

Reliance on amorphous concerns and a new forum for social gatherings to sustain a categorical prohibition on Second Amendment rights is not a faithful application of "the balance struck by the founding generation to modern circumstances." *Bruen*, 597 U.S. at 29 n.7. It is a wholesale revision of "that balance through means-end scrutiny" masquerading as a historical analysis. *Id*. at 29 n.7.

This case is a straightforward one, and the Court should treat it as one.

### G. There is no historical tradition of prohibiting the bearing of arms for personal self-defense in "quintessential crowded areas or public forums."

*Bruen* plainly stated that "sensitive places" do not include "all places of public congregation that are not isolated from law enforcement." *Id*. at 30. It explained that endorsing such a broad definition of "sensitive places" "would eviscerate the general right to publicly carry arms for self-defense…." *Id*. at 31. The Supreme Court also explained that "the historical record yields *relatively few* 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited – *e.g.*, legislative assemblies, polling places, and courthouses…." *Id.* at 30 (emphasis added). If public congregation or crowding were a suitable metric, *Bruen* could not have accurately stated that "the historical records yields relatively few 18th- and 19th-century 'sensitive places'" because public congregation and crowding are not new modern social phenomena. The historical record would have yielded many more "sensitive places" that were treated as "sensitive places" due to public congregation and

crowding. Thus, at the very least, *Bruen* requires far more than public congregation or crowding to render a place "sensitive" in a manner that justifies an absolute prohibition of firearms within it.

The historical record presented in this case supports *Bruen*'s conclusion.

Start with the Statute of Northampton and its American copycats – the same statute that *Antonyuk* started with. *Antonyuk*, 120 F.4th at 1019-20. The Statute of Northampton forbade men "to come before the King's justices, or other of the King's ministers doing their office with force and arms, nor bring no force in affray of the peace. Nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, c. 3 (1328). Nastri's expert historian, Professor Joyce Malcolm, explained that this language is "cumbersome" and required King Edward III to clarify its scope in 1328 and 1332. App.8-9. King Edward III's clarifications instructed Northumberland County officials to enforce the statutes against "all persons riding or going armed to disturb the peace." App.9. Thus, the English Crown did not even interpret the Statute of Northampton to completely prohibit the carrying of all arms in certain places, but rather to prohibit breaches of the peace.

English commentators confirmed the Statute of Northampton's scope as articulated by Edward III and that it did not prohibit the wearing of arms in fairs, markets, and other places unless they were borne in such a manner as to terrify the

people. Sir Edward Coke and Richard Burn explained in their commentaries that "no wearing of arms; is within the meaning of this statute, unless it be accompanied with; such circumstances as are apt to terrify the people." App.9, ¶ 17 (quoting Sir Edward Coke, *Institutes of the Lawes of England*, 1628 (3 Inst. 158); Richard Burn, *The Justice of the Peace and Parish Officer*, pp. 17-18 (16th ed. 1788)). Richard Wingate explained in his collection of English statutes that the Statute of Northampton prohibited "go[ing] or rid[ing] Armed in affray of Peace." App.9-10, ¶ 18 (quoting Richard Wingate, *An Exact Abridgment of all Statutes in Force and Use From the Beginning of Magna Charta, until 1641*, p. 23 (1684)). Serjeant William Hawkins directly addressed the statute of Northampton in his influential treatise: "no wearing of Arms is within the meaning of the [Statute of Northampton] unless it be accompanied with such Circumstances as are apt to terrify the people." App.10, ¶ 21 (quoting Serjeant William Hawkins, 1 *A Treatise of Pleas of the Crown, or a System of the Principal Matters relating to that Subject, Digest Under Proper Heads*, p. 136 (1716)). So did William Blackstone's commentaries: "The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by Statute of Northampton." App.11-12, ¶ 25 (quoting Blackstone, *Commentaries on the Laws of England 1765-1769*, vol. 4 pp. 148-49).

34

Guides for justices of the peace set forth the same understanding of the Statute of Northampton. Michael Dalton stated that the statute prohibited people from riding or go armed offensively "in fairs, Markets, or elsewhere (by night or by day) in Affray of the Kings people." App.10, ¶ 19 (quoting Michael Dalton, *The Country Justice*, p.7 (1690)). John Bond agreed that the Statute of Northampton prohibited the carrying of "offensive Weapons in Fairs, Markets or elsewhere in Affray of the King's People." App.10, ¶ 20 (quoting John Bond, *A Compleat Guide for Justices of the Peace* (Bond, 3rd ed. 1707)). So did Richard Burn: "Where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offense at the common law, and is strictly prohibited by statute." App.11, ¶ 24 (quoting Richard Burn, *The Justice of the Peace and Parish Officer*, p. 17 (16th Ed. 1788)).

