# 25-2413-cv

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

DAVID J. NASTRI, ESQ.,

*Plaintiff-Appellant*,

v.

KATIE DYKES,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the District of Connecticut, No. 32:23-cv-00056 VAB

_____

**BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INCORPORATED, AND SECOND AMENDMENT LAW
CENTER, INC., IN SUPPORT OF PLAINTIFFS-APPELLANTS**

_____

C.D. Michel
Anna M. Barvir
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
cmichel@michellawyers.com

*Counsel for Amici Curiae*

January 21, 2026

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, and Second Amendment Law Center, Inc., are nonprofit organizations and thus have no parent corporations and issue no stock.

Date: January 21, 2026

/s/ Anna M. Barvir
Anna M. Barvir
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement.................................................................. i

Table of Contents........................................................................................ ii

Table of Authorities .................................................................................. iii

Interest of Amici Curiae ............................................................................ iii

Introduction ................................................................................................ 2

Argument..................................................................................................... 3

I.     The Second Amendment Analysis Under *Bruen* ..................................... 3

     A.     If the Second Amendment's Text Is Implicated, the Government Must Show That Its Modern Restriction Is Consistent with History and Tradition ..................................................................................... 3

     B.     *Heller* and *Bruen* Make Clear That the "Sensitive Places" Exception Is Both Narrow and Historically Bounded; It Does Not Apply to Public Parks and Forests ....................................................... 5

II.    The District Court Overlooks a Fundamental Mismatch Between Connecticut's Modern Ban on Carry in Public Parks and the Historical Regulations It Invokes............................................................... 11

Conclusion................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Chiumento,*
  89 F.4th 271 (2d Cir. 2023) ........................................................ 9

*Antonyuk v. James,*
  144 S. Ct. 2709 (2024) ........................................................... 9

*Antonyuk v. James*
  120 F.4th 941 (2d Cir. 2024).................................................2, 8, 9

*Bonidy v. USPS,*
  790 F.3d 1121 (10th Cir. 2015).................................................... 6

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)...........................................................3-5, 10

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021) ..................................................... 3, 4

*Espinoza v. Mont. Dep't of Revenue,*
  591 U.S. 464 (2020) ........................................................... 4, 5

*Giambalvo v. Suffolk County,*
  155 F.4th 177 (2d Cir. 2025).................................................... 9

*Heller v. District of Columbia,*
  670 F.3d 1244  (D.C. Cir. 2011) ................................................ 4

*Konigsberg v. State Bar of Cal.,*
  366 U.S. 36 (1961)............................................................. 3

*Koons v. Att'y Gen. N.J.,*
  162 F.4th 100 (3d Cir. 2025) .................................................. 10

*Koons v. Att'y Gen. of N.J.,*
  156 F.4th 210 (3d Cir. 2025)................................................... 10

*Koons v. Platkin,*
  673 F. Supp. 3d 515 (D. N.J. 2023) .......................................... 9, 11

*May v. Bonta,*
  709 F. Supp. 3d 940 (C.D. Cal. 2023).........................................1, 11

*Nastri v. Dykes,*
No. 3:23-cv-000556 (VAB), 2025 WL 2884945 (D. Conn. 2025) ............................ 8

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ................................................................................... *passim*

*United States v. Ayala,*
711 F. Supp. 3d 1333 (M.D. Fla. 2024) ........................................................ 14

*United States v. Rahimi,*
602 U.S. 680 (2024) ................................................................................. 13

*Wolford v. Lopez,*
146 S. Ct. 79 (2025) ................................................................................. 11

*Wolford v. Lopez,*
116 F.4th 959 (9th Cir. 2024) .................................................................... 11

*Wolford v. Lopez,*
686 F. Supp. 3d 1034 (D. Haw. 2023) ......................................................... 11

## Constitutional Provisions

U.S. Const., amend. II .............................................................................. *passim*

## Statutes & Regulations

Conn. Gen. Stat. § 29-28 .......................................................................... 11
Conn. Gen. Stat. § 29-35 ...................................................................... 11, 12
Conn. Agencies Reg. § 23-4-1 ................................................................ *passim*
Fed. R. App. Proc. 29 .................................................................................. 1

