# 25-2413-cv

*To Be Argued By*:
Thadius L. Bochain
Assistant Attorney General

# In the United States Court of Appeals for the Second Circuit

DAVID J. NASTRI, ESQ.,
Plaintiff-Appellant

v.

COMMISSIONER KATIE DYKES,
Defendant-Appellee,

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

**BRIEF OF DEFENDANT-APPELLEE**

WILLIAM TONG
ATTORNEY GENERAL

Thadius L. Bochain,

Timothy J. Holzman, &

Blake T. Sullivan
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06106
Ph: 860-808-5020
Fax: 860-808-5347
Email: Thadius.Bochain@ct.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

COUNTERSTATEMENT OF THE ISSUES .......................................... 1

INTRODUCTION ............................................................................ 2

STATEMENT OF THE CASE ........................................................... 4

I.    Factual Background ............................................................... 4

    A.    Unprecedented social changes during the mid-1800s prompted the creation of modern public parks, along with similar government-controlled outdoor spaces in the years that followed, and firearms were uniformly banned in such locations at inception ........................................ 4

    B.    Connecticut's state parks and forests grew out of the modern parks and conservation movements and restricted firearms at inception ............................................... 8

    C.    Connecticut's state parks and forests continue to be places for respite, recreation, and tranquility that are often crowded, frequented by children, and used as places of assembly for educational and scientific purposes ................. 10

II.   The District Court Rejects Plaintiff's Challenge to § 23-4-1(c) ..... 16

STANDARD OF REVIEW .............................................................. 20

SUMMARY OF ARGUMENT ......................................................... 20

ARGUMENT ............................................................................... 23

I.    The District Court Properly Granted Summary Judgment in Favor of Commissioner Dykes ............................................ 23

    A.    Plaintiff does not challenge the district court's determination that there was no genuine dispute of material fact but, in any event, no such dispute existed ...... 25

i

B. The district court properly concluded that § 23-4-1(c) is facially constitutional because § 23-4-1(c) aligns with history and tradition ........................................................... 27

    1. The district court properly considered Reconstruction era laws and applied a nuanced approach ................................................................... 28

    2. Section 23-4-1(c) aligns with an unbroken regulatory tradition of prohibiting firearms in "modern" parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment ..................................... 32

    3. Section 23-4-1(c) is consistent with our Nation's well-established history and tradition of prohibiting firearms in crowded locations ................... 43

    4. Section 23-4-1(c) is consistent with our Nation's well-established history and tradition of prohibiting firearms in locations frequented by children ....................................................................... 52

    5. Section 23-4-1(c) aligns with principles associated with a landowner's pre-existing right to determine what happens on their land and firearms regulations promoting conservation goals ................... 58

    6. Historical analogues illustrate that § 23-4-1(c) is facially constitutional and reveal that the Second Amendment permits discrete, location-based restrictions ............................................................. 67

C. Plaintiff's contentions about "sensitive places" fail .............. 68

D. The district court properly concluded that § 23-4-1(c) constitutionally applies to Sleeping Giant State Park and the Farmington Canal Greenway State Park ...................... 72

II. The District Court Properly Denied a Permanent Injunction, and a Remand is Unwarranted .................................................. 77

CONCLUSION ...................................................................................... 80

CERTIFICATE OF COMPLIANCE ......................................................... 81

CERTIFICATE OF SERVICE ................................................................. 82

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ..........................................44 n.14

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*,
   145 S. Ct. 1900 (2025)....................................................... passim

*Baltas v. Maiga*, 119 F.4th 255 (2d Cir. 2024)...................................8 n.3

*Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015),
   *cert. denied*, 577 U.S. 1216 (2016) ........................................60

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .............................59

*Christian v. James*, 2025 U.S. Dist. LEXIS 3940 (W.D.N.Y.
   Jan. 8, 2025), *on appeal*, No. 25-384 (2d Cir.)....................................48

*CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th
   368 (2d Cir. 2025) ..........................................................8 n.3

*Commodity Trend Serv. v. CFTC*, 149 F.3d 679 (7th Cir.
   1998)........................................................................78

*Debique v. Garland*, 58 F.4th 676 (2d Cir. 2023), *cert. denied*,
   144 S. Ct. 2715 (2024)................................................25, 26

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................23, 42, 58

*Doherty v. Bice*, 101 F.4th 169 (2d Cir.), *cert. denied*, 145 S.
   Ct. 381 (2024)..............................................................25

*English v. State*, 35 Tex. 473 (1872) ............................................44 n.14

*Enquist v. Oregon Dept. of Agriculture*, 553 U.S. 591 (2008).................59

*Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025).................. passim

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir.
   2012), *cert. denied*, 568 U.S. 1088 (2013) ......................................51, 59

*Giambalvo v. Suffolk County*, 155 F.4th 163 (2025) ........................29, 49

*Hardaway v. Nigrelli*, 636 F. Supp. 3d 329 (W.D.N.Y. 2022) ........71 n.20

*Hayes v. Dahlke*, 976 F.3d 259 (2d Cir. 2020)........................................26

*Hong Mai v. Doe*, 406 F.3d 155 (2d Cir. 2005)...................................4 n.1

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), *cert. denied*, 569 U.S. 918 (2013)..............................................42

*Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021)................................78, 79

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)............................... passim

*Koons v. Attorney General of N.J.*, 156 F.4th 210 (3d Cir. 2025), *vacated, reh'g en banc granted*, 162 F.4th 100 (3d Cir. 2025).......................................................................................48, 51

*LaFave v. County of Fairfax*, 149 F.4th 476, (2025), *cert. denied*, __ S. Ct. __ (March 9, 2026) .....................................................48

*Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567 (D. Md. 2023), *appeal held in abeyance*, 2024 U.S. App. LEXIS 4132 (4th Cir. 2024) ................................................39

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..........................41, 42

*Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024) .....................56

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)..................77

*Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423 (10th Cir. 1986), *cert. denied*, 480 U.S. 951 (1987) ......................65, 66

*N.Y. State Firearms Assn. v. James*, 157 F.4th 232 (2d Cir. 2025)........................................................................................23, 43

*N.Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022) ........... passim

*Nastri v. Dykes*, 2024 U.S. App. LEXIS 7445 (2d Cir. 2024)............16 n.7

*National Assn. for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025) ...........................................................................................23, 36

*New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286 (2d Cir. 2011)................................................77

*People v. Temple*, 271 N.E.3d 64 (Ill. App. 2025), *cert. denied*, 274 N.E.3d 100 (2026) ........................................................................41

*Picard v. Magliano*, 42 F.4th 89 (2d Cir. 2022) .....................................79

*Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025), *cert. denied*, __ S. Ct. __ (2026) (April 6, 2026) .................................. passim

*State v. Shelby*, 90 Mo. 302 (1886).................................................44 n.14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023)................................................29

*Suluki v. Credit One Bank, NA*, 138 F.4th 709 (2d Cir. 2025)...............20

*Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206 (2d Cir. 2023) ..............................................................................26

*Toomer v. Witsell*, 344 U.S. 385 (1948) ...........................................65, 66

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)...........................60

*United States v. Dorosan*, 350 Fed. Appx. 874 (5th Cir. 2009), *cert. denied*, 559 U.S. 983 (2010) .......................................................60

*United States v. Gomez*, 159 F.4th 172 (2d Cir. 2025), *cert. denied*, __ S. Ct. __ (March 23, 2026) ..................................................24

*United States v. Rahimi*, 602 U.S. 680 (2024) .............................. passim

*United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025), *cert. denied*, 223 L.Ed 2d 536 (2026) .................................................. passim

*Voisine v. United States*, 579 U.S. 686 (2016) .......................................67

*We the Patriots, Inc. v. Grisham*, 697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024) ................70

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), *cert. granted*, 146 S. Ct. 79 (2025)............................................................... passim

*Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025), *cert. denied*, 223
   L.Ed. 2d 255 (2026) ................................................................. 28, 30, 72

**Statutes**

18 U.S.C. § 922(g)(8) ................................................................... 29

42 U.S.C. § 1983 .......................................................................... 16

Conn. Gen. Stat. § 23-4 ..................................................... 11, 55, 64

Conn. Gen. Stat. § 23-5 ............................................................... 11

Conn. Gen. Stat. § 26-82a ........................................................... 66

**Rules**

D. Conn. L. Civ. R. 56(a)(2) ....................................................... 26

Fed. R. App. P. 10(a)(1) ......................................................... 4 n.1

Fed. R. App. P. 30(a)(2) ......................................................... 4 n.1

Fed. R. App. P. 30(b)(1) ......................................................... 4 n.1

**Regulations**

Code of Md. Regs. 08.01.07.02(D) ......................................... 38 n.12

Conn. Agency Regs. § 23-4-1(c) .......................................... passim

**Constitutional Provisions**

PA. Const. art 1, § 21 .............................................................. 42 n.13

U.S. Const. amend I ............................................................... 41, 78

U.S. Const. amend II ............................................................... passim

U.S. Const. amend XIV ....................................................... 16, 29, 41

**Other Authorities**

E. Volokh, State Constitutional Rights to Keep and Bear
 Arms, 11 TEX. REV. L. & POLITICS 191 (2006) ...............................42

K. Still et al., The History and Tradition of Regulating Guns
 in Parks, 19 HARV. L. & POL'Y REV. 201 (2024)............................34

## COUNTERSTATEMENT OF THE ISSUES

I.  Whether the district court properly granted summary judgment in favor of Katie Dykes, the Commissioner of the Connecticut Department of Energy and Environmental Protection ("DEEP"), because § 23-4-1(c) of the Regulations of Connecticut State Agencies is facially constitutional and as-applied to Sleeping Giant State Park and the Farmington Canal Greenway State Park since § 23-4-1(c) aligns with various principles underpinning our Nation's tradition of regulating firearms, including in government-controlled locations that are often crowded, frequented by children, and used for recreational, educational, and scientific purposes.

II. Whether the district court properly denied Plaintiff-Appellant's motion for a permanent injunction.

1

## INTRODUCTION

For over 100 years, Connecticut's state parks and forests have provided children, families, and others with places to relax, socialize, and assemble for recreational, educational, and other purposes. That was their primary purpose, as these discrete locations trace their roots to the American parks movement, which sought to combat the perils of industrialization, strengthen community bonds, and improve society through recreation in nature. To ensure that parks and similar government-controlled outdoor spaces born from this movement lived up to their intended purposes, governments across the Nation banned firearms from such locations at inception. That was because the unauthorized presence of guns—even if passively carried for self-defense—was believed to undermine the key purpose of such locations as society-improving devices since guns risked interfering with all people's ability to recreate in natural scenery peacefully and without alarming (and potentially life-threatening) distractions.

Section 23-4-1(c) is deeply rooted in this Nation's history and tradition of regulating firearms and aligns with principles underpinning that tradition. The district court agreed, reasoning that § 23-4-1(c) had

2

lawful applications because it applied to locations that were typically crowded, frequented by children, and used for recreational, educational, and scientific purposes. The district court relied largely on *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) ("*Antonyuk II*"), binding precedent that Plaintiff, David J. Nasri, does not dispute the district court properly followed but now suggests this Court should ignore or overrule. Specifically, Plaintiff claims *Antonyuk II* wrongly determined that the Founding era does not receive dispositive weight in Second Amendment challenges, and that there is a well-established tradition of regulating firearms in locations that are typically crowded, frequented by children, and used for recreational, educational, or scientific purposes.

The district court was bound by *Antonyuk II*'s well-founded legal conclusions. This panel is too. And applying them here requires this Court to affirm because § 23-4-1(c)'s prohibition on carrying firearms in Connecticut's state parks and forests—which are often crowded, frequented by children, and used for recreational, educational, and scientific purposes—aligns with the principles underpinning our Nation's regulatory tradition.

3

## STATEMENT OF THE CASE

I. **Factual Background**

A. **Unprecedented social changes during the mid-1800s prompted the creation of modern public parks, along with similar government-controlled outdoor spaces in the years that followed, and firearms were uniformly banned in such locations at inception**

At the time of the Founding, there was no need to create and design respite places like the public parks we know today. *See* PA:466 (¶¶1-2).[1] That was principally because colonists had little desire or need for publicly owned outdoor spaces. PA:466 (¶2). Places like the Boston Common and other greenspaces existed then, but they were primarily used for utilitarian purposes like grazing livestock, military exercises, public executions, and dumping grounds. PA:466-67 (¶¶3-4); *see* PA:639.