In sum, the leading commentaries on the Statute of Northampton – used by both English and American lawyers and jurists – are completely silent on the new modern interpretation of the Statute of Northampton as a "sensitive places" restriction. Instead, all of the leading commentaries explained that the Statute of Northampton only prohibited the conduct of carrying arms to cause a breach of peace. The focus was conduct, not the mere presence of arms in certain places.

English courts shared the commentators' interpretation of the Statute of Northampton as only prohibiting arms carriage that would breach the peace through

conduct. In *Sir John Knight's Case*, King James II charged Sir John Knight under the Statute of Northampton on an allegation that he went into a church at the time of service "with a gun to terrify the King's Subjects." App.10, ¶ 22 (quoting *Rex v. Knight*, 87 Eng. Rep. 75, 76 (KB) (1686)). The judge questioned whether the Statute of Northampton was in abeyance, and the jury acquitted Knight, with the jury recognizing that his mere presence in the church was not a violation of the Statute of Northampton and the judge recognizing a "general connivance to Gentlemen to ride armed for their security." App.10, ¶ 22 (*Rex v. Knight*, 87 Eng. Rep. 75, 76 (KB) (1686)).

Likewise, *Rex v. Dewhurst* considered whether a crowd carrying arms to a protest gathering violated English law. The Court agreed that "weapons could be carried to a public meeting with one exception, 'persons are not warranted in carrying arms to a public meeting if they are calculated to create terror and alarm." App.12, ¶ 26 (quoting *Rex v. George Dewhurst and Others*, John Macdonell, ed., *Reports of State Trials*, new ser., vol. 1, pp. 529-608 (1820)).

Thus, English history lacked any tradition of a prohibition against peacefully carrying a firearm into towns, crowded areas, parks, or anywhere else. App.12, ¶ 27. The English tradition inherited by the Second Amendment's Framers was anti-terror, not anti-gun in almost every conceivable public place. Never did that tradition equate mere arms-bearing in a public forum with terrorizing the people.

*Antonyuk* relied on the Statute of Northampton as part of its "long, unbroken line… beginning from medieval England and extending beyond Reconstruction" that it thought indicated "the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this Nation." *Antonyuk*, 120 F.4th at 1021 (cleaned up). While *Antonyuk* might have been justified in that finding based on the record before it, the Court may not reach the same conclusion here for two reasons. First, the weight of English history – the Statute itself, Edward III's clarifications, the cases that dealt with it, and the leading commentators of the period – clearly establishes that the Statute of Northampton was not a "sensitive place" restriction, but rather a prohibition of carrying arms to disturb the peace. Second, even if the Court believes that there is another plausible interpretation of English history, *Bruen* requires the Court to adopt the plausible interpretation that "is more consistent with the Second Amendment's [textual] command." *Bruen*, 597 U.S. at 44 n.11.

American copycats of Statute of Northampton – *Antonyuk*'s next stop – are consistent with the English tradition of anti-terror. The 1786 Virginia law that *Antonyuk* relied on prohibited going or riding "armed by night [] or by day, in fairs or markets,… in terror of the county." *Antonyuk*, 120 F.4th at 1019-20 (quoting 1786 Va. Acts 35 Ch. 49) (cleaned up). Likewise, the 1816 District of Columbia law that *Antonyuk* relied on contained similar language to the Virginia law by prohibiting going or riding "armed by night nor day, in fairs or markets, or other places, in terror

37

of the county." *Antonyuk*, 120 F.4th at 1020 n.81 (quoting An Act for Punishment of Crimes and Offences, within the District of Columbia, § 40 (1816)).

*Antonyuk* also relied on North Carolina's adoption of English laws as of 1792. *Antonyuk*, 120 F.4th at 1020 (citing Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792)). That law, in its entirety, read:

> It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers, in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughs-holders, constables and wardens of the peace within their wards shall have power to execute this act. And that the Justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

Francois X. Martin, ed., *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina*, 60–61 (New Bern, NC: F. X. Martin, 1792).