## Other Authorities

Amicus Brief of Peace Officers Research Ass'n of California, et al.,
*May v. Bonta*, No. 23-4356 (9th Cir. Feb. 23, 2024), ECF No. 57.1 ...................... 12

Churchill, Robert H., *Gun Regulation, The Police Power, and the Right to Keep Arms
in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist.
Rev. 139 (2007) .................................................................................... 10

Kopel, David, & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston
L. Rev. 205 (2018) ................................................................................. 6, 7

Miller, Darrell A. H., *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary
Bill Rts. J 459 (2019) .................................................................................. 9

Smart, Rosana, et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effect of Gun Policies in the United States* 427 (4th ed. 2024), available at https://www.rand.org/pubs/ research_reports/RRA243-9.html ...... 12

Smith, Mark W., *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ................................. 5

## INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle & Pistol Association, Incorporated ("CPRA"), is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. Its members include tens of thousands of individuals who seek to exercise the right to publicly carry firearms for self-defense and who are directly affected by restrictions on where that right may be exercised. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or amicus in Second Amendment litigation. As relevant here, CRPA is currently a plaintiff in *May v. Bonta*, 709 F. Supp. 3d 940 (C.D. Cal. 2023), a lawsuit challenging California's Senate Bill 2, which (among other things) restricts public carry of firearms in state parks by holders of concealed carry permits.

Second Amendment Law Center, Inc. ("2ALC") is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide policymakers, judges, and the public with accurate historical, criminological, and technical information about firearms.

Both CRPA and 2ALC share a direct and substantial interest in ensuring this

---

[1] Appellant has given consent to the filing of this brief; Appellee takes no position. Amici have thus filed a motion for leave to file pursuant to Federal Rule of Appellate Procedure 29(a)(3). No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

Court faithfully applies *Bruen*'s text-and-history framework and the "sensitive places" exception, preventing states from effectively nullifying the right to bear arms through unduly expansive designations of "sensitive places."

## INTRODUCTION

Connecticut broadly prohibits the carry of firearms for self-defense in all public parks and forests. The district court upheld that ban by classifying those ordinary public spaces as "sensitive places," relying heavily on the panel opinion in the *Antonyuk* preliminary-injunction appeal, which itself rested on only the most attenuated historical analogues. In doing so, the district court extends the "sensitive places" exception far beyond its historically recognized limits.

Ultimately, this appeal asks whether the government may disarm ordinary, law-abiding citizens in vast categories of everyday public space, including all public parks and forests, simply by attaching the label "sensitive." The answer is no. Under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the government bears the burden of demonstrating that such a restriction is consistent with the Nation's well-established and representative historical tradition of firearm regulation. Connecticut cannot meet this exacting burden.

The Supreme Court has made clear that a "relatively few" historically grounded locations qualify as "sensitive places" where firearm possession may be banned. Public recreational lands—where no governmental functions are performed, and no special security exists—fall squarely outside that exception. Because Connecticut's statewide prohibition targets public carry in routine recreational spaces and lacks any well-established historical analogue, it cannot survive constitutional scrutiny.

2

This Court should reverse the district court's judgment.

## ARGUMENT

## I.    The Second Amendment Analysis Under *Bruen*

### A.    If the Second Amendment's Text Is Implicated, the Government Must Show That Its Modern Restriction Is Consistent with History and Tradition

In *Bruen*, the Supreme Court reaffirmed that Second Amendment challenges are governed by the original public meaning test first articulated in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Applying that framework, *Bruen* held that the Second Amendment protects the right to carry firearms in public for armed self-defense. 597 U.S. at 19, 31-33. In so doing, the Court expressly rejected any form of means-end scrutiny or interest balancing and instead set out an analysis for deciding Second Amendment questions rooted exclusively in text, history, and tradition.