---

[1] Citations to Plaintiff's appendix are PA:[page number(s)]. Citations to Plaintiff's special appendix are PSA:[page number(s)]. Citations to both correspond with the continuous pagination appearing at the bottom of Plaintiff's appendices. Citations to District Court documents are: Dist.Dkt. [number] at [page(s)]. Citations to district court filings correspond with ECF pagination appearing at the top of each document. Additionally, references to "Ex." correspond with the exhibits Commissioner Dykes submitted in support of her cross-motion for summary judgment; *see* Dist.Dkt. 81-4; PA:502-66; which this Court may consider. *See Hong Mai v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005); Fed. R. App. P. 10(a)(1); Fed. R. App. P. 30(a)(2) and (b)(1).

Things changed in the mid-1800s. PA:570 (¶6). By then, people considered cities socially degraded, noisy, polluted, and crime ridden. PA:570-71 (¶7). The American parks movement in the 1850s responded to such social ills, drawing on the idea that urban society was flawed and that parks could repair and reform society. PA:571 (¶8). The movement's philosophy was romantic, but straightforward: parks contained natural scenery that, when quietly and passively contemplated, could improve mental and physical health, and thus improve society. PA:572 (¶9). This novel idea of parks as places specifically designed for relaxation, repose, and recreation responded to unprecedented social concerns brought about by industrialization and inspired a new set of policies that spurred the creation of parks across the Nation. *See* PA:571-72 (¶¶8-10).

Broadly speaking, modern parks as we understand them today first emerged in cities, expanded to large open-spaced national parks under federal control, and then states created state-controlled parks. *See* PA:573 (¶13); Dist.Dkt. 81-14 at 47-60 (¶¶14-41) (Ex.134, Professor Terrence Young's declaration). Frederick Law Olmsted was a key figure during the parks movement, and Olmstedian ideals of peace, relaxation, and quiet enjoyment lay at the foundation of urban, national, and state

5

parks alike. PA:573 (¶¶14-15). The American conservation movement, which emerged in the latter half of the 1800s, also inspired such locations. PA:574 (¶¶16-17). Despite the two movements having some differences—one focused on parks, the other forests—both were linked at the hip, and locations growing out of both movements often shared physical characteristics. *See, e.g.,* Dist.Dkt. 81-14 at 8-9, 13-14 (¶¶23-25, 38) (Ex.133, Professor Leah Glaser's declaration); Dist.Dkt. 81-10 at 237. Ultimately, the outdoor government-controlled spaces that grew out of both movements sought to remedy the same social ills brought about by industrialization through relaxation, tranquility, and passive and active recreation. *See, e.g.,* Dist.Dkt. 81-14 at 3-4, 8-10, 13-17 (Ex.133, ¶¶12-14, 23-28, 38-41); Dist.Dkt. 81-14 at 49-50, 54-59 (Ex.134, ¶¶21-22, 30-35, 37, 40); Dist.Dkt. 81-15 at 403, 413 (¶¶21, 50) (Ex.165, Professor Leah Glaser's supplemental declaration).

At inception, firearms were uniformly banned in public parks and similar government-controlled outdoor spaces at municipal, federal, and state levels because the presence of guns in such locations—even if passively carried for self-defense—did not reflect proper behavior or decorum and risked interfering with all people's ability to recreate

peacefully in natural scenery. PA:574-76 (¶¶18-26); *see also* PA:502-15, 549-61 (excerpts of firearms prohibitions specifically dealing with parks and similar places).[2] People believed that the unauthorized carrying of guns constituted conduct that threatened to undermine such locations' key purpose of functioning as society-improving devices where all could strengthen their body and mind without potentially life-threatening interruptions (like the presence of a gun) that could distract them from nature's tranquil haven. *See* PA:574-76 (¶¶18-26). Firearms were also banned in such locations for conservation purposes, including to regulate hunting and preserve wildlife. PA:576 (¶27); *see* Dist.Dkt. 81-15 at 397-98, 404, 408-409 (Ex.165, ¶¶7, 10(a), 24, 34).

Firearms prohibitions were not limited to urban parks but, rather, also applied to geographically vast outdoor spaces that were distant and removed from society. *See* Dist.Dkt. 81-14 at 56, 58 (Ex.134, ¶¶32, 36). For example, in 1890, firearms were banned in Sequoia and Yosemite

---

[2] Commissioner Dykes submitted a chart providing relevant excerpts of historical analogues with Bates numbering citations to her exhibits, which Plaintiff made part of his appendix. PA:502-66.

National Parks.[3] Three years later, the Secretary of the Interior recommended banning firearms in Yellowstone National Park and, by 1897, the federal government banned firearms there absent permission and its 2.2 million acres. PA:575 (¶¶22-23); *see* Dist.Dkt. 81-14 at 110 (¶37) (Ex.135, Professor Saul Cornell's declaration). By 1936, the federal government banned firearms in all national parks. PA:575 (¶24)

## B. Connecticut's state parks and forests grew out of the modern parks and conservation movements and restricted firearms at inception

The parks movement took root in Connecticut by the early-1900s, with the same Olmstedian vision and purpose of parks laying at the foundation of Connecticut's state parks. *See* PA:576-77 (¶¶28-32). As that movement flourished, so did the linked conservation movement. *See* Dist.Dkt. 81-14 at 9-14 (Ex.133, ¶¶25, 32-38).

---

[3] The 1890 firearms prohibitions in Sequoia and Yosemite National Parks are part of Commissioner Dykes' appendix. *See* Defendant's Appendix ("DA"):32, 37. Although she did not submit them in support of her cross-motion for summary judgment, this Court may take judicial notice of them. *See CITGO Petroleum Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 387-88 (2d Cir. 2025); *Baltas v. Maiga*, 119 F.4th 255, 265 n.4 (2d Cir. 2024).

In 1914, Field Secretary Albert Turner—a central figure in the development of Connecticut's state parks—urged the adoption of "'rules and regulations'" prohibiting parkgoers from engaging in conduct that "'interfere[s] with the rights or enjoyment of others,'" which "'would involve the prohibition of firearms.'" PA:578 (¶36) (quoting Dist.Dkt. 81-14 at 16 (Ex.133, ¶41). By 1918, Connecticut banned firearms in state parks. PA:578 (¶37). And unsurprisingly, Olmstedian ideals and a desire to curb unauthorized or excessive hunting motivated the prohibition. PA:578 (¶¶36-38).

The firearms ban in Connecticut's state parks and forests has remained substantively unchanged since 1918, and is now contained in § 23-4-1(c) of the Regulations of Connecticut State Agencies, which provides in relevant part: "Hunting or carrying of firearms, archery equipment or other weapons, including but not limited to air rifles and slingshots, is not permitted in any state park or forest except as authorized by [DEEP]." PA:578-79 (¶¶39-40).

Today, the rationale behind § 23-4-1(c) is several-fold. *First*, it promotes safety in state parks and forests, many of which can become densely crowded. PA:579 (¶41). *Second*, consistent with Olmstedian

9

ideals, it helps to maintain state parks and forests as places of peace and quiet enjoyment where individuals, families, and children can enjoy nature peacefully. PA:580 (¶42); *see* PA:578 (¶36-37). *Third*, it promotes conservation goals and serves as the "'main'" hunting regulation for the Environmental Conservation Police ("EnCon")—DEEP's law enforcement arm—that makes it "'easier to stop poaching activity'" because the firearms prohibition allows EnCon officers to prevent unlawful hunting before it happens. PA:582 (¶47) (quoting Dist.Dkt.81-15 at 103-105 (Ex.159, Colonel Christopher Lewis' preliminary injunction testimony)); *see* PA:581 (¶46).

C. **Connecticut's state parks and forests continue to be places for respite, recreation, and tranquility that are often crowded, frequented by children, and used as places of assembly for educational and scientific purposes**

There are 142 discrete locations in Connecticut's state parks and forests system (110 parks and 32 forests). PA:57 (¶33). Collectively, they span approximately 255,000 acres (35,000 for parks, and 220,000 for forests), equating to approximately seven percent of Connecticut. PA:578 (¶35); *see* Dist.Dkt. 81-14 at 149 (¶36) (Ex.137, Thomas Tyler's declaration). Most locations have multiple uses and contain a

10

combination of beaches, camping grounds, picnicking areas, historic sites and other attractions, hiking trails, and forested areas. PA:582 (¶48). They are among Connecticut's most popular recreational destinations, particularly among children, families, and schools. PA:583, 588-90 (¶¶50, 74-75, 84-85). The number of annual visitors has "skyrocketed" in recent years, from an estimated 9-10 million in 2019 to 17 million in 2022. PA:583 (¶51).

Except for rare circumstances where Connecticut leases land from a third party, Connecticut owns all property within the parks and forests system, and DEEP exercises control over such locations. *See* Dist.Dkt. 81-14 at 149, 173 (Ex.137, ¶¶37, 101); Conn. Gen. Stat. §§ 23-4 and 23-5. Connecticut and DEEP leverage parks and forests as marketable commodities. *See* PA:599-602 (¶¶126-40). For example, in 2022, state parks and forests "generated $4.5 million in revenue[,]" accounting for "approximately 21% of [DEEP's] Parks Division's $21 million budget." PA:599 (¶130). And more broadly, Connecticut treats such locations as "key marketable assets" that have been "marketed or promoted in some form in approximately 90%" of marketing efforts to attract tourists to the state. PA:601-602 (¶¶139-40) (internal quotation marks omitted).

11

Given their popularity, many locations within Connecticut's state parks and forests system become densely crowded, and are places where people assemble for recreational, educational, and scientific purposes. *See, e.g.,* PA:583-88 (¶¶53, 67, 73). For instance, swimming areas and beaches can get so crowded that people practically must stand shoulder to shoulder. PA:585-86 (¶¶62-64); *see also* Dist.Dkt. 81-10 at 338-39 and Dist.Dkt. 81-15 at 3-6 (photographs). Larger-acreage locations can become crowded when visitors congregate at a scenic structure or historic site. PA:584 (¶¶55-56). People also crowd together in specific locations within the parks and forest system for special events like weddings, private parties, and conferences.[4] PA:586 (¶65); *see also* Dist.Dkt. 81-15 at 19-20, 23-28 (photographs of crowds). To manage crowding, DEEP established capacity limits for numerous locations—limits often reached, especially during busy summer months. *See* PA:584-85 (¶¶58-61).

What is more, people (particularly children and students) assemble in Connecticut's state parks and forests for educational and scientific

---

[4] People have also used certain locations for political activities—such as a state Senate campaign event at Hammonasset Beach State Park—and youth sporting events like high school and college cross-country meets. PA:586-87 (¶¶68-69).

purposes, including for school field trips to historic military sites, visits to one of the largest tracks of fossilized footprints in North America, and hands-on scientific educational experiences. *See* PA:586-96 (¶¶67, 73-85, 97, 113). Such use is consistent with their originally intended purposes. *See, e.g.,* Dist.Dkt. 81-14 at 17 (Ex.133, ¶43) (noting historical "common vision of parks as special places" "valued for[,]" among other things, "their recreational amenities, their scientific attributes, or their educational potential") (internal quotation marks omitted).

Children and families are *the* target audience of Connecticut's state parks and forest system. PA:588 (¶74). Indeed, a core mission is to encourage children and families "to come together through a shared appreciation of nature and the environment." PA: 587 (¶72). To that end, millions of children visit Connecticut's state parks and forests each year. PA:588 (¶75). And more granular details highlight the presence of children in such locations, with Dinosaur State Park attracting tens of thousands of children in recent years. PA:596-97 (¶¶ 114-15). In 2023, 21,771 visitors (42%) admitted to Dinosaur State Park's visitor center "were aged 12 and under" and 27,691 visitors (54%) were "aged 13 and older[.]" PA:596 (¶114); *see also id.* at 596-97 (¶115) (similar data

13

through August 2024). Schools also frequently utilize state parks and forests for field trips and as part of school curriculum. PA:590 (¶¶84-85).

Dense crowding and the presence of children exist throughout Connecticut's state parks and forest system. For instance, Sleeping Giant State Park is among Connecticut's most popular state parks, and its scenic observation tower becomes so crowded during peak season that people are almost shoulder to shoulder.[5] PA:592 (¶¶90, 93). That park reached its 200-vehicle capacity limit thirteen times in 2022, eleven times in 2023, and six times from January to June 2024. PA:593 (¶94). It has a campground utilized by a Youth Camping Program. PA:593 (¶96). And a nearby town has used it for educational purposes and summer programming, including sending public high school students there in 2022 to participate in a daily, four-week program to provide a "'place-based science educational experience[.]'" PA:593 (¶¶97-98) (quoting Dist.Dkt.81-14 at 194 (¶23) (Ex.139, Superintendent Gary Highsmith's declaration)).

---

[5] Sleeping Giant State Park is approximately .0004 percent of Connecticut. *See* PA:592 (¶89); Dist.Dkt. 81-14 at 149 (Ex.137, ¶36).