Like the Statute of Northampton itself, this language is cumbersome, and it ultimately required the North Carolina Supreme Court to interpret the statute in

1843. In *State v. Huntly*, 3 Ired. 418, 25 N.C. 418, 420 (1843), the North Carolina Supreme Court acknowledged a question of whether the Statute of Northampton had ever been in effect in North Carolina, but stated that, regardless of the answer, it certainly had not been since January 1, 1838 when the North Carolina formally repealed all statutes of England or Great Britain in effect. The North Carolina Supreme Court went a step further too. It described the Statute of Northampton as only punishing "the office of riding or going about armed with unusual and dangerous weapons, to the terror of the people." *Huntly*, 25 N.C. at 420. In reaching this conclusion, *Huntly* reviewed many of the sources Professor Malcolm has compiled and Nastri now presents to the Court. *Id.* at 420-22. Thus, in North Carolina, as of 1838, "the carrying of a gun *per se* constitutes no offence. For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun." *Id.* at 422-23. "It is the wicked purpose--and the mischievous result--which essentially constitute the crime. [A person] shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people." *Id.* at 423.

The North Carolina Supreme Court reinforced this interpretation as recently as 2023 when it considered a challenge to an indictment that relied on North Carolina's adoption of the common law offense of "going armed to the terror of the public." *State v. Lancaster*, 385 N.C. 459, 464 (2023). *Lancaster* defined the offense

39

through "a reading of English common law and our precedent interpreting such" and started that endeavor with *State v. Huntly*. *Id*. at 464. It then rejected the defendant's attempt to impose a locational element on North Carolina's version of the law: "To the contrary, the statute specifically provided that punishment was applicable to those were armed 'in fairs, markets,' and any other public location." *Id*. at 468. Lastly, *Lancaster* held that

> the elements of the common law crime of going armed to the terror of the public are that the accused (1) went about armed with an unusual and dangerous weapon, (2) in a public place, (3) for the purpose of terrifying and alarming the peaceful people, and (4) in a manner which would naturally terrify and alarm the peaceful people.

*Id*. at 468.

As previously discussed, this conduct-focused interpretation is historically accurate. The only locational element to the Statute of Northampton and American copycat statutes was any public place, and these laws targeted conduct, not mere arms-bearing in certain places.

More importantly, Founding Era history actually demonstrates a different tradition – one that required people to bring their weapons to public forums and quintessentially crowded areas. App.13-15, ¶ 29. For example, a 1619 Virginia statute required everyone to attend church on Sunday and bring their weapons on the pain of a three-shilling fine. App.13, ¶ 29(a) (quoting Lyon G. Tyle, ed., *Narratives of Early Virginia, 1606-1625*, p. 273). A 1636-1637 Massachusetts law required

every person older than 18 to bring firearms to all public assemblies or be fined. App.14, ¶ 29(b) (quoting 1 Records Of The Governor And Company of The Massachusetts Bay In New England 190 (1853)). The New Haven Colony, in 1646, required every male between 16 and 60 bring their arms to church and recorded fines imposed on men who failed to do so. App.14, ¶ 29(c) (quoting *Records Of The Colony And Plantation of New Haven, From 1638 To 1649*, 486 (1857)).

In other words, Founding Era history lacks any prohibitions on citizens carrying their firearms in public forums or where people gathered. Instead, it contains numerous examples demonstrating that the carrying of firearms was required at public forums and quintessentially crowded places.

More importantly, this historical tradition shatters "the long, unbroken line…" *Antonyuk* found on the limited record before it. *Antonyuk*, 120 F.4th at 1021. From 1328 to well after the Second Amendment's adoption and close to the Civil War, English and American law did not prohibit the carrying of arms simply because a place was crowded. Instead, they prohibited the carrying of arms to terrorize people – a specific form of conduct. Any new legal developments, therefore, would come too late in time to justify the conclusion that quintessentially crowded places are "sensitive places."