Under that approach, courts must begin with the Second Amendment's plain text. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Only if the government can satisfy that burden, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

This burden is demanding by design. The state cannot meet it by relying on a smattering of isolated restrictions because doing so would "risk endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Twp.*, 9

F.4th 217, 226 (3d Cir. 2021)). In *Bruen*, for instance, New York offered a patchwork of historical laws—three from the Colonial era, three from the turn of the 18th century, three from the 19th century, and five from the late 19th century, all from the Western Territories. 597 U.S. at 37-70. Yet the Court rejected these laws as insufficiently representative of any enduring national tradition of firearm regulation. And the Court emphasized, as it had in *Heller*, that it would not stake its interpretation of the Second Amendment on historical outliers that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id.* at 65. Instead, the government must "identify a *well-established and representative* historical analogue." *Id.* at 30 (emphasis added).

Concededly, *Bruen* does not require a "historical twin." *Id.* But it does require that modern regulations be "relevantly similar" to their purported historical analogues in two critical respects: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, the Court explained, analogical reasoning must examine "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified* …." *Id.* (emphasis added). These twin inquiries—"how" the laws operate and "why" they were adopted—are "central" to the constitutional analysis. *Id.*

Accordingly, the government must demonstrate that: (1) its modern restriction is "relevantly similar" to analogous laws from the Founding Era[2] both in "how" it

---

[2] Reconstruction-era evidence is relevant only if it provides *confirmation* of what had been established before, but "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also Espinoza*

operates and "why" it was adopted; and (2) the historical analogues were sufficiently widespread and enduring, not merely outliers. Without that showing, the government cannot meet its burden under *Bruen*.

### B. *Heller* and *Bruen* Make Clear That the "Sensitive Places" Exception Is Both Narrow and Historically Bounded; It Does Not Apply to Public Parks and Forests

With respect to location-based restrictions, like Connecticut's ban on carry in public parks and forests, the Supreme Court has emphasized that "the historical record yields *relatively few* 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597 U.S. at 30 (emphasis added). Indeed, "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have *not* broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 70. The Court also warned that expanding the doctrine beyond those narrow confines could effectively nullify the right to public carry:

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly ... [it] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id.* at 31.

---

*v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (noting that even "more than 30 States" adopting laws "in the second half of the 19th century . . . cannot by itself establish an early American tradition" because "such evidence may reinforce an early practice but cannot create one"). *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791.").

In short, the Supreme Court has already instructed that the "sensitive places" doctrine is a narrow carve-out, not a catch-all exception that can be invoked whenever or wherever the government prefers that people be disarmed. Indeed, the Court identified just three paradigmatic examples of "sensitive places" supported by the historical record: "legislative assemblies, polling places, and courthouses." *Id.* at 30 (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36 (2018)). These are sites where vital civic decisions are made and where political intimidation or violence would threaten the functioning of government itself. Nothing in the historical record supports broadly designating of ordinary public places as "sensitive." Not fairs or streets. Not bars or restaurants. And not public parks or forests. Extending the exception for "sensitive places" to such everyday places would transform a narrow historical exception into a sweeping rule that effectively swallows the right. *Bruen* expressly forbids that result. 597 U.S. at 31.

To be sure, courts may use analogical reasoning "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous 'sensitive places' are constitutionally permissible." *Id.* at 30. But that inquiry must remain tethered to historical principles, not modern policy preferences. The government's mere declaration that a place is "sensitive" does not make it so. As one judge has explained, "most places are 'sensitive' for someone. Surely that, without more, cannot categorically justify a firearms regulation in all such places. Such a conclusion would give the government untrammeled power to restrict Second Amendment rights in any place even plausibly considered 'sensitive.'" *Bonidy v. USPS*, 790 F.3d 1121, 1136-37 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part).

6

Indeed, the government's own conduct may reveal whether a location is truly regarded as "sensitive." As the Kopel & Greenlee article cited with approval in *Bruen* explained:

> Passing a statute declaring some place to be a "gun free zone" does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, *is protected by metal detectors and guards*, the government shows the seriousness of the government's belief that the building is sensitive . . . Conversely, *when the government provides no security at all*—such as in a Post Office or its parking lot—*the government's behavior shows that the location is probably not sensitive*.

Kopel & Greenlee, *supra*, at p. 292 (emphasis added).