The Farmington Canal Greenway State Park is often crowded too, even by Plaintiff's own account.[6] During summer months and with good weather, thousands of people use it every day for recreation. PA:594 (¶102); *see* PA:594-95 (¶¶104-10). Plaintiff avoids using it at times because of too many people, which often occurs during summer, since the crowd density requires "bobbing and weaving" that he does not like to do when jogging. PA:594 (¶103) (internal quotation marks omitted); *see* Dist.Dkt. 81-15 at 80-81 (Ex.159, Plaintiff's preliminary injunction testimony); Dist.Dkt. 81-15 at 146-47 (Ex.160, Plaintiff's deposition testimony).

Put simply, various locations within Connecticut's state parks and forest system become densely crowded, are frequented by children, and are used as places of assembly for recreational, educational, and scientific purposes. PA:583 (¶53); *see, e.g.,* PA:584-98 (¶¶56, 65, 67, 74-85, 89-123). And such data illustrates that Connecticut's state parks and forests, consistent with their century-old purpose, continue to serve as welcoming places of respite and quiet enjoyment, where all people—particularly

---

[6] The Farmington Canal Greenway State Park is a twenty-five-mile-long trail. PA:594 (¶100).

15

children and families—can safely reconnect with nature and escape modern life. *See* PA:580 (¶42).

## II.   The District Court Rejects Plaintiff's Challenge to § 23-4-1(c)

Plaintiff sued Commissioner Dykes pursuant to 42 U.S.C. § 1983, claiming that § 23-4-1(c) violated his rights under the Second and Fourteenth Amendments to the United States Constitution because it was facially unconstitutional and as applied to two state parks (Sleeping Giant State Park and the Farmington Canal Greenway State Park) and one state forest (Naugatuck State Forest).[7] *See generally* Dist.Dkt. 68. The parties cross-moved for summary judgment. *See* Dist.Dkt. Nos. 74, 81, 83, 92.

Commissioner Dykes argued that Plaintiff failed to demonstrate that § 23-4-1(c) was facially unconstitutional because it had various lawful applications, including prohibiting firearms in locations that were typically crowded and/or frequented by children. *See* Dist.Dkt. 81-1 at 13-14, 20-47. Commissioner Dykes further argued that Plaintiff's as-applied

---

[7] The district court previously dismissed an amended complaint for lack of standing after a preliminary injunction hearing, but this Court reversed and remanded. *See Nastri v. Dykes*, 2024 U.S. App. LEXIS 7445 (2d Cir. 2024) (summary order).

challenge to Naugatuck State Forest failed because he lacked standing to pursue it and, in any event, § 23-4-1(c) constitutionally applied to the three above locations. *See id.* at 51-55.

The district court agreed. Among other things, it noted that "modern style parks" at the urban, national, and state levels emerged as part of the American parks movement and were principally intended to save society from the perils of industrialization and urbanization, with Olmstedian ideals laying at their foundation. *See* PSA:2-4. The court further noted that firearms were prohibited in such locations at inception for two overarching reasons: (1) "firearms interfered with natural scenery contemplation, the parks' purpose and function as places that improve mental health and society, and with the romantic ideals that inspired the park movement"; and (2) to promote "conservation purposes, including to preserve game by preventing or deterring unauthorized or excessive hunting[.]" PSA:5-6.

The court also stated that the parks and forests within the ambit of § 23-4-1(c) grew out of the same parks and conservation movements generating similar locations throughout the Nation, and that firearms were banned there at inception for the same reasons parks across the

17

Nation banned them. *See* PSA:6-7, 46. Furthermore, the court observed § 23-4-1(c) presently serves various purposes, including to "alleviate safety concerns, since many State park and forest properties become very crowded"; *id.* at 7; and is EnCon's "main hunting regulation that makes it easier to stop poaching activity" and "unlawful hunting before it happens[,]" thus promoting "conservation goals[.]" PSA:8-9 (internal quotation marks omitted).

Regarding the use of Connecticut's state parks and forests, the court stated that such locations frequently become densely crowded, including in isolated areas in "parks and forests covering larger acreages of land" where individuals "tend to congregate" at scenic, popular, or historic sites. PSA:11; *see id.* at 10-12. The court further noted that such locations are also often frequented by families, children, and students for recreational and educational purposes, and provided more granular descriptions of various locations illustrating that they become densely crowded and/or are frequented by children. *See* PSA:12-16.

The court therefore concluded that Commissioner Dykes demonstrated § 23-4-1(c) was facially constitutional and as-applied to Sleeping Giant State Park and the Farmington Canal Greenway State

18

Park.[8] After concluding that the Second Amendment presumptively protected Plaintiff's proposed course of conduct; *see* PSA:34-35; the court analyzed § 23-4-1(c) under a nuanced approach. *See* PSA:39-42. The court held that Plaintiff's facial challenge failed because § 23-4-1(c) had constitutional applications since it prohibited firearms in various locations that are typically crowded and serve as places for education, literary, or scientific purposes, and for social gatherings; *see* PSA:45-48; and are frequented by children. *See* PSA:48-50. Relatedly, the court rejected Plaintiff's as-applied challenges to Sleeping Giant State Park and the Farmington Canal Greenway State Park because there was no genuine dispute of material fact that both locations are typically crowded, and Sleeping Giant State Park serves as a place of assembly for recreational, educational, or scientific purposes and is frequented by children. *See* PSA:53-57. Thus, the court granted Commissioner Dykes' motion for summary judgment, denied Plaintiff's cross-motion, and denied Plaintiff's motion for a permanent injunction. PSA:57.

---

[8] The court concluded Plaintiff lacked standing to bring his as-applied challenge to Naugatuck State Forest and, therefore, did not address its merits. PSA:51-53. Plaintiff has forfeited any challenge to that determination. *See Antonyuk II*, 120 F.4th at 1007 n.63; PB:20 n.5.

19

## STANDARD OF REVIEW

This Court reviews de novo a ruling involving cross-motions for summary judgment. *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 719 (2d Cir. 2025). It will affirm the granting of summary judgment in favor of one party if, "on the record presented, considered in the light most favorable to the other party, no reasonable jury could have found in favor of the latter." *Id.*

## SUMMARY OF ARGUMENT

Plaintiff offers a bevy of arguments on appeal, but *Antonyuk II* forecloses most of them. For instance, he contends that 1791 receives dispositive weight in assessing § 23-4-1(c)'s constitutionality. Plaintiff's Brief ("PB"):24-27.[9] *Antonyuk II* rejected that notion. *See* 120 F.4th at 974. He also contends that there is no historical tradition of regulating firearms in locations that are typically crowded or frequented by children. *See* PB:36-38, 44-55, 59-65. But *Antonyuk II* (and our Nation's regulatory tradition) say otherwise. *See* 120 F.4th at 1019-38. And he faults the district court for applying a nuanced approach in assessing §

---

[9] Citations to Plaintiff's brief correspond with the ECF pagination appearing at the top of each page.

23-4-1(c)'s constitutionality, even though the regulation pertains to discrete locations in Connecticut born from the American parks movement and responded to unprecedented societal concerns brought about by industrialization. *See* PB:41-44. Again, *Antonyuk II* bars that contention because the "novelty of public parks" as we understand them today warrants a nuanced approach under *N.Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1, 27 (2022). *See* 120 F.4th at 1022 n.86. The district court properly followed these and other well-founded legal conclusions from *Antonyuk II*, so this Court should affirm.

*First*, Plaintiff does not argue that there were any genuine issues of material fact that many of Connecticut's state parks and forests, including Sleeping Giant State Park and the Farmington Canal Greenway State Park, are typically crowded, frequented by children, and/or used for recreational, educational, or scientific purposes. That concession is dispositive because our Nation has a well-established regulatory tradition of prohibiting firearms in such locations.

*Second*, the court properly rejected Plaintiff's facial challenge to § 23-4-1(c) because it aligns with our Nation's regulatory tradition. Whether this Court reviews the historical analogues that Commissioner

21

Dykes relied upon independently or in conjunction; *see United States v. Vereen*, 152 F.4th 89, 100 (2d Cir. 2025), *cert. denied*, 223 L.Ed 2d 536 (2026); § 23-4-1(c) has constitutional applications because it aligns with various principles underpinning our Nation's regulatory tradition, including those associated with (1) firearms restrictions in modern parks and other government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment, (2) firearms restrictions in locations that are typically crowded or frequented by children, (3) laws recognizing a landowner's right to exclude, and (4) firearms restrictions advancing conservation goals.

*Third*, because § 23-4-1(c) aligns with various principles underpinning our Nation's regulatory tradition, the court properly rejected Plaintiff's as-applied challenges to Sleeping Giant State Park and the Farmington Canal Greenway State Park. Notably, Plaintiff admitted that Sleeping Giant State Park is often crowded, frequented by children, and used for recreational, educational, and scientific purposes. And he also admitted that the Farmington Canal Greenway State Park is often crowded and used for recreational purposes. Those admissions—

22

standing alone—are sufficient to demonstrate that § 23-4-1(c) constitutionally applies to both locations.

*Finally*, the court properly denied Plaintiff's motion for a permanent injunction because he failed to demonstrate an actual success on the merits. But even if he demonstrated an actual success on the merits—which he did not—he is not entitled to sweeping, statewide injunctive relief because, at most, he would be entitled to injunctive relief only with respect to him and the two locations he visits: Sleeping Giant State Park and the Farmington Canal Greenway State Park.

## ARGUMENT

### I. The District Court Properly Granted Summary Judgment in Favor of Commissioner Dykes

"The Second Amendment protects an individual right to 'keep and bear Arms,' but that right is not unlimited." *National Assn. for Gun Rights v. Lamont*, 153 F.4th 213, 221 (2d Cir. 2025) ("*NAGR*"), *pet. certs. filed*, Nos. 25-421 (Oct. 3, 2025) and 25-566 (Nov. 7, 2025); *accord District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). To assess the constitutionality of a firearms regulation, this Court applies *Bruen*'s "two-step framework[.]" *N.Y. State Firearms Assn. v. James*, 157 F.4th 232, 244 (2d Cir. 2025).

At step one, Plaintiff must demonstrate that the Second Amendment's plain text covers the specific conduct he seeks to engage in. *See United States v. Gomez*, 159 F.4th 172, 176 (2d Cir. 2025), *cert. denied*, __ S. Ct. __ (March 23, 2026); *Frey v. City of New York*, 157 F.4th 118, 127 (2d Cir. 2025). If Plaintiff meets his burden, the conduct is "presumptively protect[ed]," and only then will the Court proceed to the next step. *See Bruen*, 597 U.S. at 24; *Frey*, 157 F.4th at 217.

Commissioner Dykes bears the burden at step two to demonstrate that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To meet this burden, she need not identify "'a dead ringer' or a 'historical twin.'" *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 30). Rather, a challenged regulation is lawful if "'relevantly similar'" laws exist in our Nation's regulatory tradition. *See id.* (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* Under *Bruen*, a challenged law survives attack if it imposes a "*comparable* burden on the right of armed self-defense and . . . that burden is *comparably* justified" when compared to historical analogues. 597 U.S. at 29 (emphasis added). Commissioner

24

Dykes prevails if § 23-4-1(c) is "consistent with the principles that underpin our regulatory tradition."[10] *Rahimi*, 602 U.S. at 692. Thus, "what matters in the search for historical antecedents of modern firearms regulations is the *substance* of the regulation, rather than the *form*." *Antonyuk II*, 120 F.4th at 997 (emphasis in original).

### A. Plaintiff does not challenge the district court's determination that there was no genuine dispute of material fact but, in any event, no such dispute existed

Plaintiff does not present any factual or legal argument regarding any genuine dispute of material fact. He instead contends that the court erred because Commissioner Dykes was not entitled to judgment as a matter of law since state parks and forests are not "sensitive places." *See* PB:13-14, 21-22. Plaintiff has therefore abandoned any contention regarding a genuine dispute of material fact, so that issue is not presented. *See Debique v. Garland*, 58 F.4th 676, 684 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2715 (2024); *cf. Doherty v. Bice*, 101 F.4th 169, 175 n.3 (2d Cir.), *cert. denied*, 145 S. Ct. 381 (2024).

---

[10] Despite *Rahimi*'s clarification of the appropriate analysis; *see Vereen*, 152 F.4th at 99; Plaintiff appears to ignore *Rahimi* by only citing to it once in referencing the district court's conclusion that he met his burden at *Bruen*'s first step. *See* PB:23.