Isolated Reconstruction Era laws are inconsistent with and extreme outliers of the well-established national tradition of firearm regulation that prohibited

terrorizing conduct instead of imposing locational restrictions as discussed above. For example, the three state laws *Antonyuk* discussed – 1883 Mo. Sess. Laws 76, 1869 Tenn. Pub. Acts 23, and 1870 Tex. Gen. Laws 63, ch. 46 – were so broad that that they prohibited the carrying of firearms not only into houses of religious worship or educational, literary, or social gatherings, but also into "any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state." 1883 Mo. Sess. Laws 76; *see also* 1869 Tenn. Pub. Acts 23 (prohibiting carry by "any person attending any fair, race course, or other assembly of people"); 1870 Tex. Gen. Laws 63, ch. 46 (prohibiting carry by any person at any "other social gathering composed of ladies and gentlemen... or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly…"). These laws drew no distinction on the size of the gathering. In other words, two or ten people standing on a street corner discussing politics while carrying weapons for self-defense would be guilty of the same crime as someone who walked into a crowded ballroom. That result is wholly inconsistent with our nation's history and tradition, and it plainly demonstrates the peril of relying on such laws – enacted 90 years after the Second Amendment's adoption – to shed light on the Second Amendment's limitations.

While *Antonyuk*'s reliance on these laws may have been defensible as a historical matter on *Antonyuk*'s record, those laws are no longer sufficient to carry

the day on this historical record. There is no long unbroken line of laws demonstrating a right to restrict the carriage of firearms in crowded places.

## H. **There is no free-standing historical tradition of prohibiting the carrying of firearms in public parks.**

Public parks are not new phenomena that first appeared in the second half of the nineteenth century. Nor do they implicate "unprecedented societal concerns or dramatic technological changes" that require "a more nuanced approach" under *Bruen*. 597 U.S. at 27. There is nothing new about public reservations for common purposes, including recreation, or the reservation of public parks themselves. There is also nothing new about potential violence in public parks or in public green spaces more generally.

Many public parks existed before 1800, including the National Mall in Washington, D.C., Boston Common in Massachusetts, Battery and Duane Parks in New York, and more. *See, e.g.,* Trust for Public Land, *The 150 Largest City Parks* (hereinafter "Largest City Parks");[8] Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE (June 2009) (hereinafter "Walls"). Several dozen more parks were created in the years preceding the Fourteenth Amendment's ratification. *See Largest City Parks*.

---

[8] App.620-622.

For example, Boston Common, established in 1634, is considered "the nation's first city park." Walls at p. 1; *accord Koons v. Platkin*, 673 F.Supp.3d 515, 640 (D.N.J. 2023). It was far from a gun-free zone. Instead, the space was commonly used for militia purposes, including training with firearms. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). "The Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *Boston Common*, Nat'l Park Serv.[9]

In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y. City Dep't of Parks & Recreation.[10] New York's Bowling Green Park was established in 1733. *Id.* Nearby Duane Park was also the first open space purchased "specifically for use as a public park" in 1797. *Duane Park*, The Hist. Marker Database.[11] Other examples abound throughout the colonies and early Republic. *See, e.g., Largest City Parks* at 5–6.

Despite the existence of parks at the Founding, there is no analogous historical tradition of banning firearm carry there by private citizens. To the contrary, had the colonists left their muskets at home when they mustered on the Lexington Common

---

[9] https://www.nps.gov/places/boston-common-ma.htm

[10] https://on.nyc.gov/3hBZXfe (last visited Nov. 15, 2024).

[11] http://tinyurl.com/2t96nykf (last visited Nov. 15, 2024).

(also known as the Lexington Battle Green) in April of 1775, Americans might still be British subjects.

Dykes' own historical expert, Saul Cornell also testified that colonial New England reserved common land spaces, known as greens, for common purposes, including recreation. App.629-34.

Municipal park laws – even those that existed shortly before and after the Civil War – are insufficient to show a new tradition pertaining to public parks alone because they addressed the same societal problems that the Statute of Northampton and subsequent laws addressed: terrorizing people.

Municipal laws often only applied to individual parks. Municipal laws often only applied to individual parks. *See, e.g.*, PA. SESS. LAWS § 1 (1868) (referencing Fairmount Park); CITY OF READING, PA. LAWS & ORDINANCES ch. II § 20 (1897) (referencing Penn's Common park). They also were often coupled with restrictions on shooting animals. *See, e.g.*, PA. ACTS OF ASSEMBLY § 21 (1870) ("No persons shall carry fire-arms, or shoot birds in [Fairmount] Park[.]"); ANN. REPORTS OF THE CITY OF ST. PAUL § 6 (1888) ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof[.]"). Thus, these laws did not reflect a broad, well-established national tradition restricting firearms carriage in public places, including public parks.