Connecticut's treatment of its state parks and forests under § 23-4-1(c) fails that test outright. The state does not provide controlled entry, metal detectors, or a meaningful law-enforcement presence at most state parks or forests. App.494.[3] Visitors remain exposed not only to criminal assault but also to wildlife threats and delayed emergency response—circumstances fundamentally unlike those present in the historically recognized "sensitive places" identified in *Bruen*. And notably, unlike legislative assemblies, polling places, and courthouses, Connecticut has not imposed a blanket ban on carry in public parks and forests. Rather, Appellee Dykes retains broad discretion to permit firearms for various purposes, including hunting, shooting range activities, and Civil War reenactments, App. 496-498, while singling out ordinary citizens carrying for lawful self-defense for disarmament. That selective restriction

---

[3] Appellant identifies that there is limited law enforcement presence in Connecticut parks and forests, including for enforcement of parking restrictions, alcohol prohibitions, and hunting and fishing laws. Appellant's Opening Br. At 22 (citing App. 194-495).

underscores that § 23-4-1(c) is not designed to protect uniquely "sensitive places," but to suppress carry by the very people the Second Amendment protects. If public parks and forests were truly "sensitive" in the constitutional sense, Connecticut would secure them accordingly. It has chosen not to do so. That choice speaks loudly.

Still, the district court, relying heavily on this Court's decision in the *Antonyuk* preliminary injunction appeal, reasoned that Connecticut's (selective) ban on carry in public parks and forests reflects a historical tradition of restricting firearms in "quintessentially crowded places," including urban parks, and places that children frequent. *Nastri v. Dykes*, No. 3:23-cv-000556 (VAB), 2025 WL 2884945, * 22-25 (D. Conn. 2025) (discussing *Antonyuk v. James*, 120 F.4th 941, 1019, 1022-26 & n.80 (2d Cir. 2024)). This rationale is in direct tension with *Bruen*'s express warning against "expanding the category of 'sensitive places' simply to all places of public congregation." 597 U.S. at 31.

Further, *Antonyuk* derived this expansive principle from a remarkably thin historical foundation: just two Founding-era laws said to "replicate[] the medieval English law prohibiting firearms in fairs and markets," three Reconstruction-era laws, and two territorial regulations. 120 F.4th at 1019-21.[4] From that handful of sources, *Antonyuk* inferred that a "'long, unbroken line,' [citation omitted], beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is 'part of the "immemorial"

---

[4] With regard to carrying in public parks, specifically, the *Antonyuk* court also cited eight municipal regulations (unaccompanied by relevant state laws) from the mid-to-late 19th century that regulated firearms in parks in some way. 120 F.4th at 1022 (referencing rules regulating firearms in parks in Chicago, Detroit, New York City, Philadelphia, Pittsburgh, Salt Lake City, St. Paul, St. Louis).

custom' of this Nation." *Id.* at 1021 (quoting Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J 459, 476 (2019)). But *Bruen* rejects the notion that a handful of temporally scattered and geographically limited laws establish a national *tradition* of regulation—particularly where they conflict with the broader historical tradition of lawful public carry. 597 U.S. at 24, 30, 65-66, 70.

In any event, *Antonyuk* does not bind this panel on the merits. Decisions resolving preliminary injunction appeals bind later panels only when they resolve "pure question[s] of law that cannot be impacted by further development of the record." *Giambalvo v. Suffolk County*, 155 F.4th 177, 181 n.4 (2d Cir. 2025). Indeed, *Antonyuk* itself emphasized that its ruling was not final and that "further briefing, discovery, and historical analysis" in *Antonyuk* or even other cases might change the ultimate decision on the merits. 120 F.4th at 1048. On the fuller historical record developed here, it is clear that Connecticut's ban on carry for self-defense in public parks and forests lacks a well-established and relevantly similar historical analogue. Indeed, even this Court itself has questioned whether the historical record could justify carry restrictions in rural settings, like those at issue here. *Antonyuk v. Chiumento*, 89 F.4th 271, 362 (2d Cir. 2023) (*Antonyuk II*) (expressing doubt that "[t]he evidence presently in the record could set forth a well-established tradition of prohibiting firearm carriage in rural parks"), *cert. granted*, *judgment vacated*, *Antonyuk v. James*, 144 S. Ct. 2709 (2024) (mem.). It was right to have those doubts.