Regardless, the court properly determined that no genuine dispute of material fact existed under governing law. PSA:45; *see Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 220-22 (2d Cir. 2023); *Hayes v. Dahlke*, 976 F.3d 259, 267-68 (2d Cir. 2020). Plaintiff admitted in his Local Rule 56(a)(2) statement that various state parks and forests, including Sleeping Giant State Park and the Farmington Canal Greenway State Park, can become densely crowded, and/or are used for recreational, educational, and scientific purposes. *See* PA:583-95 (¶¶53-56, 62-70, 73, 84, 93-97, 102-10). He further admitted that children and students frequent such locations, including Sleeping Giant State Park. PA:586-93 (¶¶67, 73-85, 96-98). He posits that Sleeping Giant State Park and the Farmington Canal Greenway State Park are more akin to a "rural park" like New York's Adirondack Park. *See* PB:66-68; *Antonyuk II*, 120 F.4th at 1025-26. Plaintiff is wrong about that. *See* Argument, Part I.D, below. But in any event, his attempted analogy does nothing to create a genuine dispute of material fact that various state parks and forests are often densely crowded, frequented by children, and used for recreational, educational, and scientific purposes.

26

### B. The district court properly concluded that § 23-4-1(c) is facially constitutional because § 23-4-1(c) aligns with history and tradition

Plaintiff bears a heavy burden for his facial challenge. To prevail, he "must establish that no set of circumstances exists under which [§ 23-4-1(c)] would be valid, or show that the law lacks a plainly legitimate sweep." *Antonyuk II*, 120 F.4th at 983 (internal quotation marks omitted). So long as § 23-4-1(c) has some constitutional application, Plaintiff cannot prevail. *Rahimi*, 602 U.S. at 693.

Commissioner Dykes demonstrated that § 23-4-1(c) aligned with various principles underpinning our Nation's regulatory tradition. Whether historical analogues are viewed independently or together with one another; *see Vereen*, 152 F.4th at 100; § 23-4-1(c) has constitutional applications because it aligns with our Nation's regulatory tradition of (1) restricting firearms in modern parks and other government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment, (2) firearms restrictions in locations that are typically crowded or frequented by children, (3) laws recognizing a landowner's right to exclude, and (4) firearms restrictions advancing conservation goals.

27

### 1. The district court properly considered Reconstruction era laws and applied a nuanced approach

Preliminarily, this Court should reject Plaintiff's attempt to reframe the analytical rubric by asking this Court, for example, to treat the Founding era as dispositive or demand "dead ringers," rather than applying *Bruen*'s nuanced approach and principles underpinning our Nation's regulatory tradition.

*First*, Plaintiff contends the district court improperly assessed § 23-4-1(c)'s constitutionality because it could not look to Reconstruction era analogues without first identifying a comparable Founding era analogue. *See* PB:21, 24-27. That argument fails because *Antonyuk II* rejected it: when assessing a state law like § 23-4-1(c), 1791, 1868, and "the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." 120 F.4th at 974; *see Zherka v. Bondi*, 140 F.4th 68, 78 n.14 (2d Cir. 2025), *cert. denied*, 223 L.Ed. 2d 255 (2026). *Antonyuk II* agreed with various other courts on that score. 120 F.4th at 973-74. And it noted that courts can focus their analysis on Reconstruction era evidence because such evidence is "at least as relevant" as that of the Founding era. 120 F.4th

28

at 988 n.36; *see id.* at 987-88; *cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 231, 263-64 (2023) (Thomas, J., concurring) (describing ratification of Fourteenth Amendment as Nation's "second founding"). The district court was bound by that "well-considered conclusion of law[,]" and this panel is too. *Giambalvo v. Suffolk County*, 155 F.4th 163, 177 n.4 (2025); *see also Frey*, 157 F.4th at 130 (noting that "the dearth of similar Founding-era laws does not help us discern with clarity the scope of the Second Amendment right" and that courts, "rather than shrugging our shoulders . . . must instead continue our march through history to ascertain" meaning of Second Amendment's text).

*Second*, Plaintiff faults the district court for applying *Bruen*'s nuanced approach without allegedly articulating an unprecedented societal concern prompting firearms prohibitions like that here. *See* PB:22, 41-44. But even assuming such an unprecedented societal concern needed to be identified post-*Rahimi* to demonstrate that a modern regulation is "relevantly similar" to historical analogues; 602 U.S. at 692 (internal quotation marks omitted); *see also Vereen*, 152 F.4th at 99 ("Without first holding that [18 U.S.C. § 922(g)(8)] implicated

29

unprecedented societal concerns or dramatic technological changes, *Rahimi* applied the 'relevantly similar' framework."); *Bruen's* nuanced approach applies because *Antonyuk II* already held that Founding generations could not have imagined the need for modern parks, let alone the need to create them as a remedy to unimaginable social illnesses industrialization caused. *See* 120 F.4th at 1022 n.86; *see also Zherka*, 140 F.4th at 80 (noting that "evolving public health crisis" regarding gun violence warranted nuanced approach). And even if this Court were writing on a blank slate, Plaintiff ignores the unprecedented societal concern Commissioner Dykes articulated about why lawmakers enacted firearms restrictions in modern parks and similar government-controlled outdoor spaces. That unforeseen societal concern was not simply the "effect" that firearms have "on the general public and the dangers posed by allowing them into areas frequented by children." PB:43. Instead, lawmakers created modern parks and similar government-controlled spaces to remedy industrialization's social ills, and they banned the unauthorized presence of firearms in such locations because guns threatened to undermine the key purpose that those locations served,

30

namely, functioning as peaceful, serene, and welcoming society-improving devices. *See* Dist.Dkt. 92 at 7-8.

*Third*, Plaintiff attempts to flip the "relevantly similar" analysis on its head by relying on a passing footnote in *Bruen* to contend that "historical ambiguities" must be read in his favor; PB:38; because, according to him, "the government must point to clear and unambiguous historical laws and cases to justify its regulation." PB:40; *see also Bruen*, 597 U.S. at 44 n.11 (discussing Statute of Northampton and English common law and noting that Court would "favor" interpretation "that is more consistent with the Second Amendment's command"). But the cited footnote in *Bruen* is ambiguous at best because it is unclear what consistency with "the Second Amendment's command" means, especially considering the "relevantly similar" metrics. *See* 597 U.S. at 29-30, 44 n.11. And in any event, Plaintiff's contention fails because *Rahimi*—a decision he fails to substantively grapple with or otherwise acknowledge—makes clear that Commissioner Dykes need not identify "'a dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). She prevails if § 23-4-1(c) aligns with "principles" underpinning our Nation's regulatory tradition—which it does. *Id.* That

31

"higher level of generality" rubric; *Vereen*, 152 F.4th at 101; permits a flexible approach in search of principles, not the "clear and unambiguous historical laws" (i.e., dead ringers) that Plaintiff demands. PB:40.

> **2. Section 23-4-1(c) aligns with an unbroken regulatory tradition of prohibiting firearms in "modern" parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment**

Even though Commissioner Dykes was not required to submit "dead ringers" to § 23-4-1(c), she did. *See Rahimi*, 602 U.S. at 692. *Antonyuk II* had before it only "eight examples" of municipal regulations prohibiting firearms in urban parks. 120 F.4th at 1022. The present record is different and establishes a robust and unbroken regulatory tradition of prohibiting—at inception—firearms in public parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment.

Commissioner Dykes submitted more than 100 ordinances, regulations, and laws from municipalities, states, and the federal government—starting in 1858 and extending through the early-twentieth century—prohibiting firearms in modern parks and similar government-controlled outdoor spaces set aside for the public's peaceful

32

and quiet enjoyment, including prohibitions in geographically vast locations. The district court did not base its decision on this unbroken tradition, but this Court may affirm on any ground that finds support in the record. *See N.Y. State Firearms Assn.*, 157 F.4th at 244. And this regulatory tradition is reason enough to affirm because such firearms prohibitions are "dead ringers" to § 23-4-1(c), imposing a comparable burden on Second Amendment rights (total bans—i.e., the "how") that were comparably justified (preserving tranquility and safety, while also promoting conservation goals, in parks and similar government-controlled outdoor locations—i.e., the "why").

Between 1858 and 1888, at least fourteen municipalities prohibited guns in public parks. *See* PA:502-505, 549-50 (Exs.1-17, 202-204); *Antonyuk II*, 120 F.4th at 988 n.36. Such restrictions applied to "the entire population of the nation's five largest cities" around that time. Dist.Dkt. 81-14 at 108-109 (Ex.135, ¶34) (referring to New York City, Chicago, Philadelphia, St. Louis, and Boston); *see Antonyuk II*, 120 F.4th at 1023. That trend continued, with twenty-one more cities prohibiting guns in public parks in the 1890s, twenty more in the 1900s, and many

others throughout the 1910s and 1920s. *See* PA:505-15, 550-58 (Exs.18-68, 205-209, 212, 214, 219, 221-22, 224-27, 230).

Such prohibitions were not limited to urban parks. They existed in geographically vast and rural locations too. When the federal government—which unquestionably was constrained by the Second Amendment—began creating national parks that "were large" and "relevantly distant from most of America's population"; Dist.Dkt. 81-14 at 56 (Ex. 134, ¶32); guns were prohibited in such locations. *See* PA:514-15, 551-56. By 1882, firearms were banned in Mackinac National Park in Michigan. *See* K. Still et al., The History and Tradition of Regulating Guns in Parks, 19 HARV. L. & POL'Y REV. 201, 226 (2024). In 1890, the federal government banned firearms in Sequoia and Yosemite National Parks. DA:32, 37. Moreover, as Professor Terrence Young explained, Yellowstone National Park spanned "approximately 2.2 million acres" when it was established—a rural place by any metric. *See* Dist.Dkt. 81-14 at 56 (¶32). By 1897, the federal government banned firearms there absent permission. *See* Dist.Dkt. 81-14 at 110 (¶37); PA:551-52 (Exs.210-11). So, too, in Crater Lake National Park (1902), General Grant National Park (1902), Mount Rainier National Park (1903), Mesa Verde

34

National Park (1908), and many other national parks in the years that followed. *See* PA:514-15, 553-56 (Exs.69-70, 215-18, 223). The District of Columbia and states around this time prohibited guns in cities and state parks. *See* PA:510, 513-60 (Exs.44, 62, 66, 213, 220, 228-29, 231-40). And by the 1930s, at least nineteen states prohibited firearms in parks and similar government-controlled outdoor spaces, reflecting a settled practice that guns could be prohibited in such locations. *See Antonyuk II*, 120 F.4th at 989 n.41; *see generally* Dist.Dkt 81-18 at 1-194 (Exs.241-43, 1936 United States Department of the Interior compilation of laws and regulations for state parks).

Notably, *Antonyuk II* endorsed identifying a historical tradition of firearms regulations by looking to widespread municipal regulations from the Reconstruction era when it analyzed a challenge to the discretionary decision-making intrinsic to New York's licensing scheme. *See* 120 F.4th at 988-94 and nn.36-37. *Antonyuk II* was "not troubled that many licensing schemes originated in the cities of the post-Civil War period" because "[l]icensing was the result of changes in American society in the nineteenth century, including urbanization[.]" *Id.* at 992.

35

This Court should not be troubled by relying on widespread municipal regulations either. The practice throughout the Nation in the mid-1800s and into the early-twentieth century regarding firearms prohibitions in parks and similar government-controlled outdoor spaces initially began in cities, and that unbroken practice settled an understanding that firearms could be prohibited in parks and similar government-controlled outdoor spaces. *See id.* at 990. Indeed, "a regular course of practice may settle a constitutional debate at *any* point in our history," where, as here, the question of whether firearms could constitutionally be banned in such locations remained an open question. *Frey*, 157 F.4th at 131 (emphasis in original); *see NAGR*, 153 F.4th at 242-43.

This unbroken regulatory tradition establishes that firearms were prohibited in parks and similar government-controlled outdoor spaces set aside for the public's quiet use and enjoyment because: (1) the presence of guns—even if passively carried for self-defense—did not reflect proper behavior or decorum in such locations and threatened to undermine their key purpose of functioning as society-improving devices where all could strengthen their mind and body without alarming and potentially life-

36

threatening interruptions (like the presence of a gun) that would distract people from nature's tranquil haven; and (2) to promote conservation purposes, including to regulate hunting and preserve wildlife.[11] *See* PA:574-76 (¶¶18-27).

The above historical analogues are "dead ringers" to § 23-4-1(c). Like its predecessors, § 23-4-1(c) bans unauthorized firearms from public parks and similar government-controlled outdoor spaces that, by design, are intended to be places of relaxation, tranquility, and recreation (i.e., the "how"). *See* PA:578-80 (¶¶36-42). And it does so for two comparably justified reasons (i.e., the "why"): (1) the unauthorized presence of guns threatens to undermine such locations' foundational ideals because guns can create alarming and potentially life-threatening distractions that risk deterring people from using such society-building safe havens; and (2) the firearms prohibition promotes conservation goals, serving as EnCon's main hunting regulation that helps to prevent unauthorized hunting before it happens. *See* PA:578-82 (¶¶36-41, 46-47); *Kipke v.*

---

[11] The undisputed reasons for such firearms prohibitions demonstrate that they were not simply designed to address "terrorizing people." PB:57.