Other reasons exist to be skeptical of municipal park laws. They often barred the exercise of other constitutional rights, such as freedom of speech or assembly, rendering them poor models of constitutionality. For example, a regulation restricting firearms in Central Park from 1858 barred "conversing with construction workers." MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK (1858). And Brooklyn's Prospect Park in 1868 restricted "indecent language." RULES & REGULATIONS, PROSPECT PARK, BROOKLYN (1868). A regulation from the same year governing Fairmount Park in Pennsylvania similarly barred "indecent language" and public gatherings or meetings for political purposes. LAWS OF THE GENERAL ASSEMBLY OF PENNSYLVANIA (1868). Laws permeated with constitutional violations are likely not probative of the Second Amendment's meaning in a historical analysis.

In any event, the earliest park laws submitted in this case did not arise until the 1850s. They escaped any Second Amendment review because of the Supreme Court's refusal to incorporate the Second Amendment against the states until 2010. Because these laws escaped meaningful legal review and address the same problems society has always addressed through firearms regulation through different means completely unpalatable to the Founders, they cannot serve to carry Dykes' burden in this case.

46

## I.  There is no historical tradition of banning firearms in locations simply because children frequent them.

The district court relied on *Antonyuk* to find that *Bruen* established a well-established and representative tradition of regulating firearms in places frequented by children. SPA.42, SPA.48. It also acknowledged that *Antonyuk* did not rely on this "tradition" because it found alternative grounds for its holding. Nonetheless, the district court rejected Nastri's Second Amendment challenge, at least in part, based on this "tradition" and the frequency and number of children visiting Connecticut state parks and forests. SPA.46, SPA.48-50. That was error.

First, *Antonyuk* overread *Bruen* as establishing this tradition. The *Bruen* majority opinion does not contain a single mention of the words "child" or "children" although the dissent made much of them. *Compare Bruen*, 597 U.S. at 8-71 *with id.* at 84-133 (Breyer, J. dissenting). To the extent that *Bruen* discussed schools as "sensitive places," a fair reading of that discussion points in the opposite direction. *Bruen* acknowledged that *Heller* included schools among its discussion of "longstanding laws forbidding the carrying of firearms in sensitive places…." *Id.* at 30. *Bruen*, however, did not include schools in its list of sensitive places – "*e.g.*, legislative assemblies, polling places, and courthouse" – that it was "aware of no disputes regarding the lawfulness of such prohibitions. *Id.* at 30. To support this proposition, *Bruen* cited to a law review article by David Kopel and Joseph Greenlee. *Id.* at 30 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13

47

Charleston L. Rev. 205, 229–236, 244–247 (2018)). As a historical matter, Kopel

and Greenlee dispute *Heller*'s inclusion of schools in its list of "sensitive places:"

> None of the above laws provides support for *Heller*'s designation of 'schools' as sensitive places where arms carrying may be banned. Students at the two New Jersey schools were allowed to carry on campus, although they were deprived of nearby handgun ranges. Students in Mississippi could carry arms as long as they did so openly. The riotous students at the University of Virginia were wholly disarmed, but the faculty and staff remained as well-armed as ever. Whatever one thinks about the collective punishment of the U. Va. students, the campus was not a place where arms were forbidden to responsible adults.

Kopel & Greenlee, 13 Charleston L. Rev. at 252.

*Bruen*'s omission of schools from its list of "sensitive places" was no accident.

It clearly recognized the disputed nature of school restrictions, and it did "not

undertake an exhaustive historical analysis... of the full scope of the Second

Amendment" when it discussed the "sensitive places" doctrine in its rejection of

New York's "sensitive places" argument. *Bruen*, 597 U.S. at 31 (cleaned up). Far

from recognizing the tradition as settled, well-established, and representative,

*Bruen*'s silence was an indication that schools were a tradition that would need to be

fleshed out on a full record, not summarily decided without the benefit of party

presentation.[12]

---

[12] *Antonyuk* determined the school question and the broader question of a historical tradition to children without a detailed analysis because the "Appellees do not dispute hat 18th- and 19th-century laws prohibiting guns in schools, which the State provided as examples of the more general tradition of prohibiting firearms in places

Moreover, holding that places with high concentrations of child visitors are "sensitive" defies *Bruen*'s logic that sensitive places should be narrowly defined lest a broader definition "in effect exempt[]s cities from the Second Amendment and [] eviscerate[s] the general right to publicly carry arms for self-defense[.]" *Id.* at 31. Instead, *Bruen* recognized a general right to public carry in many locations where children are undoubtably present such as sidewalks and "the island of Manhattan." *Id.* at 31, 33. Nothing in its decision purports to authorize an ever-shifting definition of "sensitive places" that strip law-abiding adults of their Second Amendment rights based on how many children are there at a given time.