As the district court in *Koons v. Platkin*, 673 F. Supp. 3d 515 (D. N.J. 2023), acknowledged, "[d]espite the existence of such common lands [i.e., parks, beaches, recreation facilities, playgrounds, and state parks] since the colonial period," the

historical record lacks any "laws from the *18th century* that *prohibited* firearms in areas that today would be considered parks." *Id.* at 640 (emphasis added), *aff'd in part, vacated in part, rev'd in part*, *Koons v. Att'y Gen. N. J.*, 156 F.4th 210 (3d Cir. 2025). There, the "[c]ourt only uncovered colonial laws that prohibited *discharging* firearms in areas that were the forerunners of today's public park." *Id.* (citing Robert H. Churchill, *Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007) (observing that colonial governments "exercised their police powers to restrict the time, place, and manner in which Americans used their guns" by restricting the discharge of firearms, not their mere possession). Such laws are in no way comparable in *how* they restrict Second Amendment conduct as *Bruen*'s analogical inquiry requires. 597 U.S. at 29.

The Third Circuit in *Koons* reversed the district court's factual finding on this point, suggesting that "[e]xamples abound" of historical firearm bans in parks. *Koons v. Att'y Gen. of N.J.*, 156 F.4th 210, 257 (3d Cir. 2025), *reh'g en banc granted, vacated,* 162 F.4th 100 (3d Cir. 2025). But the court expressly discussed only one—New York's outlier restriction on carrying firearms in Central Park. *Id.* Even assuming a single law in effect in a single city could be deemed a valid historical tradition, Connecticut explodes that purported tradition by banning carry not just in one or two urban parks, but at all public parks and forests in the state. The burden of a ban on carry in one park and a ban on carry in all parks are simply not comparable.

In sum, neither Supreme Court precedent nor the historical record supports treating public parks and forests as "sensitive places." *Bruen* and *Heller* confine that exception to civic institutions tied to the functioning of government, and they reject

expanding it to ordinary places of public congregation. And Connecticut's statewide prohibition bears no meaningful similarity to those "relatively few" sensitive places *Bruen* cited. Because § 23-4-1(c) targets ordinary public spaces rather than sites of civic decision-making, it falls outside the narrow historical exception for "sensitive places."

## II. The District Court Overlooks a Fundamental Mismatch Between Connecticut's Modern Ban on Carry in Public Parks and the Historical Regulations It Invokes

Although many states now allow individuals who may lawfully possess firearms to carry them without a permit,[5] Connecticut is not among them. Like roughly twenty other states, Connecticut requires a license to carry in public. Conn. Gen. Stat. §§ 29-28, 29-35. Such licensing schemes entail substantial vetting, and available state-level data consistently show that Americans with carry permits are extraordinarily law-abiding—more so, in fact, than the population at large.

Courts have repeatedly recognized this reality. In Amicus CRPA's own lawsuit challenging California's post-*Bruen* "sensitive places" restrictions, the district court credited extensive evidence that permit holders do not present the kind of risk such laws purport to address. "Simply put, CCW permitholders are not the gun wielders legislators should fear." *May v. Bonta*, 709 F. Supp. 3d at 969 (C.D. Cal. 2023), *aff'd in part, rev'd in part*, *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), *cert. granted*, *Wolford v. Lopez*, 146 S. Ct. 79 (2025). Other courts have reached the same conclusion. *See, e.g.*, *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1076 (D. Haw. 2023), *aff'd in part, rev'd in part*, *Wolford*, 116 F.4th 959, *cert. granted*, *Wolford*, 146 S. Ct. 79 (observing that "the vast majority of conceal carry permit holders are law-abiding"); *Koons*, 673 F. Supp. 3d at

---

[5] This is often referred to as "constitutional" or permitless carry.

577 (finding no "evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence").