*Moore*, 165 F.4th 194, 215-16 (4th Cir. 2026); *Antonyuk II*, 120 F.4th at 1024.

*Kipke* is instructive. There, the Fourth Circuit rejected a challenge to firearms prohibitions in state parks, state forests, and Chesapeake Forest Lands in Maryland.[12] *See Kipke*, 165 F.4th at 214-16. The defendants demonstrated that firearms were banned in urban parks at inception and that analogues were relevantly similar to the challenged law—i.e., a total ban (the "how") to preserve the tranquility of parks (the "why")—so the Court upheld the firearms ban in state parks. *See id.* at 215. The Fourth Circuit based that determination on its assessment of the firearms prohibitions in parks that prior courts discussed—analogues *fewer* in number than the record before this Court. *See, e.g., id.* at 215 (citing *Antonyuk II*, 120 F.4th at 1022 ("eight examples") and *Wolford v.*

---

[12] The forested lands in *Kipke* totaled approximately 274,000 acres. *See* Code of Md. Regs. 08.01.07.02(D); Maryland Department of Natural Resources, Forest Service, Maryland's State Forest, available at https://dnr.maryland.gov/forests/pages/mdforests.aspx#:~:text=%E2%80 %8B%E2%80%8B%E2%80%8BThe%20Maryland,a%20number%20of%2 0recreational%20opportunities. (last visited March 18, 2026). This Court properly may take judicial notice of material on government websites. *See Frey*, 157 F.4th at 135 n.8. Additionally, similar to Connecticut's state parks and forests, Maryland "allow[s] hunting and target shooting on certain state lands." *Kipke*, 165 F.4th at 214 n.6.

*Lopez*, 116 F.4th 959, 982-83 (9th Cir. 2024) (twenty seven examples), *cert. granted*, 146 S. Ct. 79 (2025)); *see also Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 585-86 (D. Md. 2023) (denying preliminary injunction challenging firearms restriction in parks and relying on seventeen parks restrictions enacted by states and municipalities between 1857 and 1921, and cited as support in *Wolford*), *appeal held in abeyance*, 2024 U.S. App. LEXIS 4132 (4th Cir. 2024). Furthermore, *Kipke* (as in *Antonyuk II* and *Wolford*) did not find any "evidence that courts questioned the constitutionality" of such firearms prohibitions in parks. *Id.* at 215 n.7. And notably, "[t]he same logic" *Kipke* applied to uphold the firearms prohibition in state parks justified upholding the firearms ban in forested lands because they were "sufficiently analogous to state parks[.]" *Id.* at 215-16.

Like *Kipke*, there can be no reasonable dispute that, when parks and similar government-controlled outdoor spaces set aside for the public's peaceful and quiet enjoyment "first arose in modern form," lawmakers promptly "began to regulate the possession of firearms" in such locations. 165 F.4th at 215 (internal quotation marks omitted); *see* PA:574-76 (¶¶18-27). And just as "Maryland's forests offer diverse and

39

substantial recreational and educational opportunities"; *Kipke*, 165 F.4th at 215; Connecticut's parks and forests do too, rendering them sufficiently analogous to one another. "Families and children are *the* target audience of" Connecticut's parks and forests; PA:588 (¶74) (emphasis added); millions of children and adults utilize them for recreational, educational, and scientific purposes (as they are intended to be used), and many locations within Connecticut's parks and forests system become densely crowded. *See* PA:576-93 (¶¶26, 42, 53-56, 75, 84-85, 96-98).

Plaintiff unpersuasively offers several arguments to discount these "dead ringers." *First*, he asserts that municipal regulations "did not reflect a broad, well-established national tradition restricting firearms carriage in public places, including public parks." PB:57. The record proves otherwise. Moreover, Plaintiff's contention fails because it hinges on his mistaken assertions that this Court cannot assess § 23-4-1(c) by focusing on the period around 1868 (an argument *Antonyuk II* forecloses) and that "modern" parks are akin to Founding era greenspaces (an assertion courts have repeatedly rejected based on the differing primary purposes between modern parks and Founding era greenspaces). PB:55-

57; *see Kipke*, 165 F.4th at 214-15; *Frey*, 157 F.4th at 128; *Antonyuk II*, 120 F.4th at 974, 988-90, 1025; *Wolford*, 116 F.4th at 982; *People v. Temple*, 271 N.E.3d 64, 74-75 (Ill. App. 2025), *cert. denied*, 274 N.E.3d 100 (2026).

*Second*, he claims that parks regulations are "poor models of constitutionality" because they burdened First Amendment rights. PB:58. But even if such analogues "might well be deemed unconstitutional today on First and Fourteenth Amendment grounds, [t]hey are . . . relevant to the Second Amendment historical analysis that *Bruen* requires[.]" *Vereen*, 152 F.4th at 103 (internal quotation marks omitted).

*Third*, Plaintiff contends that this Court should discount the unbroken tradition of regulating firearms in modern parks and similar government-controlled outdoor spaces because they "escaped" judicial review before *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), determined that the Second Amendment applied to the states. *See* PB:58. He fails to explain, though, why judicial review was unavailable to challenge the firearms prohibitions in geographically vast *federally* controlled lands like Yellowstone National Park. Nor does he present

41

any evidence of constitutional challenges to firearms restrictions in such rural, federally controlled locations. What is more, many states have their own state constitutional provisions relating to the right to bear arms and had them long before *McDonald*. *See Heller*, 554 U.S. at 585 and n.8; E. Volokh, State Constitutional Rights to Keep and Bear Arms, 11 TEX. REV. L. & POLITICS 191 (2006). Prior to *McDonald*, individuals could have challenged local ordinances or state laws prohibiting firearms in parks or similar government-controlled outdoor spaces as violating their right to bear arms under state constitutional provisions.[13] *See Kachalsky v. County of Westchester*, 701 F.3d 81, 90-91 (2d Cir. 2012), *cert. denied*, 569 U.S. 918 (2013), *abrogated on other grounds by Bruen*. How people understood such state constitutional provisions informs the Second Amendment's meaning. *See Heller*, 554 U.S. at 600-601; *Rahimi*, 602 U.S. at 719-20 (Kavanaugh, J., concurring). So Plaintiff's failure to present any authority challenging firearms

---

[13] For example, in 1790, Pennsylvania had a state constitutional provision securing for individuals the right to "bear arms in defence of themselves[.]" *See* PA. CONST. art 1, § 21. In 1868, Pennsylvania passed one of the earliest laws prohibiting firearms in a public park. *See* PA:502 (Ex.3). Plaintiff failed to demonstrate that Pennsylvania's 1868 firearm prohibition in a park was ever challenged or held unconstitutional.

prohibitions in parks and similar government-controlled government outdoor spaces confirms what courts have recognized: the prohibitions "were not merely adopted by legislative bodies" but, rather, "they were apparently accepted without any constitutional objection by anyone." *Antonyuk II*, 120 F.4th at 1022; *see Kipke*, 165 F.4th at 215 n.7. That reality highlights the Nation's understanding that such restrictions were constitutional.

### 3. Section 23-4-1(c) is consistent with our Nation's well-established history and tradition of prohibiting firearms in crowded locations

Even if the above dead ringers were not enough to affirm—which they are—the district court nonetheless properly rejected Plaintiff's facial challenge to § 23-4-1(c) because the firearms prohibition aligns with principles running through our Nation's regulatory tradition of banning firearms in places where people crowd together, including for recreational, educational, or scientific purposes.

*Antonyuk II* repeatedly recognized and applied a well-established tradition of regulating firearms in typically crowded locations. *See* 120 F.4th at 1019-38. It reached that legal conclusion based on: (1) the Statute of Northampton and Founding era "going armed" laws in Virginia

43

(1786), North Carolina (1792), and the District of Columbia (1816); (2) three Reconstruction era laws in Tennessee (1869), Texas (1870), and Missouri (1883); and (3) two laws from the Arizona (1889) and Oklahoma (1890) territories.[14]  *See id.* at 1019-21 and n.81.  This Court reaffirmed *Antonyuk II*'s legal conclusion regarding a national tradition of prohibiting firearms in crowded locations in *Frey,* 157 F.4th at 132 and 133 n.6.

Commissioner Dykes relied on the same authority the Court cited in *Antonyuk II* to demonstrate a well-established tradition of banning firearms in locations where crowds gather for social, recreational, educational, scientific, and other purposes.  *See* PA:517-22, 562 (Exs.78, 80, 83, 86, 95, 97, 244-45).  But she also built on that historical record.

For example, in 1870, Georgia prohibited individuals from carrying "about his or her person . . . any pistol or revolver . . . to . . . any other public gathering in this State, except militia muster-grounds."  PA:518

---

[14] The state Supreme Courts in Texas, Tennessee, and Missouri upheld as constitutional such firearms prohibitions.  *See Antonyuk II*, 120 F.4th at 1021 (discussing *English v. State*, 35 Tex. 473, 478-79 (1872), *Andrews v. State*, 50 Tenn. 165, 181-82 (1871), and *State v. Shelby*, 90 Mo. 302, 305 (1886)).

(Ex.84). In 1889, the territory of Idaho made it unlawful for anyone other than specified security personnel or government officials "to carry, exhibit or flourish . . . any pistol, gun, or other deadly weapons . . . in any public assembly of Idaho Territory." PA:522 (Ex.96). When New Orleans, Louisiana had approximately 216,000 inhabitants in 1882, that city prohibited any person from "carry[ing] a dangerous weapon, concealed or otherwise, into any theatre, public hall, tavern, pic-nic ground . . . or other place for public entertainment or amusement." PA:521 (Ex.93); *see also* PA:518 (Ex.82) (New Orleans ordinance from 1831); Census.gov, *Louisiana, New Orleans*, page 213 available at https://www2.census.gov/prod2/decennial/documents/1880a_v19-04.pdf (last visited March 22, 2026) (listing aggregate population in New Orleans in 1880 as "216,090"). And enactments from Missouri (1874, 1879) and Montana (1903, 1907) prohibited concealed or partially concealed firearms in places of recreation, education, socialization, or public assembly. PA:519-24 (Exs.88, 91, 102-103). So contrary to Plaintiff's patently false assertion that there is "*no* historical tradition of prohibiting the bearing of arms for personal self-defense" in locations

45

where people crowd together; PB:44 (emphasis added); history proves otherwise.

Consistent with that well-established tradition, the district court properly concluded that Connecticut's state parks and forests are crowded locations where people group densely together, including for recreational, educational, or scientific purposes. *See* PSA:46-48. Plaintiff admitted—as he must—that various locations within Connecticut's state parks and forest system become densely crowded, particularly during peak season, and where people sometimes stand shoulder to shoulder. PA:583-86, 592-94 (¶¶53-67, 93-94). The record is replete with examples, but the crowding that can be found at Hammonasset Beach State Park, which hosts approximately 3 million people every year, is more than sufficient to demonstrate that § 23-4-1(c) has at least one lawful application to a typically crowded location. PA:597-98 (¶¶120-21); *see* Dist.Dkt. 81-10 at 339 (Ex.115); *Frey*, 157 F.4th at 134-35.

There is also no dispute that people, particularly children and students, assemble in Connecticut's state parks and forests for educational and scientific purposes. PA:586-90 (¶¶67, 73, 82-84). Indeed, Connecticut's parks were designed with "scientific attributes, or

46

. . . educational potential" in mind.  Dist.Dkt. 81-14 at 17 (Ex.133, ¶43). Again, the record is replete with examples, but § 23-4-1(c) has at least one lawful application to a place where crowds assemble for educational and scientific purposes: Dinosaur State Park, which caters to tens of thousands of children each year, partially because it has one of the largest tracks of fossilized dinosaur footprints in North America, and is where schools often send students on fieldtrips as cost-effective ways to enhance course curricula.  *See* PA:590, 596-97 (¶¶84, 113-15); *Kipke*, 165 F.4th at 217; *Antonyuk II*, 120 F.4th at 1027, 1038.

Even if the above examples were not enough to show that § 23-4-1(c) has constitutional applications—which they are—locations *within* various state parks and forests (particularly buildings, structures, or other areas that are scenic or popular) are often crowded or frequented by groups of people, including children, for recreational, scientific, political, and/or educational purposes.  For example, people have weddings at places like Harkness Memorial State Park's Eolia Mansion or Gillette Castle State Park.  PA:582-86 (¶¶49, 65).  And Hammonasset Beach State Park and Dinosaur State Park have nature centers that cater to thousands of children each year.  PA:596-98 (¶¶113-15, 122).  So

47

§ 23-4-1(c) has constitutional applications because it lawfully applies to at least some subsets of Connecticut's state parks and forests. *See LaFave v. County of Fairfax*, 149 F.4th 476, 481-84 (2025), *cert. denied*, __ S. Ct. __ (March 9, 2026).