Second, historical restrictions in schools were limited and enacted for a different reason that Dykes claims Conn. Agencies Regs. § 23-4-1(c) was enacted to protect children.

Start with the scope, which implicates *Bruen*'s "how" metric. Founding-Era restrictions related to schools were limited in how they burdened Second Amendment rights because they only applied to students, not faculty, staff, or visitors to campus. *See, e.g., The Lawes of the College Published Publiquely Before The Students of Harvard College* (1655) ("[n]o Student nor students shall be suffered

_____

frequented by vulnerable people, were motivated by the need to protect children." *Antonyuk*, 120 F.4th at 1011 n.69. Thus, *Antonyuk* lacked the critical aspect of a developed historical record under which to analyze New York's claimed historical tradition. That is not the case here.

to have a Gunn in his or their Chambers, or Studyes, or keeping for their use any elsewhere in the Towne"); *The Laws of Yale College, in New-Haven, In Connecticut, Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795*, p. 26 (Thomas Green and Son 1800) ("[n]o Scholar is allowed to keep any kind of fire-arms, or gun-powder, upon penalty of seventeen cents; and if any Scholar shall fire any gunpowder in or near the College-yard, he shall be fined fifty cents: and if it be done near the dwelling-house or the person of the President, a Professor or a Tutor, he shall also be punished as for contempt"); *Laws of the University of North-Carolina; Established by the Board of Trustees, at Their Session in December 1799*, p. 12 (Gales 1800) ("No student shall keep a dog or fire-arms; nor shall he use fire-arms without permission from some one of the Faculty."); *The Laws of Rhode Island College, Enacted by the Fellows and Trustees*, p. 12 (Carter 1803) ("No student shall keep any kind of fire-arms or gunpowder in his room, nor fire gunpowder in or near the College, in any manner whatever."); *The Minutes of the Senatus Academicus, 1799-1842,* p. 86 (Univ. Ga. Lib. 1976) ("no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."); *Laws of the Columbian College in the District of Columbia*, p. 10 (1824) ("No student shall … keep fire arms, or any deadly weapon whatever. He shall bring no gunpowder upon the College

50

premises...."). These laws endured in some form or fashion at the University of Virginia in 1824, the College of New Jersey, and in all Mississippi universities, colleges, or schools. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 249-51 (2018).

None of these regulations barred faculty, staff, or visitors to campus from carrying firearms for self-defense simply because they were around children. In fact, the undersigned could not find, in law reviews or through his own historical research, any school weapons restrictions that barred faculty, staff, or visitors to campus from carrying firearms for self-defense from the 1600s to 1900.

Our nation's history actually support a tradition of carrying firearms around children. *Bruen* cited an 1866 Freedmen's Bureau report to Congress that indicated that firearms were a necessity to protect schools:

> the Bureau reported that a teacher from a Freedmen's school in Maryland had written to say that, because of attacks on the school, "[b]oth the mayor and sheriff have warned the colored people to go armed to school, (which they do,)" and that "[t]he superintendent of schools came down and brought [the teacher] a revolver" for his protection.

*Bruen*, 597 U.S. at 61 (quoting Cong. Globe, 39th Cong., 1st Sess., 658 (1866)).

Further reinforcing this point was the Founding Era tradition that required adults to bring their weapons to public gathering where children were presumably present in large numbers – e.g., church services. App.13-14 (citing laws requiring men to bring their arms to church).

51

The "why" of school regulations also does not support a conclusion that they are "sensitive places" regulations. Schools could lawfully disarm students and children in this time period because they exercised *in loco parentis* authority over them. *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *State v. Pendergrass*, 19 N.C. 365, 366 (1837) (recognizing that the "teacher is the substitute of the parent"); *State v. Mizner*, 45 Iowa 248, 251 (1876); *North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296, 306, 27 N.E. 54, 56 (1891) ("By voluntarily entering the university, or being placed there by those having the right to control him, [the student] necessarily surrenders very many of his individual rights."). Universities lawfully exercised this power to respond to "spoiled and violent behavior." Kopel and Greenlee, 13 Charleston L. Rev. at 249-50. At the University of Virginia in 1824, that behavior including drinking, brandishing of guns freely, shooting in the air and sometimes at each other, gambling, rioting, and vandalism. *Id*. at 249-50 & n.158.