So widely accepted is this fact that several major law enforcement organizations in California filed a brief supporting the *May* plaintiffs, explaining that "[i]n California, CCW permit holders are some of the most highly vetted, trained, responsible and law-abiding citizens" and they "do not jeopardize public safety." *See* Amicus Brief of Peace Officers Research Ass'n of California, et al. at 6, *May v. Bonta*, No. 23-4356 (9th Cir. Feb. 23, 2024), ECF No. 57.1. Even RAND, a research organization often cited in support of more restrictive gun laws, acknowledges that "evidence generally shows that, as a group, license holders are particularly law abiding and rarely are convicted for violent crimes." Rosanna Smart, et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effect of Gun Policies in the United States* 427 (4th ed. 2024), available at https://www.rand.org/pubs/ research_reports/RRA243-9.html.

This reality is critical to the sensitive-places inquiry because modern restrictions on carry bear little resemblance to the legal landscape that existed when the historical "analogues" the district court relied upon were enacted. For most of this Nation's history, ordinary citizens could openly carry firearms in public without prior government vetting and approval. Where permitting requirements did emerge in the late 19th century, they typically regulated *concealed* carry only, while *open* carry remained lawful. Today, however, Connecticut generally prohibits open carry, Conn. Gen. Stat. § 29-35(a)(2), leaving licensed concealed carry as the sole practical means by which most Connecticuters may exercise the right to carry a firearm in public for self-defense.

The district court hardly grappled with this fundamental difference in "how" Connecticut's modern (selective) ban on carry in parks and forests operates compared to the historical laws it treated as comparable. But *Bruen* makes clear that the questions of "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is *comparably justified* are 'central' considerations when engaging in an analogical inquiry." 597 U.S. at 29 (emphasis added). And as the Supreme Court recently affirmed, the historical tradition of firearm regulation distinguishes between those "who have been found to pose a credible threat to the physical safety of others [and] those who have not." *United States v. Rahimi*, 602 U.S. 680, 700 (2024). Connecticut cannot show—because the evidence runs the other way—that those to whom it issues carry permits "pose a credible threat" to public safety. On the contrary, carry permit holders are defined precisely by the fact that the government has determined they do not. In light of the extensive vetting that precedes lawful carry in present-day Connecticut, which was absent historically, Connecticut's modern restriction and the proposed historical analogues are simply not "comparably justified."

None of this is to say that licensed carriers are immune from all place-based restrictions on carry. Indeed, the Supreme Court has emphasized that history does support restrictions on carry in certain genuinely "sensitive places." *Bruen*, 597 U.S. at 30. But the examples the *Bruen* Court identified—legislative assemblies, polling places, and courthouses—share a common feature. They are sites where the deliberative business of governance takes place. At most, then, history supports government restrictions on "firearms possession in places where important and legally definitive

governmental decisions are regularly made." *United States v. Ayala*, 711 F. Supp. 3d 1333, 1347 (M.D. Fla. 2024) (refusing to extend that principle to post offices because they "are not ordinarily the sites of such decisions"). Modern analogues might include places like city council chambers or voter registration centers—but not ordinary recreational spaces like public parks that people frequent in their daily lives.

## CONCLUSION

As discussed above, Connecticut's regulation differs from its purported historical analogues both in "how" it operates and in "why" it restricts carry. The district court ignored these critical differences. Historical "sensitive place" restrictions applied narrowly to sites of civic decision-making, not to everyday public spaces. Connecticut's ban on carry in public parks and forests thus burdens law-abiding citizens in a way history cannot justify.

This Court should reverse the district court's judgment and remand with instructions to enter judgment in Appellant's favor.

Dated: January 21, 2026                    Respectfully submitted,

                                           /s/ Anna M. Barvir
                                           Anna M. Barvir
                                           MICHEL & ASSOCIATES, P.C.
                                           180 E. Ocean Blvd., Ste. 200
                                           Long Beach, CA 90802
                                           cmichel@michellawyers.com

                                           *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 3,939 words. This brief also complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond.


Date: January 21, 2026    /s/ Anna M. Barvir
              Anna M. Barvir
              *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, AND SECOND AMENDMENT LAW CENTER, INC., IN SUPPORT OF PLAINTIFF-APPELLANT with the Clerk of the Court for the United States Court of Appeals for the Second Circuit on January 21, 2026, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: January 21, 2026                     /s/ Anna M. Barvir
                                           Anna M. Barvir
                                           *Counsel for Amici Curiae*