Section 23-4-1(c) thus aligns with history and tradition. It imposes a comparable burden on the right to bear arms that is comparably justified because it prohibits firearms in discrete locations without any exception for self-defense (i.e., the "how") as a way to maintain order and peaceable assembly in often crowded, heavily trafficked places that also offer educational and scientific opportunities (i.e., the "why"). *See Antonyuk II*, 120 F.4th at 1024, 1027, 1031, 1038; *Christian v. James*, 2025 U.S. Dist. LEXIS 3940, at *2 (W.D.N.Y. Jan. 8, 2025), *on appeal*, No. 25-384 (argued June 25, 2025); *see also Koons v. Attorney General of N.J.*, 156 F.4th 210, 258 (3d Cir. 2025) (concluding "Nation's history of firearm regulation embraces regulating the carry of firearms in parks and similar locations of recreation and amusement"), *opinion vacated, rehearing en banc granted*, 162 F.4th 100, 101 (3d Cir. 2025).

Plaintiff's contrary arguments are unavailing. He concedes that *Antonyuk II* made a legal "conclusion" that a tradition of regulating

48

firearms in typically crowded locations exists, but asks this Court to reverse that conclusion based on the threadbare "additional historical evidence that [he] presented[.]" PB:36-37. Plaintiff spills much ink on this argument, principally based on his contentions that the Statute of Northampton and its American counterparts (like in Virginia and North Carolina) were not location-based restrictions but, rather, conduct-based prohibitions. *See* PB:44-52. His arguments fail for several reasons.

*First*, under this Court's rules and practice, this panel is bound by *Antonyuk II*'s holding that a well-established tradition of regulating firearms in typically crowded locations exists and cannot overrule it. *See Giambalvo*, 155 F.4th at 177 n.4. Notably, *Frey* recognized that tradition in noting that Reconstruction era statutes "more than adequately establish the robustness of the historical tradition" of prohibiting firearms in such locations. 157 F.4th at 133 n.6

*Second*, Plaintiff's contention is mistakenly premised on his claim that the Founding era receives dispositive weight in analyzing our Nation's tradition of regulating firearms. *See* PB:53. Again, *Antonyuk II* holds otherwise. *See* 120 F.4th at 974.

49

*Third*, Plaintiff unconvincingly contends that the Reconstruction era laws *Antonyuk II* relied upon should be discounted because they are "inconsistent with and extreme outliers" in comparison to affray laws. *See* PB:53-54. Regardless of whether the Statute of Northampton and its American counterparts require a conduct element, specifically terrorizing others (something *Antonyuk II* found unpersuasive); *see Antonyuk II*, 120 F.4th at 1020 n.82 and 1039; such laws still reflect that Founding era "lawmakers were sensitive to the potential mayhem gun-wielding may cause in crowded locations, but do not provide clarity into how far they understood they could legislate to mitigate those concerns." *Frey*, 157 F.4th at 133 n.6. Such laws underscore a principle that lawmakers could prohibit firearms in crowded locations, "even if another condition is required to complete the violation." *Schoenthal v. Raoul*, 150 F.4th 889, 912 (7th Cir. 2025), *cert. denied*, __ S. Ct. __ (2026) (April 6, 2026). Put simply, such Founding era evidence is "inconclusive" at best for Plaintiff regarding whether guns could be banned from crowded places and, therefore, not inconsistent with Reconstruction era legislation. *See Frey*, 157 F.4th at 133 n.6.

50

*Finally*, Plaintiff unpersuasively relies on three early-seventeenth century laws from Virginia (1619), Massachusetts (1636-37), and New Haven (1646) to contend that our Nation's history reveals a tradition of requiring people to bring firearms to crowded locations like church or public assemblies. PB:52-53. Such reliance fails because those laws "long predate" 1791 or 1868 and, therefore, do not "have much bearing" here, especially because they "contradict[] the overwhelming weight of other evidence." *Antonyuk II*, 120 F.4th at 969. They are also not relevantly similar because they imposed a legal duty on people to bring arms while gathered to protect colonists from raids or ambushes by Native Americans, so the "why" is different. *See Wolford*, 116 F.4th at 997; *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 n.42 (11th Cir. 2012), *cert. denied*, 568 U.S. 1088 (2013), *overruled on other grounds by Bruen*; PA:13 (¶29). And at any rate, laws requiring people to bring arms to certain locations as a legal *duty* for colonial protection is, at best for Plaintiff, inconclusive regarding the constitutional *right* to bear arms in such locations, which warrants a more searching review through history. *See Frey*, 157 F.4th at 133 n.6; *see also Koons*, 156 F.4th at 255 (discussing colonial-era statutes requiring colonists to bring firearms to

church services and noting that "an obligation to bear arms in *certain* locations is distinct from a license to do so at will in *any*") (emphasis in original).

> ### 4. Section 23-4-1(c) is consistent with our Nation's well-established history and tradition of prohibiting firearms in locations frequented by children

Section 23-4-1(c) also aligns with principles underlying our Nation's regulatory tradition of banning "firearms in spaces frequented by children," especially when such locations provide educational or scientific opportunities. *See Antonyuk II*, 120 F.4th at 1026-27 (citing *Bruen*, 597 U.S. at 30); *id.* at 1010 n.67 and 1019 n.80.

The record Commissioner Dykes relied upon substantially mirrors the record in *Antonyuk II*. *See id.* at 1027 (discussing laws in Texas (1870), Tennessee (1869), Missouri (1883), Arizona (1889), Oklahoma (1890)); PA:518-23, 562 (Exs.83, 86, 95, 97, 245); *see also* PA:520-23 (Exs.89 (1874 Texas) (similar to 1870 analogue), 100 (1893 Oklahoma) (similar to 1890 analogue), and 101 (1901 Arizona) (similar to 1889 analogue)). But Commissioner Dykes also built upon it, reinforcing a regulatory tradition of prohibiting firearms in locations frequented by

children and especially in places providing educational or scientific opportunities.

For example, although *Antonyuk II* discussed an 1883 Missouri statute, Missouri's prohibition on firearms carrying in "any school room or place where people are assembled for educational, literary or social purposes" originated at least four years earlier; PA:521 (Ex.91); and Missouri regulated firearms possession in such locations even earlier, albeit prohibiting "concealed" carry. *See* PA:519 (Ex.88 (1874 Missouri). In 1903, Montana prohibited individuals from carrying "concealed or partially concealed about his person a pistol or other firearm" in "any school room or other place where people are assembled for amusement or educational or scientific purposes[.]" PA:524 (Ex.102); *see id.* (Ex.103 (1907 Montana). And other states regulated firearms possession in learning environments, including schools, at least in some form by imposing restrictions on students carrying firearms. *See, e.g.,* PA:521-23 (Exs.90 (1878 Mississippi) (prohibiting "any student" from "carry[ing] concealed, in whole or in part," a pistol), 92 (1880 Mississippi) (same), 98 (1892 Mississippi) (similar), 99 (1892 Vermont) (prohibiting "carry[ing] or hav[ing] in his possession" firearms "while a member of and in

53

attendance upon any school"); *see also* PA:526-28 (Exs.118-24 (university regulations between 1655 and 1838 prohibiting firearms)).

Such analogues reveal commonsense principles: guns can be regulated in locations frequented by children to protect them and to ensure that places offering educational or scientific opportunities remain orderly and peaceful. *See, e.g., Antonyuk II*, 120 F.4th at 1011 (noting that reason for historical firearms prohibitions in schools was "for the protection of vulnerable populations"); *id.* at 1027 (noting that "[b]oth public squares and educational and scientific spaces inherently presume orderly and peaceable assembly"); *see also Kipke*, 165 F.4th at 217 ("Even though all places where people gather are necessarily sensitive places, locations that serve an educational purpose, or serve children, are historically protected.") (emphasis and internal quotation marks omitted); *Schoenthal*, 150 F.4th at 917 ("But the fact that public transit serves the 'vulnerable population[]' of children is a 'why' that Section 65(a)(8) shares with historically permissible restrictions in schools.") (quoting *Wolford*, 116 F.4th at 1001).

There is no dispute that children and families are *the* target audience for such locations, which offer educational and scientific

54

opportunities. PA:587-90, 596 (¶¶72-85, 112). Again, the record is replete with examples, but Dinosaur State Park demonstrates that § 23-4-1(c) has at least one lawful application. In 2023, approximately 42 percent of the visitors admitted to that location's visitor center were reportedly aged twelve and under, and approximately 54 percent of visitors to that location were reportedly aged thirteen and older—datapoints reflecting that a large percentage of Dinosaur State Park's visitors are minors or individuals "accompanied by children." *Antonyuk II*, 120 F.4th at 1026-27; *see* PA:590, 596-97 (¶¶84, 114-15). Moreover, § 23-4-1(c) seeks to alleviate safety concerns and ensure that Connecticut's parks and forests, which offer educational and scientific opportunities, remain peaceful and orderly places where children and families can go to enjoy nature. *See* PA:576-93 (¶¶26, 36-37, 41-42, 84-85, 97); Conn. Gen. Stat. § 23-4(a).

Section 23-4-1(c) therefore imposes a comparable burden on the right to self-defense that is comparably justified: it prohibits firearms in discrete locations without any exception for self-defense (i.e., the "how") as a way to protect vulnerable children, especially in places that provide educational or scientific opportunities where the presence of firearms

55

would disrupt such opportunities (i.e., the "why"). *See Kipke*, 165 F.4th at 212; *Schoenthal*, 150 F.4th at 917; *Antonyuk II*, 120 F.4th at 1011-12, 1026-27; *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 63-65 (N.D.N.Y. 2024).

Plaintiff's contrary arguments are unavailing. Brushing aside *Antonyuk II*'s legal conclusion that our Nation has a well-established tradition of "regulating firearms in spaces frequented by children"; 120 F.4th at 1026; Plaintiff asserts that there is "*no* historical tradition of banning firearms in locations simply because children frequent them." PB:59 (emphasis added). *Antonyuk II* and the record before this Court again demonstrate otherwise.

Plaintiff also unpersuasively contends that historical firearms prohibitions in schools are improper analogues because they only applied to students, not others. See PB:61-63. The firearms restrictions he cites, though, specifically prohibited *college or university* students from having firearms. *See* PB:61-62. Consistent with *Rahimi*'s higher level of generality analytical rubric; *see Vereen*, 152 F.4th at 101; those prohibitions support Commissioner Dykes because they reinforce a principle underlying our Nation's regulatory tradition: lawmakers regulated firearms possession, at least in some form, in "spaces hosting

56

educational" opportunities. *See Antonyuk II*, 120 F.4th at 1027; *see also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold."). So lawmakers understood that they could constitutionally restrict individuals from possessing firearms in particular places hosting learning environments, even if they did not legislate to their "constitutional limits" by unequivocally prohibiting all individuals from possessing guns in such locations. *See Antonyuk II*, 120 F.4th at 969-70. But regardless, states also more generally banned firearms in "any school room"—places where vulnerable children unquestionably would be present.[15] *E.g.*, PA:519, 562 (Exs.86 (1870 Texas), 245 (1883 Missouri)).

Finally, Plaintiff mistakenly contends that a school's "in loco parentis authority over" students is the reason that students could lawfully be disarmed. PB:64. That argument fails, though, because

---

[15] Plaintiff represents he could not locate "any school weapons restrictions that barred faculty, staff, or visitors to campus from carrying firearms for self-defense from the 1600s to 1900." PB:63. *Antonyuk II* identified a regulatory tradition of prohibiting firearms in school rooms or educational environments prior to 1900. *See* 120 F.4th at 1019-20. Commissioner Dykes did too. *See, e.g.,* PA:519-23, 562 (Exs.89 (1870 Texas), 91 (1879 Missouri), 245 (1883 Missouri), 95 (1889 Arizona), 100 (1893 Oklahoma)).

*Bruen* and *Heller* referred to "schools" as being sensitive places, not that students could lawfully be prohibited from possessing firearms. It makes no sense "for the Supreme Court to talk about schools in the context of sensitive places if it was actually referring to restrictions on students, a subset of those occupying the place." *Schoenthal*, 150 F.4th at 909; *see Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626-27; *Kipke*, 165 F.4th at 223 n.2 (Agee, J., concurring in part and dissenting in part).

> **5.** **Section 23-4-1(c) aligns with principles associated with a landowner's pre-existing right to determine what happens on their land and firearms regulations promoting conservation goals**

The court did not address Commissioner Dykes' related arguments that § 23-4-1(c) aligned with regulatory principles associated with a landowner's pre-existing right to determine what happens on their land, including whether someone may carry a gun into such lands; *see* Dist.Dkt. 81-1 at 35-40; and that lawmakers could regulate firearms carrying and use in locations to preserve deer and wildlife (i.e., to advance "conservation goals"). *See id.* at 40-44.