"Why" is very clear from this history. Historical school laws were a direct response to exuberant, carousing student behavior, not threats posed by law-abiding, responsible adults carrying firearms where they might be. The historical lack of firearms restrictions for faculty, staff, and visitors leaves no doubt that this is the correct interpretation of these regulations.

Thus, the Court should decline to find that there is a historical tradition of prohibiting the carriage of firearms by law-abiding, responsible adults in places children frequent.

### J.   <u>The Court Should Reverse The District Court's Rejection Of Nastri's Facial Challenge To Conn. Agencies Regs. § 23-4-1(c).</u>

The district court rejected Nastri's facial challenge to Conn. Agencies Regs. § 23-4-1(c) because it concluded that there was a historical tradition of firearms regulation in urban parks and because there is a well-established tradition of regulating firearms in places frequented by children. SPA.45. The district court then found that at least some Connecticut state parks and forests are used for literary, scientific, or social purposes and are crowded, and that at least some Connecticut state parks and forests are frequented by children. SPA.45-50. As explained previously, the district court's historical analysis is wrong, and this Court should reverse it.

If the Court reverses the district court's conclusions about our nation's historical tradition of firearms regulation, then it should reverse the district court's rejection of Nastri's facial challenge because the district court did not base its ruling on anything else.

53

### K. **Alternatively, the Court Should Reverse The District Court's Rejection Of Nastri's As-Applied Challenge To Conn. Agencies Regs. § 23-4-1(c) As It Pertains To Sleeping Giant State Park And The Farmington Canal Greenway State Park.**

Relying on *Antonyuk*, the district court rejected Nastri's as-applied challenge to Dykes' application of Conn. Agencies Regs. § 23-4-1(c) to prohibit him from carrying a handgun for self-defense in Sleeping Giant State Park and the Farmington Canal Greenway State Park. SPA.53-57. It found that both parks were heavily crowded at various times, and it also found that children frequent Sleeping Giant State Park regularly. SPA.54-56. The district court, however, erroneously elevated these two factors over all of the factors that show that these two parks are rural parks as contemplated by *Antonyuk*.

*Antonyuk* explained that "rural parks" are more like "commons" and "wilderness areas" because "they are not primarily designed for peaceable assembly." *Antonyuk*, 120 F.4th at 1025. It used Adirondack Park and its "vast forests, rolling farmlands, towns and villages, mountains and valleys, lakes, ponds and free-flowing rivers, private lands and public forest" as an example that echoes "New England commons... spaces held by the community for shared utilitarian purposes." *Id*. at 1025.

Sleeping Giant State Park and the Farmington River Canal Trail are akin to Adirondack Park in their design. Sleeping Giant State Park is a 32-mile backcountry trail system. App.431. A person hiking its trails will quickly find themselves more

54

than a mile away from the nearest public access point. App.440. In other words, it is a quintessential wilderness park, and its trails bear a striking, but more rugged, resemblance to public streets. The Farmington Canal Greenway State Park (also known as the Farmington River Canal Trail) is a "greenway" – a simple trail – that runs the length of Connecticut along the Farmington Canal and an old rail line. App.454. It is more akin to a public street than it is to a quintessential public forum that draws a crowd.

Each of these parks is not a public forum or a quintessentially crowded place where activities similar to a public forum occur. They are wilderness parks open to a variety of activities that would be intolerable in a public forum – shooting, hunting, snowmobiling. Permitting Nastri to carry his handgun peaceably for self-defense within these locations will be no more disruptive, and actually far less disruptive, to their activities than a hunter discharging his shotgun, a target shooter firing at a target with a rifle, or someone racing around on a snowmobile. This is especially true since Connecticut prohibits openly carrying handguns in public. Conn. Gen. Stat. § 29-35(a)(2).