Section 23-4-1(c) imposes a comparable burden that is comparably justified when compared to historical analogues illustrating such

58

principles because: (1) it requires individuals to obtain permission before they may carry a gun into, or otherwise hunt on, outdoor spaces owned or controlled by another entity (i.e., the "how"); and (2) it does so to promote conservation goals while also honoring a landowner's pre-existing right to exclude individuals from carrying guns into their land absent consent (i.e., the "why").

Second Amendment rights must be weighed against another pre-existing right: a landowner's right to exclude others from their lands, including those seeking to bear arms on such lands without permission. *See Kipke*, 165 F.4th at 208-209; *Wolford*, 116 F.4th at 994; *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1265. "The right to exclude is one of the most treasured rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (internal quotation marks omitted). Notably, "'there is a crucial difference'" between the government acting as sovereign "'lawmaker,'" on the one hand, and "'acting as a proprietor, to manage its internal operation[,]'" on the other. *Kipke*, 165 F.4th at 208 (quoting *Enquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 598 (2008)). Even when it comes to the Second Amendment, governments retain comparable rights to those held by private landowners regarding

59

property they own and control. *See Kipke*, 165 F.4th at 209; *Wolford*, 116 F.4th at 970-71, 1000; *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), *overruled in part on other grounds by Bruen*; *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126-27 (10th Cir. 2015), *cert.+ denied*, 577 U.S. 1216 (2016), *overruled in part on other grounds by Bruen*; *United States v. Dorosan*, 350 Fed. Appx. 874, 875 (5th Cir. 2009) (per curiam), *cert. denied*, 559 U.S. 983 (2010), *overruled in part on other grounds by Bruen*.

Consistent with a landowner's pre-existing property right to exclude, statutes leading up to 1791 reflect that individuals wishing to bear arms on another's property did not have the right to do so; rather, they first needed permission from the landowner, who could also determine whether individuals could hunt on their lands. *See, e.g.,* PA:515-38 (Exs.168 (1715 Maryland), 71 (1721 Pennsylvania), 72-73 (1722 and 1771 New Jersey), 172 (1738 Virginia), 174 (1748 Virginia), 175 (1760 Pennsylvania), 176 (1763 New York), 178 (1784 North Carolina), 179 (1790 Massachusetts)). Relatedly, as Professor Leah Glaser noted, colonial era laws underscored that lawmakers "could regulate when and where hunting could take place, *including by regulating the carry of firearms*." Dist.Dkt. 81-15 at 399 (Ex.165, ¶13)

(emphasis added). The "higher level of generality" principles to be drawn from these colonial and Founding era sources; *see Vereen*, 152 F.4th at 101; are that Founding generations understood that landowners can determine what can or cannot happen on their land, even when it comes to another person's desire to bear arms, and that lawmakers could regulate unauthorized hunting by imposing restrictions on carrying firearms into another's land absent consent.[16]

Similar laws underscoring a landowner's right to determine who gets to carry a gun into their land and the government's ability to control unauthorized hunting by regulating the carrying of firearms continued through Reconstruction and beyond. For example, Florida (1865) and Louisiana (1865) made it unlawful for a person to carry a firearm into another's land absent consent. *See* PA:516, 541 (Exs.74, 186). Delaware (1873) and Iowa (1894) made it unlawful to enter another's land, absent

---

[16] *Antonyuk II* considered some of the laws Commissioner Dykes relies upon, characterizing them as "deterring unlicensed hunting" and "aimed at preventing the 'damages and inconveniences' caused 'by persons carrying guns and *presuming to hunt* on other people's land.'" 120 F.4th at 1046 (emphasis in original) (discussing Pennsylvania (1721), New Jersey (1722), and New York (1763) statutes). Such reading supports the principles that Commissioner Dykes advances.

consent, with a gun for the purpose of hunting. PA:542 (Exs.187, 189). And some states regulated hunting by passing laws based on simply possessing a gun in certain areas. In 1838, for example, Maryland essentially created a default presumption of unlawful hunting when it passed a conservation law stating that "discovering or finding of any . . . gun . . . fowling piece or pistol on any" water vessel in a particular location "shall, in all cases . . . be deemed prima facie evidence of intent to shoot or molest said wild fowls" in violation of the law. PA:540 (Ex.182). Maryland enacted a similar law in 1900, which also regulated hunting certain small game during winter and provided that "whoever shall be found traversing woods or field with dog or gun, while the same are covered in snow . . . shall be deemed prima facie guilty of" unlawful hunting. PA:543 (Ex. 191). Other states enacted similar laws that essentially created default presumptions of unlawful hunting by merely possessing a gun in certain locations, including open lands, unless a landowner consented or the person complied with prescribed requirements. *See, e.g.,* PA:544-46 (Exs.193 (1909 North Carolina), 194 (1909 West Virginia), 195 (1915 New Mexico.)).

62

Although many of these analogues often related to lands held by private individuals, the underlying substantive "principles"—i.e., a landowner's right to decide whether someone could bring a gun into their land and lawmakers having the ability to regulate hunting by imposing restrictions on carrying firearms—are what matter. *See Rahimi*, 602 U.S. at 692; *Antonyuk II*, 120 F.4th at 997-98. And significantly, those same principles run through the firearms restrictions in municipal, federal, and state parks and similar government-controlled outdoor spaces set aside for the public's quiet use and enjoyment that grew out of the nineteenth century parks and conservation movements. *See* PA:576 (¶27). It cannot reasonably be disputed that government entities owned or controlled such lands, reflecting a settled understanding that government entities (much like private landowners) could exercise property rights to decide whether guns were permitted on lands they owned or controlled. *See Frey*, 157 F.4th at 131; *Antonyuk II*, 120 F.4th at 968; Dist.Dkt. 81-15 at 412-14 (Ex.165, ¶¶45, 51). Moreover, lawmakers promulgated the firearms restrictions in those locations to promote conservation goals because such regulations helped to prevent

63

unauthorized or excessive hunting.[17] *See* PA:576 (¶27); *see also* PA:548-49 (Exs.200-201, conservation laws from Mississippi (1924) and Indiana (1927) imposing firearms restrictions in public or state parks).

Section 23-4-1(c) aligns with these same principles. DEEP promulgated § 23-4-1(c) under its authority to manage and maintain Connecticut's state parks and forest system. *See* Conn. Gen. Stat. § 23-4(a). The regulation prohibits the carrying of firearms "except as authorized by [DEEP]," which aligns with its pre-existing right to exclude firearms from locations that it controls—just like any other landowner could do. *Cf. Schoenthal*, 150 F.4th at 918 (noting that government's ownership is "a relevant characteristic" of "locating the public transit restriction within our nation's tradition"). And the fact that Connecticut and DEEP leverage such locations as marketable commodities only reinforces DEEP's ability to exercise property rights to decide if, how,

---

[17] Statutes abound throughout our Nation's history reflecting a desire by lawmakers to promote conservation goals. *See, e.g.,* PA:533-44 (Exs.170 (1717 Massachusetts), 177 (1772 Virginia), 180 (1796 Connecticut), 183 (1849 Virginia), 190 (1894 Yellowstone National Park), 192 (1909 North Carolina)).

where, or when an individual can enter such locations with a firearm.[18] *See Kipke*, 116 F.4th at 209; *Wolford*, 116 F.4th at 970-71; PA:599-602 (¶¶126-40).

What is more, DEEP promulgated § 23-4-1(c) at least in part to curb unauthorized or excessive hunting, and the regulation continues to serve such conservation goals by functioning as EnCon's main hunting regulation that helps to prevent unauthorized hunting before it happens. PA:578, 581-82 (¶¶38, 46-47). *Cf. Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423, 1426-27 (10th Cir. 1986) (en banc) (noting that "[t]he governmental trust responsibility of wildlife is lodged initially in the states" and Supreme Court precedent reflects "'the importance to its people that a State have power to preserve and regulate the exploitation of an important resource'") (quoting *Toomer v. Witsell*, 334 U.S. 385, 402

---

[18] *Antonyuk II* involved default presumptions against public carry where (1) the landowner had not first objected to firearms and (2) the state acted as a sovereign lawmaker, rather than exercising its own pre-existing property rights over lands that it controls. *See* 120 F.4th at 1044-45. *Antonyuk II* therefore does not foreclose Commissioner Dykes' argument. And she may properly base her argument on a principle derived from historical sources like those considered in *Antonyuk II* because § 23-4-1(c) is a narrower restriction than a "universal default presumption against carrying firearms in public places[.]" 120 F.4th at 1047; *see Rahimi*, 602 U.S. at 700.

65

(1948)), *cert. denied*, 480 U.S. 951 (1987).  Although DEEP authorizes the use of certain handguns capable of firing .22 caliber rounds to shoot small game in limited circumstances, it does not allow individuals to hunt deer with a handgun in any state park or forest.  *See* Dist.Dkt. 81-15 at 91, 115-19 (Ex.159).  Poachers and unauthorized hunters could skirt hunting laws, including those that only permit hunting deer with a "revolver" that is ".357 caliber or larger" on "private land" for two months out of the year; *see* Conn. Gen. Stat. § 26-82a; in state parks and forests by asserting a right to bear pistols or handguns of various calibers for self-defense and then using them to shoot wild game.[19]  That plainly would contravene the conservation goals underlying § 23-4-1(c).  The principles underpinning our Nation's regulatory tradition of permitting firearms restrictions to promote conservation goals, however, illustrate that DEEP does not need to take that risk.

---

[19] Such circumstances are not unfathomable.  A 1903 Report of the Secretary of the Interior regarding Sequoia National Park described one instance involving an individual being arrested after unlawfully attempting to shoot a deer with a revolver after being "given permission to carry a revolver for self-protection in the park."  PA:566 (Ex.254).

**6.  Historical analogues illustrate that § 23-4-1(c) is facially constitutional and reveal that the Second Amendment permits discrete, location-based restrictions**

The above analogues individually and collectively reveal principles underlying our Nation's regulatory tradition permitting discrete, location-based firearms restrictions.  Section 23-4-1(c) continues that constitutional tradition.  Moreover, its infringement on Second Amendment rights is negligible because it applies to a small sliver of Connecticut and does not prohibit individuals, like Plaintiff, from exercising their right to carry elsewhere.  *See, e.g., Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting) (observing that sensitive place restrictions are "narrow restrictions" that "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms"); *Schoenthal*, 150 F.4th at 910 (noting that sensitive places are "discrete places" that are "dispersed . . . within a community, not the community itself").  Indeed, Plaintiff could entirely avoid § 23-4-1(c) by recreating elsewhere.  *See Schoenthal*, 150 F.4th at 915.  Section 23-4-1(c) is therefore facially constitutional.

67

### C. Plaintiff's contentions about "sensitive places" fail

This Court should reject Plaintiff's unfounded contention that the only "sensitive places *Bruen* identified" are "legislative assemblies, polling places, and courthouses." PB:21; *see id.* at 27-36. Additionally, he mistakenly contends that § 23-4-1(c) is unconstitutional because: (1) Connecticut's state parks and forests are not places where "functions of deliberative self-government occur"; *id.* at 28; (2) Connecticut's state parks and forests are not "enclosed, securable locations" with "comprehensive security"; *id.* at 29; and (3) § 23-4-1(c) is discretionary, not "absolute and categorical[.]" *See id.* at 33-34. His arguments fail for several reasons.

*First*, Plaintiff misunderstands the proper analytical framework in positing that courts must mechanically analogize modern *locations* to "places" that the Supreme Court has deemed a sensitive place. PB:27. Neither *Bruen* nor *Rahimi* require mechanical comparison of past and present places; rather, courts apply "principles" gleaned from historical analogues. *See Rahimi*, 602 U.S. at 692. Plaintiff's restrictive approach would not apply principles but, rather, would search to fit a contemporary location into a historical mold—something that analogical reasoning of

68

*regulations* (which are what courts analyze) does not require. *See id.* at 740 (Barrett, J., concurring); *see also Bruen*, 597 U.S. at 30 ("[C]ourts can use analogies to those historical *regulations* of 'sensitive places' to determine that modern *regulations* prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.") (emphasis altered); *Schoenthal*, 150 F.4th at 908 ("We are in the project of comparing regulations, not places.") This Court need not—and should not—conclusively define what constitutes a sensitive place. Instead, *Rahimi* requires application of principles gleaned from historical analogues, including but not limited to those associated with recognized sensitive places like schools, to assess whether § 23-4-1(c) passes constitutional muster. And in doing so, "characteristics" of how a modern location is used (e.g., typically crowded, frequented by children, or places of assembly for recreational, educational, or scientific purposes) are relevant considerations reflecting a regulatory principle "that potentially render it ill-advised to allow firearms" in that location. *See Schoenthal*, 150 F.4th at 909-10; *Antonyuk II*, 120 F.4th at 1019-24.