Instead of focusing on the actual design of these parks, the district court threw design aside to focus on bare statistics and the frequency with which children visit. *Antonyuk*, however, requires district courts to look at design, not bare statistics. 120 F.4th at 1025. Design is crucially important to *Antonyuk*'s reasoning because its

distinction between urban and rural parks becomes completely unworkable if mere crowding or the presence of children is the dividing marker. More people could desire to frequent a rural park at particular times of the year to take in the scenery. Children could be drawn to a state forest at certain times of the year for outdoor activities. Under the district court's reasoning, whether the park or forest is urban or rural would be fluid, depending on the use that it gets. The inevitable result is that all public parks become urban parks, no matter how much they strive to preserve a rugged, wild nature experience.

*Antonyuk* simply does not point to that result. Courts must carefully look to the design of parks to draw that line, not the bare statistics. In this case, there is ample evidence to show that both Sleeping Giant State Park and the Farmington Canal Greenway State Park were designed as rural parks. Their popularity does not render them urban parks. Thus, the Court should reverse the district court's rejection of Nastri's as-applied challenge.

## II. The District Court Erred By Denying Nastri's Motion For A Permanent Injunction Based On Its Finding That He Failed To Demonstrate Actual Success On The Merits.

### A. Standard of review.

The test for injunctive relief is well-established:

According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as

56

monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.* "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 99-100 (2d Cir. 2012) (quotation marks omitted).

**B. Remand is the appropriate remedy if the Court agrees that Nastri demonstrated actual success on the merits.**

If the Court determines that Conn. Agencies Regs. § 23-4-1(c) violates the Second Amendment, then the only remaining issue is the appropriate scope of injunctive relief.

This Court "generally refrain[s] from considering issues not decided by the district court." *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 184 (2d Cir. 2021). "Though we have broad discretion to consider issues raised, briefed, and argued in the district court, we are more likely to exercise our discretion (1) where

consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding." *Id.* (cleaned up). Furthermore, "[t]he law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, and where that party has had ample opportunity to make the point in the trial court in a timely manner, waiver will bar raising the issue on appeal." *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977) (cleaned up).

In the district court, Dykes did not argue that permanent injunctive relief would be inappropriate if Nastri prevailed on the merits. Dykes argued only that a statewide injunction was uncalled for and that injunctive relief should be limited to the three parks identified in Nastri's as-applied challenge. *Nastri v. Dykes*, No. 3:23-cv-00056-VAB, ECF. 81-1, p. 53-55. Thus, Dykes effectively conceded that the district court should enter a permanent injunction as to Sleeping Giant State Park and the Farmington River Canal Trail if Nastri succeed on either his facial or as-applied challenge, making the only question before the district court whether to grant a statewide injunction if Nastri's facial challenge was successful. Dykes is limited to that argument on appeal. *See Braunig*, 553 F.2d at 780.

The district court, however, did not discuss whether a statewide injunction would be appropriate if Nastri succeeded on his facial challenge. That question would require the district court to balance the hardship upon the State which could

58

flow from enjoining Conn. Agencies Regs. § 23-4-1(c) in parks Nastri has not visited against Nastri's right to carry a handgun in those parks should he choose to do so. Because that question involves a discretionary, fact-based determination, it is not one that the Court should make for the first time on appeal. Moreover, no manifest injustice will result from allowing the district court to decide the scope of injunctive relief in the first instance.

Because Dykes conceded the elements of injunctive relief as to Sleeping Giant State Park and the Farmington River Canal Trail, the Court should enter or direct entry of a permanent injunction as to those parks if it reverses the district court's judgment on either Nastri's facial or as-applied challenge. If Nastri's facial challenge succeeds, the Court should remand for the district court to decide whether to issue a statewide injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Nastri respectfully requests the Court reverse the judgment of the district court, and remand with instructions for the district court to enter judgment in his favor and for further proceedings to determine the appropriate scope of permanent injunctive relief.

Dated: January 14, 2026                    *//s//  Cameron L. Atkinson*

                                        Cameron L. Atkinson, Esq.
                                        ATKINSON LAW, LLC
                                        122 Litchfield Rd., Ste. 2
                                        P.O. Box 340
                                        Harwinton, CT 06791
                                        Telephone: 203.677.0782
                                        Email: catkinson@atkinsonlawfirm.com

            *Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1 because it contain 13,921 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.


Dated: January 14, 2026

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 14, 2026, an electronic copy of the foregoing

Brief Of The Plaintiff-Appellant was filed with the Clerk of the Court using the ECF

system and thereby served upon all counsel appearing in this case.

<u>/s/ Cameron L. Atkinson /s/</u>
Cameron L. Atkinson