*Second*, various courts have properly rejected Plaintiff's recycled argument that sensitive places are limited to locations performing core

69

government functions *and* are "enclosed, securable locations" with "comprehensive security[.]" *See* PB:27-35. Plaintiff's assertions are unfounded, principally because they ignore the Supreme Court's recognition that schools are sensitive places, and various recognized sensitive places lack comprehensive security (both presently and historically). *See Schoenthal*, 150 F.4th at 909-10; *Wolford*, 116 F.4th at 981; *We the Patriots, Inc. v. Grisham*, 697 F. Supp. 3d 1222, 1237-38 (D.N.M. 2023), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024); *see also Kipke*, 165 F.4th at 223 n.2 (*Agee, J.*, concurring in part and dissenting in part) (disagreeing with assertion that "sensitive place[s]" are either "where the Government acts *in loco parentis* over students (schools) or provides its own substantial security over the location (government buildings, legislative assemblies, polling places)" because such assertion "rests on questionable factual support" and "more fundamentally lacks foundation in the Supreme Court's cases").

*Third*, Plaintiff's definition of a sensitive place is both overinclusive and underinclusive because some clearly recognized sensitive places lack the necessary components he asserts they must possess. For example, he fails to explain how government buildings or schools—which the

70

Supreme Court has recognized are sensitive places—were (or are) places that provide "the forum necessary to engage in considered and independent decision-making regarding matters of self-government."[20] PB:28. Nor does he explain what he means by "comprehensive security"; PB:29, 33; and the laws he cites, to the extent relevant, fail to demonstrate how simply compensating doorkeepers, sheriffs, or others to attend court sessions or legislative assemblies or otherwise perform administrative tasks reflects "comprehensive security" at such locations. *See* PB:30-32; PA:47-147; *see also Schoenthal*, 150 F.4th at 909-10 and nn.16-18 (considering some of same laws Plaintiff relies upon and noting, among other things, that law enforcement presence at legislative assemblies, courthouses, and polling places "ensured smooth operations, which is distinct from the practice of comprehensive security to keep people safe").

*Finally*, the fact that § 23-4-1(c) gives DEEP discretion to allow guns into Connecticut's state parks and forests supports its

---

[20] The only case Plaintiff relies on is *Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 346 (W.D.N.Y. 2022) (Sinatra, J.), but that nonbinding decision similarly ignores government buildings and schools in concluding that places of worship were not sensitive places. *See* PB:29.

constitutionality, rather than cuts against it. *See* PB:33, 35-36.

Firearms historically could be "altogether prohibited" from "sensitive

places[.]" *Bruen*, 597 U.S. at 30. So § 23-4-1(c)'s imposition of a *lesser*

burden on Second Amendment rights because it does not impose a

categorical bar indicates that the regulation comports with historical

analogues since constitutionally permissible greater restrictions (i.e.,

absolute prohibition) include contemporary lesser restrictions (i.e.,

discretionary prohibition). *See Rahimi*, 602 U.S. at 699; *Zherka*, 140

F.4th at 82.

**D.    The district court properly concluded that § 23-4-1(c) constitutionally applies to Sleeping Giant State Park and the Farmington Canal Greenway State Park**

Plaintiff mistakenly contends that the court improperly rejected his

as-applied challenges to Sleeping Giant State Park and the Farmington

Canal Greenway State Park because they are not comparable to urban

parks since their geographical "design" is more akin to Adirondack Park

in New York, which *Antonyuk II* suggested in dicta might be similar to

Founding era commons or wilderness areas. *See* PB:22, 66-68; *Antonyuk

II*, 120 F.4th at 1025. Plaintiff is mistaken for various reasons.

72

*First*, *Antonyuk II* recognized that, on a more developed record, it might have concluded there is "well-established tradition of prohibiting firearm carriage in rural parks[.]" *See* 120 F.4th at 1025-26. Commissioner Dykes presented such a record, and firearms prohibitions in Yellowstone National Park and other geographically vast national parks are the clearest examples of that tradition.

*Second*, Plaintiff fixates on the "design" of a location (i.e., its physical characteristics or topography), instead of focusing on the principles underlying historical analogues. The relevant inquiry is not one of physical similarity but rather regulatory principles and traditions. Although *Antonyuk II* noted in passing that a "more proper analogue for rural parks based on the record before [it] appears to be 'commons' and 'wilderness areas'"; *id.* at 1025; this Court was not suggesting that future litigation regarding place-based restrictions should turn on mechanically comparing the physical characteristics of locations to present counterparts. Reading *Antonyuk II* to require that kind of mechanical comparison would not apply "principles" gleaned from historical analogues but, rather, would search to fit a contemporary location into a historical mold—something that analogical reasoning of firearms

73

regulations does not require. *See Rahimi*, 602 U.S. at 692; *id.* at 740 (Barrett, J., concurring). As noted above, contemporary place-based restrictions need only align with the principles underpinning historical analogues—which § 23-4-1(c) does.

*Third*, there is no genuine dispute of material fact that Sleeping Giant State Park is a discrete location that is typically crowded, frequented by children, and is often used for recreational, educational, and scientific purposes. Sleeping Giant State Park is approximately .0004 percent of Connecticut. *See* footnote five, above. Furthermore, Plaintiff admitted that: (1) it is one of Connecticut's most popular state parks; (2) its 200-vehicle capacity limit is often reached; (3) its observation tower gets so densely crowded at times that people stand almost shoulder to shoulder; (4) it has a campground utilized by a Youth Group Camping program; (5) schools routinely send students there for field trips as cost-effective ways to enhance course curricula; (6) in 2022, the town of Hamden sent local high school students there for a daily, four-week place-based science educational experience; and (7) the town of Hamden offers summer programming for children between the ages of three and fifteen years of age, who have visited that park. PA:590-93

74

(¶¶84, 90-98). Such admissions demonstrate that § 23-4-1(c) constitutionally applies to Sleeping Giant State Park because such application aligns with principles underlying our Nation's regulatory tradition of prohibiting firearms in locations that are typically crowded, frequented by children, and used for recreational, educational, or scientific purposes. *See Kipke*, 165 F.4th at 217; *Antonyuk II*, 120 F.4th at 1020-24, 1027.

*Fourth*, there is no genuine dispute of material fact that the Farmington Canal Greenway State Park is a discrete location that is a typically crowded and used for social recreation. It is a portion of a larger trail that Plaintiff admitted thousands of people use every day during peak season for recreational purposes. *See* PA:594-95 (¶¶102-110). Even Plaintiff avoids using it when it gets too crowded because the crowding requires "bobbing and weaving" around people that he does not like to do when he jogs. PA:594 (¶103). Such evidence demonstrates that § 23-4-1(c) constitutionally applies to the Farmington Canal Greenway State Park because such application aligns with principles underlying our Nation's regulatory tradition of prohibiting firearms in typically crowded

locations that are used for recreation. *See, e.g., Antonyuk II*, 120 F.4th at 1020-21.

*Fifth*, regardless of crowding, the presence of children, or places of assembly for recreation, education, or scientific purposes, § 23-4-1(c) constitutionally applies to Sleeping Giant State Park and the Farmington Canal Greenway State Park because such application aligns with the other principles articulated above. For example, both locations grew out of the parks and conservation movements, so applying § 23-4-1(c) aligns with Olmstedian ideals of maintaining such locations as society-improving devices and promoting conservation purposes. *See* PA:578-82 (¶¶36-41, 46-47); *Kipke*, 165 F.4th at 215-16; *Antonyuk II*, 120 F.4th at 1024. Notably, hunting is not permitted in either location. *See* Dist.Dkt. 81-10 at 140-49 (Ex.108, Connecticut Hunting and Trapping Guide, describing where hunting is permitted).

*Finally*, neither Sleeping Giant State Park nor the Farmington Canal Greenway State Park are akin to New York's Adirondack Park. Both are discrete locations, representing tiny portions of Connecticut— not comparable to Adirondack Park, which is "one-third of the total land

area of New York State[.]" *Antonyuk II*, 120 F.4th at 1025 (internal quotation marks omitted).

## II. The District Court Properly Denied a Permanent Injunction, and a Remand is Unwarranted

Plaintiff mistakenly contends that he is entitled to a permanent injunction barring enforcement of § 23-4-1(c) in Sleeping Giant State Park and the Farmington Canal Greenway State Park, and that a remand is appropriate to assess whether the district court should issue a statewide injunction. *See* PB:70-71.

To obtain permanent injunctive relief, Plaintiff bore the burden of demonstrating an actual success on the merits for his claims and that four factors weighed in his favor. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-157 (2010); *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2011). Because he failed to demonstrate an actual success on the merits, the district court properly denied his motion for a permanent injunction. PSA:57. This Court's analysis can stop there.

But even if Plaintiff could show actual success on the merits— which he cannot—he is not entitled to a remand to determine whether statewide injunctive relief, prohibiting enforcement of § 23-4-1(c) against

him in all state parks and forests, is appropriate for his facial claim. *See* PB:70-71. On the one hand, if this Court concludes—as it should—that one or both of Plaintiff's as-applied claims fail, then his facial challenge necessarily fails because § 23-4-1(c) would have a lawful application. *See Rahimi*, 602 U.S. at 700; *Antonyuk II*, 120 F.4th at 983. On the other hand, if Plaintiff prevails on his as-applied claims, the Court should decline to reach the merits of his facial claim altogether. "The Supreme Court has 'strong[ly] admon[ished] that a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute.'" *Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021) (*quoting Commodity Trend Serv. v. CFTC*, 149 F.3d 679, 683 (7th Cir. 1998)). And if a plaintiff "succeeds on its as-applied challenge, [courts] should not conduct further proceedings concerning the facial challenge." *Commodity Trend Serv.*, 149 F.3d at 683. Indeed, this Court has reversed a district court's order enjoining enforcement of a law in all applications because the plaintiff prevailed on his as-applied challenge, noting that "[a]n injunction prohibiting the application of [the challenged law] in the circumstances presented by [the plaintiff's] case . . . would suffice to

vindicate [his] First Amendment right[.]" *Picard v. Magliano*, 42 F.4th 89, 106 (2d Cir. 2022) (alterations added).

Here, the only injury Plaintiff claims is that § 23-4-1(c) prohibits him from carrying a handgun for self-defense in Sleeping Giant State Park and the Farmington Canal Greenway State Park. He does not claim an injury flowing from any other applications of § 23-4-1(c) or assert any imminent intention of visiting any other Connecticut state park or forest. Indeed, Plaintiff testified that he has no future plans to visit any other state parks or forests. *See* Dist.Dkt. 81-15 at 66-71, 79-80. Thus, if his as-applied claims have merit—which they do not—an injunction prohibiting enforcement against his intended conduct in Sleeping Giant State Park and the Farmington Canal Greenway State Park would be all that is needed to vindicate Plaintiff's Second Amendment right and provide him with complete relief.

So regardless of whether Plaintiff prevails on his as-applied challenges, he is not entitled to statewide relief on his facial claim. Facial relief would serve him no added benefit, while at the same time unnecessarily restricting Commissioner Dykes' ability to enforce a century-old firearms restriction. *See, e.g., Kane*, 19 F.4th at 173 (noting

that, "as a general rule . . . injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (internal quotation marks omitted).

## CONCLUSION

For these reasons, this Court should affirm the court's judgment granting summary judgment in favor of Commissioner Dykes, denying Plaintiff's cross-motion, and denying Plaintiff's motion for a permanent injunction.

Respectfully submitted,

DEFENDANT-APPELLEE,
COMMISSIONER
KATIE DYKES

WILLIAM TONG
ATTORNEY GENERAL

BY: /s/ *Thadius L. Bochain*
Thadius L. Bochain (ct31367)
Timothy J. Holzman (ct30420)
Blake T. Sullivan (ct30289)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
Thadius.Bochain@ct.gov
Timothy.Holzman@ct.gov
Blake.Sullivan@ct.gov

# CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure (FRAP) 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of FRAP 32(a)(7)(B), as modified by Second Circuit Local Rule 32.1(a)(4), in that this brief contains **13,990** words, excluding the parts of the brief exempted by FRAP 32(f). I further certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

/s/ *Thadius L. Bochain*

_____

Thadius L. Bochain
Assistant Attorney General

Dated: April 15, 2026

81

## CERTIFICATE OF SERVICE

I hereby certify that on this 15 day of April, 2026, I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Thadius L. Bochain*

_____

Thadius L. Bochain
Assistant Attorney General

82