# EXHIBIT A

# 25-2413

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

DAVID J. NASTRI, ESQ.

*Plaintiff-Appellant,*

v.

COMMISSIONER KATIE DYKES,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Connecticut

## BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue,
P.O. Box 4184
New York, NY 10163

Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

April 22, 2026

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

i

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 1

ARGUMENT ................................................................................... 3

    I.    This Court Should Consider Historical Context in Evaluating Connecticut's Parks Regulation ........................................................ 3

        A.    National Parks Continued the Park Movement Traditions that Began in Urban Parks ........................................................................ 6

        B.    Firearms Regulations in National Parks Continued the Regulatory Tradition from Urban Parks .........................................10

    II.    Sensitive Places Are Not Defined By Government-Provided Security.............................................................................................19

        A.    Schools and Government Buildings...........................................20

        B.    Legislative Buildings, Polling Places, and Courthouses .........23

CONCLUSION .............................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*,
145 S. Ct. 1900 (2025) ...................................................... 2, 3, 4, 5, 6, 11

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) ........................................................21

*Burson v. Freeman*,
504 U.S. 191 (1992) ............................................................................24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................20, 21, 22

*Kipke v. Moore*,
165 F.4th 194 (4th Cir. 2026)........................................................20, 22

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024),
*aff'd in part, vacated in part on other grounds*, 149 F.4th 476
(4th Cir. 2025) ...................................................................................20

*LaFave v. County of Fairfax*,
149 F.4th 476 (4th Cir. 2025), *cert. denied*, No. 25-872, 2026 WL
642852 (U.S. Mar. 9, 2026) ............................................................... 5

*Nastri v. Bondi*,
No. 3:24-cv-00222, 2026 WL 821682 (D. Conn. Mar. 25,
2026).........................................................................20, 23, 25, 26

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ............................................ 2, 15, 19, 20, 21, 22, 23

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025), *cert. denied*, No. 25-541, 2026 WL
922526 (U.S. Apr. 6, 2026) ........................................ 2, 19, 21, 24, 25

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023)............................................................19

*United States v. Bullock*,
123 F.4th 183 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 255 (2025).......19

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019 ...........................................................20

*United States v. Rahimi,*
   602 U.S. 680 (2024) .......................................................................2, 3

*United States v. Vereen,*
   152 F.4th 89 (2d Cir. 2025), *cert. denied*, No. 25-6198, 2026 WL 79986
   (U.S. Jan. 12, 2026) ..........................................................................19

*Wolford v. Lopez,*
   116 F.4th 959 (9th Cir. 2024), *cert. granted on other grounds*, 146 S.
   Ct. 79 (2025) ...................................................................6, 7, 19, 21, 23

**Statutes**

Act of Feb. 26, 1929, ch. 332, § 1, 45 Stat. 1316 ....................................10

Act of Mar. 1, 1872, ch. 24, § 1, 17 Stat. 32 ........................................... 9

Act of Mar. 3, 1875, ch. 191, § 1, 18 Stat. 517 .......................................13

Act of May 11, 1910, ch. 226, § 1, 36 Stat. 354 ....................................... 9

Act of May 22, 1902, ch. 820, § 1, 32 Stat. 202 ....................................... 9

Act of Oct. 1, 1890, ch. 1263, § 1, 26 Stat. 650.......................................12

Act of Sept. 25, 1890, ch. 926, § 1, 26 Stat. 478......................................12

**Other Authorities**

Archives of Maryland (Biographical Series): Cornelius Mills ................26

Burch, Benjamin, *History, Art, & Archives – United States House of
   Representatives*................................................................................27

D.H. Kelton, *Annals of Fort Mackinac* (1882) .......................................12

Del. Const. of 1776, art. 28, *reprinted in Constitutions of the Several
   Independent States of America* (1786)...............................................24

Frederick Law Olmsted, *Preliminary Report upon the Yosemite and Big
   Tree Grove* (Aug. 1865), *reprinted in The Papers of Frederick Law
   Olmsted* (2015) ............................................................................... 8

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1880) ..................................................................................7, 9

*Guarding the White House*, White House Hist. Ass'n, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house ...................................................28

*Guns in the Park: Rules and Regulations Strictly Enforced*, Tulare County Times (Visalia, Cal.) (July 31, 1902) .......................................17

J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1 (1990) ....................27

J.L. Powell, *A Trip to the West*, Gallatin Democrat (Gallatin, Mo.) (Oct. 10, 1889) ......................................................................................13

*John Quincy Adams Digital Diary, Dated 22 March 1838* .....................27

*John Quincy Adams Digital Diary, Dated 7 December 1831* .................27

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, Wash. Post (Sept. 23, 2014)..................................................28

Laura Wood Roper, *FLO: A Biography of Frederick Law Olmsted* (1973)...............................................................................7, 8, 10

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020)........................................24

National Park Service, *Firearms Regulations in the National Parks 1897-1936* (2008), *available at* perma.cc/5SRK-VYXZ ........................14

*Natural Friends of Man*, Public Ledger (Memphis, Tenn.) (Dec. 22, 1892) ................................................................................................14

*Northwestern Letter*, Indiana Times (Indiana, Pa.) (Sept. 25, 1889) .....13

Raymond L. Freeman, "National Parks," *in American Landscape Architecture: Designers and Places* (1989) ............................................ 8

*Report of the Acting Superintendent of the Yosemite National Park*, in III *Report of the Secretary of the Interior* (1896)..................................16

*Report of the Secretary of the Interior* (1890)..........................................12

v

*Report of the Secretary of the Interior*, in *Annual Reports of the Department of the Interior Secretary of the Interior* (1897) .................16

*Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1910* (1910) ..............................................................................18

*Rules and Regulations of the Sequoia National Park* § 5 (Oct. 21, 1890), *reprinted in Report of the Secretary of the Interior* CLXII (1890)........12

*Rules and Regulations of the Yellowstone National Park* § 5 (Aug. 1, 1894), *reprinted in Report of the Secretary of the Interior* (1894) ........13

*Rules and Regulations of the Yosemite National Park* § 5, Oct. 23, 1890 ..................................................................................................12

*Special Instructions, Office of Superintendent Yellowstone National Park*, in *Annual Reports of the Department of the Interior* (1898) ......16

*Tour of the President*, Battle Creek Enquirer (Battle Creek, Mich.) (Mar. 18, 1903) ..................................................................................17

United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission ...........................28

*Will They Ever Finish Central Park?*, N.Y. Magazine (July 14, 2016).... 4

*Yellowstone National Park*, Kansas City Star (Kansas City, Mo.) (July 3, 1890) ..................................................................................................14

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Connecticut's regulation restricting firearms in state parks and forests is constitutional under the approach to Second Amendment analysis established in in *New York State Rifle & Pistol Ass'n v. Bruen*,

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), for the reasons set out in the State's brief, Dkt. 38 ("State Br."). Everytown submits this amicus brief to expand on two points that support the constitutionality of this law.

*First*, to the extent any further historical analysis is needed after *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025), this Court should consider the historical context surrounding the emergence of public parks in evaluating the constitutionality of Connecticut's regulation. History demonstrates that wilderness parks grew out of the same ideals that inspired the urban parks movement of the 1800s and embraced firearms prohibitions at or very quickly after their creation.

*Second*, the Court should reject Plaintiff's historically inaccurate theory that sensitive places are defined by comprehensive, government-provided security. As multiple courts have concluded, any effort to limit sensitive places to locations the government secures "does not withstand historical scrutiny." *Schoenthal v. Raoul*, 150 F.4th 889, 909 (7th Cir. 2025), *cert. denied*, No. 25-541, 2026 WL 922526 (U.S. Apr. 6, 2026.

2

## ARGUMENT

### I.  This Court Should Consider Historical Context in Evaluating Connecticut's Parks Regulation

The methodological and substantive conclusions in *Antonyuk v. James*, 120 F.4th 941, compel upholding Connecticut's regulation. *Antonyuk* confirmed that Reconstruction-era and later laws are a crucial part of the Second Amendment analysis, *see id.* at 988 n.36; it concluded that history supports prohibiting guns from "often-crowded public forums," *see id.* at 1021; it recognized that *Rahimi* requires upholding a law against a facial challenge so long as it is constitutional "in *some* of its applications," *see id.* at 983 (quoting *Rahimi*, 602 U.S. at 693) (emphasis added by *Antonyuk*); and it recognized the importance of historical context in ascertaining the principles that underpin our regulatory tradition, *see, e.g.*, *id.* at 994 (considering historical growth of licensing scheme regulations "in the context of … larger changes in criminal justice").

Historical context is particularly salient in considering regulations that respond to societal or technological change. Close historical cousins to a modern regulation will not exist before the condition that prompted regulation arose. Historical context thus provides important insight into

3

past legislative action—and inaction. *See id.* at 993-94. In particular, the historical context of the American park movement—which generated first urban parks and then "rural" or wilderness parks— reveals why prohibitions on guns in those parks emerged in the 19th century and soon became ubiquitous.[2]

To be clear, Connecticut's regulation applies to a wide range of state parks and forests, including small parks like Sherwood Island State Park in Westport, Connecticut.[3] As in *Antonyuk*, which held that

---

[2] *Antonyuk* used the term "rural parks" as distinct from "urban parks." *See* 120 F.4th at 1019. In historical context, this term is potentially confusing, because large, bucolic urban parks like Central Park were frequently described as "rural," including by Frederick Law Olmsted himself. *See, e.g.*, Justin Davidson, *Will They Ever Finish Central Park?*, N.Y. Magazine (July 14, 2016) (quoting Olmsted describing Central Park as a "rural recreation ground"); R.I. Duffus, *Central Park Playground Stirs Old Issue*, N.Y. Times (May 10, 1925) ("People must not forget that Central Park is unique. It was the great original rural park." (quoting president of Parks Preservation Association)). Accordingly, we use the term "wilderness parks" to describe parks like Yosemite National Park and Yellowstone National Park.

[3] Sherwood Island covers 235 acres—less than a third of the size of New York's Central Park—on the shore of Long Island Sound. It features the kinds of recreational and family-friendly amenities that typify a busy urban-area park. *See* Sherwood Island State Park, https://ctparks.com/parks/sherwood-island-state-park (features include picnic areas, concessions, a nature center, and fishing and swimming areas).

New York's parks restriction is likely constitutional at least as applied to urban parks, Plaintiff's facial challenge to Connecticut's parks-and-forests restriction fails because it is constitutional in at least some of its applications. *See Antonyuk*, 120 F.4th at 1025-26; *see also LaFave v. County of Fairfax*, 149 F.4th 476, 483-84 (4th Cir. 2025) (rejecting facial challenge to law prohibiting guns in county parks because it was constitutional as applied to preschools within parks), *cert. denied*, No. 25-872, 2026 WL 642852 (U.S. Mar. 9, 2026). And the locations as to which Plaintiff raised as-applied challenges (and had standing to do so)—Sleeping Giant State Park and the Farmington Canal Trail—are also frequently and undisputedly crowded. *See* PSA:53-57.[4] But even if Plaintiff challenged the law as applied to a large forest park, the

---

[4] Citations to Plaintiff's appendix and special appendix begin "PA:" and "PSA:" respectively, with the page numbers that follow corresponding to the pagination at the bottom of each appendix and special appendix page. Citations to documents from the district court docket in this case are "Dist.Dkt. [number] at [page(s)]," with the page numbering corresponding to the ECF pagination at the top of each document. Citations to the Defendant's appendix begin "DA:" with the page numbers that follow corresponding to the continuous pagination at the bottom of each appendix page. "Dkt." refers to docket entries in other cases.

historical tradition of prohibiting guns in wilderness parks would still defeat that challenge.[5]

## A. National Parks Continued the Park Movement Traditions that Began in Urban Parks

"'The modern idea of the park emerged in the nineteenth century.'" *Antonyuk*, 120 F.4th at 1024 (citation omitted). Before that, "open spaces that were not privately owned ... consisted of grazing areas open to all." *Id.* (citation omitted); *see also Wolford v. Lopez*, 116 F.4th 959, 970, 982 (9th Cir. 2024) (agreeing with *Antonyuk* that "[p]arks in modern form ... first arose in the middle of the 19th century," and that founding-era green spaces like Boston Common "were not relevantly similar to parks in their modern form"), *cert. granted on other grounds*, 146 S. Ct. 79 (2025). As Frederick Law Olmsted wrote in 1880, "[t]wenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else. ... Allow me to use the term *park movement* [to describe what has happened since]."

---

[5] Plaintiff also tried to challenge the law as applied to Naugatuck State Forest, but the district court concluded that he lacked standing to do so, and Plaintiff has not appealed that holding. PSA:51-53; Dkt. 23 ("Pl. Br.") 8 n.5.

6

Frederick Law Olmsted, *The Justifying Value of a Public Park* 7-8 (1880).

The first American parks appeared in urban areas, beginning with New York's Central Park in 1858. *See Wolford*, 116 F.4th at 982. These parks arose in response to the Romantic idea that contemplating natural scenery could improve people's lives, and, ultimately, society. *See* State Br. 5; PA:572 ¶¶ 9-10 (admitting statements in State's Statement of Undisputed Facts ("State SOF")).

Wilderness parks grew out of the same movement and ideals. *See* State Br. 5-6. Olmsted, a central figure in the urban park movement and (with Calvin Vaux) the architect of Central Park, also "help[ed] to create early state and federal parks." Dist.Dkt. 81-14 at 111 ¶ 40 (Cornell Decl.). In the words of his leading academic biographer, not only did Olmsted and Vaux "originate[] the rural park movement in the United States," but Olmsted was also "the theoretician and director of the successful drive to set aside areas of unusual scenic beauty for popular enjoyment." Laura Wood Roper, *FLO: A Biography of Frederick Law Olmsted* xiii (1973). He "advocated a policy of establishing national parks across the nation and laid the foundation for our current national

7

park system." Dist.Dkt. 81-14 at 54 ¶ 30 (Young Decl.) (quoting Raymond L. Freeman, "National Parks," in *American Landscape Architecture: Designers and Places* 172 (1989)).

In particular, Olmsted served in the 1860s as a commissioner of a California state public park encompassing Yosemite Valley and a separate redwood grove, and in that capacity he wrote a report setting out many of his fundamental principles about the role of parks. *See* Frederick Law Olmsted, *Preliminary Report upon the Yosemite and Big Tree Grove* (Aug. 1865) ("Olmsted Report"), *reprinted in The Papers of Frederick Law Olmsted* (2015), *available at* perma.cc/C46G-EDK7. Olmsted's biographer described the report as "elaborat[ing], for the first time in America, the policy underlying the reservation by government to the public of a particular, and fine, scenic area …. In short, he formulated the philosophic base for the establishment of state and national parks." Wood Roper, *FLO* at 285.

According to Olmsted, Yosemite should be set aside and "devoted forever to popular resort and recreation," as well as contemplation. Olmsted Report at 489, 502. His account of the value and purpose of doing so echoed his account of the value and purpose, on a smaller scale,

of parks within cities. *Compare, e.g.*, *id.* at 502-06 (discussing benefits of "contemplation of natural scenes" for mental and physical health and emphasizing the government's duty to ensure such places are "laid open to the use of the body of the people" and not reserved for the wealthy) *with, e.g.*, Olmsted, *The Justifying Value of a Public Park* at 19-20 (discussing the value of "contemplation of natural scenery" in "counteracting and alleviating" the ills of urban life and observing that "if the object of parks is not that thus suggested, I know of none which justifies their cost").

A few years after Olmsted wrote his Yosemite report, Congress established Yellowstone as the first national park. 17 Stat. 32, ch. 24 (Mar. 1, 1872). Its authorizing act dedicated the land as a "pleasuring-ground for the benefit and enjoyment of the people," *id.* § 1—invoking the same Olmstedian principles that animated the urban park movement. The authorizing acts for many later national parks contained similar language. *See, e.g.* 32 Stat. 202, ch. 820, § 1 (May 22, 1902) (dedicating Crater Lake National Park "as a public park or pleasure ground for the benefit of the people of the United States"); 36 Stat. 354, ch. 226, § 1 (May 11, 1910) (same, as to Glacier National

9

Park); 45 Stat. 1316, ch. 331, § 1 (Feb. 26, 1929) (same, as to Grand Teton National Park).

These laws and writings confirm the close connection between the urban park movement and wilderness parks. They illustrate the two trends—the "demand for rural parks in cities and the interest in natural scenery"—that combined in the mid-19th century "to precipitate the idea that regions of unusual beauty should be set aside as public parks." Wood Roper, *FLO* at 285. And the same traditions, in the late 19th and early 20th centuries, in turn manifested in the creation of state parks like Connecticut's. *See* State Br. 5-6, 8-9. In brief—as Plaintiff has stipulated— "Olmstedian ideals of peace, relaxation, and quiet enjoyment lay at the foundation of … national and state parks, which grew out [of] the same parks movement that created urban parks." PA:573 ¶ 15 (admitting facts in State SOF).

## B. Firearms Regulations in National Parks Continued the Regulatory Tradition from Urban Parks

Just as the creation of wilderness parks was closely linked to the creation of urban parks, the regulatory traditions in the two types of parks were closely aligned. In all of these parks, the presence of

10

firearms was antithetical to their founding ideals of peace and quiet enjoyment.

America's large urban parks prohibited firearms at or soon after their creation. *See* State Br. 32-34; PA:574 ¶¶ 18-20 (admitting facts in State SOF); *see also Antonyuk*, 120 F.4th at 1022 (explaining that the "proliferation of" urban park rules "regulating firearms" "coincide[d] with the rise of public parks"). New York's Central Park, for example— the paradigm of the new park movement—prohibited guns in 1858, and similar rules appeared in other cities as parks opened across the country. *See* PA:574 ¶¶ 19-20. These prohibitions aligned with the conception of parks as places of repose and recreation, from which features or actions that interfered with the peaceful contemplation of should be excluded. *See* PA:576 ¶ 26 (admitting that lawmakers banned firearms from parks because they believed that firearms interfered with "parks' purpose and function as serene places").

National parks, which likewise were set aside for repose and recreation, also prohibited firearms at or soon after their founding. In some, guns were prohibited from the start. Yosemite National Park and Sequoia National Park are two examples. Congress established both

11

parks in 1890. *See* 26 Stat. 478, ch. 926, § 1 (Sept. 25, 1890) (Sequoia); 26 Stat. 650, ch. 1263, § 1 (Oct. 1, 1890) (Yosemite). Within a month, the Secretary of the Interior published rules and regulations for each park, including the rule that "no one shall carry into or have in the park any fire-arms" unless either the Secretary or the park's superintendent granted permission. Rules and Regulations of the Sequoia National Park § 5, Oct. 21, 1890, DA:37; *Rules and Regulations of the Yosemite National Park* § 5, Oct. 23, 1890, DA:32.[6]

In other parks, research has revealed that a prohibition was in place soon after the park's founding but has not yet revealed the earliest date of regulation. For example, an 1882 publication about Mackinac National Park reveals that its rules prohibited guns by that time, seven years after Congress created the park. *See* D.H. Kelton, *Annals of Fort Mackinac* 22 (1882) (setting out park rules, including that "[n]o person shall carry … fire-arms in the park"); 18 Stat. 517, ch.

---

[6] The statute creating Sequoia National Park also created a smaller park, General Grant National Park (now a part of Kings Canyon National Park). Although we have not yet located a copy of its original rules, the Secretary of the Interior reported in 1890 that "[t]he rules and regulations adopted by the Secretary" for General Grant "were also the same in general effect" as those for Sequoia. *Report of the Secretary of the Interior* CXXV (1890).

191, § 1 (Mar. 3, 1875) (establishing Mackinac National Park). But neither Kelton's *Annals* nor other research has revealed when precisely the park rules were created.

The date when Yellowstone National Park first prohibited guns is also unclear. The earliest prohibition in a published set of rules our research has located is from 1894. *See Rules and Regulations of the Yellowstone National Park* § 5 (Aug. 1, 1894) *reprinted in Report of the Secretary of the Interior* 662 (1894) ("Firearms will only be permitted in the Park on written permission of the superintendent thereof. On arrival at the first station of the Park guard parties having firearms will turn them over to the sergeant in charge[.]"). However, multiple newspaper reports indicate that a prohibition was in place earlier. For example, two travelogues in 1889 reported that guns were prohibited in the park. *See Northwestern Letter*, Indiana Times (Indiana, Pa.) (Sept. 25, 1889), p.4 ("No person is allowed to take any firearms into the Park[.]"); J.L. Powell, *A Trip to the West*, Gallatin Democrat (Gallatin, Mo.) (Oct. 10, 1889), p.2 ("[H]ere we … have to give up our guns as no person is allowed to carry fire arms within the park."). Another travelogue the following year stated that "visitors are not permitted to

13

carry firearms." *Yellowstone National Park*, Kansas City Star (Kansas City, Mo.) (July 3, 1890), p.5. An 1892 newspaper referred to the "banishment of guns from the Yellowstone National park" and to the "law forbidding the carrying of firearms in the park, except by the soldiers." *Natural Friends of Man*, Public Ledger (Memphis, Tenn.) (Dec. 22, 1892), p.10. Accordingly, it seems clear that the 1894 rules were not the earliest—but when precisely the prohibition first appeared is unknown.

The pattern of gun prohibitions appearing at or soon after a park's founding continued as Congress designated new national parks:[7]

| | National park | Established | Earliest restriction located |
|---|---|---|---|
| 1 | Yellowstone | 1872 | 1894 (but newspaper reports of firearm prohibition appear as early as 1889) |
| 2 | Mackinac | 1875 | 1882 |
| 3 | Sequoia | 1890 | 1890 |
| 4 | Yosemite | 1890 | 1890 |

---

[7] The firearms restrictions in parks 1 through 5 are set out and discussed *supra* pp. 11-14 & n.6. For the restrictions in parks 6 through 12, *see* National Park Service, *Firearms Regulations in the National Parks 1897-1936* 25, 28, 33, 38, 42, 47 (2008), *available at* perma.cc/5SRK-VYXZ.

| 5 | General Grant | 1890 | 1890 |
|---|---|---|---|
| 6 | Mount Rainier | 1899 | 1903 |
| 7 | Crater Lake | 1902 | 1902 |
| 8 | Wind Cave | 1903 | 1908 |
| 9 | Mesa Verde | 1906 | 1908 |
| 10 | Platt | 1906 | 1908 |
| 11 | Glacier | 1910 | 1910 |
| 12 | Rocky Mountain | 1915 | 1915 |

Some gun-rights litigants have tried to portray these national park prohibitions as mere permitting regimes in light of the authority given to the Secretary and park superintendent to grant individual exceptions.[8] That is not correct. First, this argument is impossible to reconcile with *Bruen*.[9] Second, and in any event, instances where

---

[8] *See, e.g.*, Reply Br. Pls.-Appellants 9, *LaFave*, 149 F.4th 476 (No. 24-1886), Dkt. 51 (4th Cir. Jan. 28, 2025).

[9] *Bruen* held that an otherwise-unconstitutional regime—there, a complete prohibition on carrying guns outside the home—cannot be saved by a "may issue" permitting regime under which government officials are given open-ended discretion to grant exceptions to that prohibition. *See* 597 U.S. at 13-14, 60, 71. Gun litigants pointing to the ability for park superintendents to grant a wholly discretionary exception to what they (wrongly) believe is an unconstitutional

15

national park users successfully sought permission to carry firearms were extremely rare.

In 1896, for example, Yosemite's acting superintendent reported "I have refused permits to carry any firearms inside the park boundaries, and have required all persons to give up firearms in their possession on entering the park." *Report of the Acting Superintendent of the Yosemite National Park*, in III *Report of the Secretary of the Interior* 736 (1896). The following year, he reported that the fauna in Yosemite was increasing in light of "[t]he rigid enforcement of the rule against carrying firearms in the park." *Report of the Secretary of the Interior*, in *Annual Reports of the Department of the Interior Secretary of the Interior* 808 (1897). And an 1898 report from Yellowstone indicated that permits were only granted to carry a gun *sealed*—and thus inoperable (and only if the applicant planned to leave the park via a different route and was a "reliable part[y]"). *Special Instructions, Office of Superintendent Yellowstone National Park*, in *Annual Reports of the Department of the Interior* 975 (1898).

---

prohibition on guns in parks are making the same argument *Bruen* rejected.

16

Newspaper reports also underscore the rigor with which park authorities applied the prohibitions. One newspaper in 1902 published correspondence between the acting superintendent of Sequoia National Park and a San Francisco businessman whose guns had been confiscated in the park. *See Guns in the Park: Rules and Regulations Strictly Enforced*, Tulare County Times (Visalia, Cal.), July 31, 1902, at 3. The superintendent explained that the rules the businessman had violated were clear, and continued:

> My soldiers have no guns in the park, neither have the Forest Rangers …, and so long as I am superintendent, I will see that none are brought in by them, or by tourists or anyone else whomsoever.

*Id.* Not even the President of the United States was exempt from the restrictions. When Theodore Roosevelt spent several days in Yellowstone in 1903, a newspaper explained that, "[a]s the law prohibits the carrying of firearms in the park, the president's sojourn will be a camping expedition pure and simple." *Tour of the President*, Battle Creek Enquirer (Battle Creek, Mich.), Mar. 18, 1903, at 4.

In addition, there were no exceptions under the 1910 rules for national monuments. Promulgated in 1910 to regulate areas as significant as the Grand Canyon (later Grand Canyon National Park),

Mount Olympus (later Olympic National Park), and Lassen Peak (later Lassen Volcanic National Park), the rules stated simply: "No firearms are allowed." *See Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1910*, at 562 (1910), *available at* tinyurl.com/yc4fymad; *see also id.* at 565 (setting out 1908 regulations for Muir Woods National Monument, including "No firearms allowed").

In sum, our nation has prohibited guns in its national parks from the 19th century, starting at or soon after each park's creation. Just as our national parks continued the American parks movement's tradition of setting aside natural landscapes for leisure and repose, the prohibitions on firearms in the national parks continued the tradition of banning guns from urban parks. And those traditions continued as states—including Connecticut—created their own parks.

Considered together, the corpus of firearms prohibitions in parks is overwhelming. The State presented over one hundred laws in its district court and appellate appendices. *See* PA:502-15, 549-62, 566; DA:22-37. Undersigned counsel has compiled a total of fifty-six

18

additional parks laws in the attached appendix.[10] In light of this corpus, it is nonsensical for Plaintiff to contend that prohibiting guns in parks is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

## II. Sensitive Places Are Not Defined By Government-Provided Security

Plaintiff argues that the Second Amendment forbids prohibiting guns in the absence of "comprehensive, government-provided security." *See* Pl. Br. 17-23. Several courts have rejected this theory, both before and after *Bruen*. *See Schoenthal*, 150 F.4th at 909-10 & nn. 16-18; *Wolford*, 116 F.4th at 981; *United States v. Class*, 930 F.3d 460, 464-65

---

[10] This Court can consider historical laws beyond those presented by the parties or to the district court. *See United States v. Vereen*, 152 F.4th 89, 101 n.3 (2d Cir. 2025) (rejecting argument that district court should only have considered laws the parties presented), *cert. denied*, No. 25-6198, 2026 WL 79986 (U.S. Jan. 12, 2026); *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) ("Because the Second Amendment analysis is a legal inquiry into the text and history related to the relevant regulation, the government may provide additional legal support for its arguments on appeal."), *cert. denied*, 146 S. Ct. 255 (2025); *United States v. Alaniz*, 69 F.4th 1124, 1129 n.1 (9th Cir. 2023) ("Alaniz contends that the government's analogues cannot be considered on appeal because they were not raised below. But that is not so …. Because the constitutional claim was raised below, we may consider the government's step two arguments and analogues put forward on appeal.").

(D.C. Cir. 2019; *Nastri v. Bondi*, No. 3:24-cv-00222, 2026 WL 821682, at *9-12 (D. Conn. Mar. 25, 2026), *appeal docketed*, No. 26-925 (2d Cir. Apr. 4, 2026); *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *13 (E.D. Va. Aug. 23, 2024), *aff'd in part, vacated in part on other grounds*, 149 F.4th 476 (4th Cir. 2025), *cert. denied*, No. 25-872, 2026 WL 642852 (U.S. Mar. 9, 2026); *see also Kipke v. Moore,* 165 F.4th 194, 223 n.2 (4th Cir. 2026) (Agee, J., concurring in part and dissenting in part).

This Court should follow those well-reasoned decisions and reject Plaintiff's argument for at least two reasons. *First*, the government-security argument is impossible to reconcile with *Heller* and *Bruen*'s recognition that guns may be prohibited in schools and government buildings. And *second*, the argument is irreconcilable with *Bruen*'s confirmation that prohibitions in legislative buildings, polling places, and courthouses are constitutional.

## A. Schools and Government Buildings

*Heller* recognized that guns may be prohibited in schools and government buildings, and *Bruen* reiterated *Heller*'s statement. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *Bruen*, 597 U.S.

20

at 30; *see also id.* at 81 (Kavanaugh, J., concurring). The constitutionality of these prohibitions alone is sufficient to defeat the comprehensive-security argument. Schools—which typically include not only buildings but yards, play areas, and athletic fields—routinely lack comprehensive, government-provided security. *See, e.g.*, *Wolford*, 116 F.4th at 981 (rejecting argument because "[m]any schools and polling places have few security measures—now or in the past—yet the Supreme Court listed those places as conclusively sensitive"); *Class*, 930 F.3d at 465 (observing that "many schools and government buildings— the paradigmatic 'sensitive places' identified in [*Heller*]—are open to the public, without any form of special security or screening" (cleaned up)). Thus, because *Bruen* said that "schools are places where firearms can be prohibited for all individuals," and schools often lack security, "what makes schools 'sensitive' … is not government provided security." *Schoenthal*, 150 F.4th at 909.

The same is true of government buildings. Any number of government buildings lack comprehensive security, such as public libraries, community recreation centers, and post offices. *See, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015)

21

(stating, in rejecting Second Amendment challenge to prohibition on firearms in post offices, that post office "d[id] not regularly employ any security officers"); *LaFave*, 2024 WL 3928883, at *13 (observing that "many recognized sensitive spaces lack enhanced security"). Thus, *Bruen*'s endorsement of prohibitions in government buildings also defeats the government-security claim. *See Kipke*, 165 F.4th at 208 (upholding prohibitions in government-owned and -leased buildings despite plaintiffs' government-security argument); *id.* at 223 n.2, 229-30 (Agee, J., concurring in part and dissenting in part) (agreeing that government-buildings restriction is constitutional and expressly rejecting government-security argument).

In essence, Plaintiff's comprehensive-security argument first ignores *Heller* and *Bruen*'s endorsement of firearms prohibitions in schools and government buildings, then invents a principle purportedly (but incorrectly, *see infra* Part II.B) based on the other location restrictions *Bruen* approves, and then tries to deploy that principle as a reason to ignore the Supreme Court's endorsement of prohibitions in schools and government buildings. That is hopelessly circular.

### B. Legislative Buildings, Polling Places, and Courthouses

Even leaving aside that Plaintiff's argument is impossible to reconcile with the constitutionality of firearms restrictions in schools and government buildings, the argument also "fails on its own terms." *Nastri*, 2026 WL 821682, at *10. As the Seventh Circuit explained in *Schoenthal*, the government-security principle "cannot unify even legislative assemblies, polling places, and courthouses," the three additional locations *Bruen* named. 150 F.4th at 909. Here, too, Plaintiff has failed to establish that these locations all feature comprehensive security.

Polling places, for example, routinely lack government security. *See Wolford*, 116 F.4th at 981; *see also Nastri*, 2026 WL 821682, at *10 (disagreeing with the claim that government today "provides security in … legislative assemblies and, especially, polling places"). As one district court recently observed, "[m]illions of Americans vote in high school gymnasiums, churches, municipal offices, recreation centers, and other places that would never qualify as 'secured locations protected by government-provided security.'" *Nastri*, 2026 WL 821682, at *10. Indeed, law enforcement officers are often "barred from the vicinity of

23

the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) (describing Tennessee law); *see also*, *e.g.*, Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [law enforcement officers] to a polling place. You just can't do it. It's unlawful."). The same was true historically. *See* Del. Const. of 1776, art. 28, *reprinted in The Constitutions of the Several Independent States of America* 143-44 (1786) (mandating that "*no persons* shall come armed" to any election and that no "battalion or company, in the pay of the continent, or of this or any other State" shall come within one mile of any election-place for twenty-four hours before or after an election (emphasis added)). To the extent law enforcement officials were present, "their role was largely to help run elections rather than provide security." *Schoenthal*, 150 F.4th 909-10; *see id.* at 909 n.18 (citing historical laws).

Historical legislative assemblies similarly lacked government-security, as illustrated by Plaintiff's own evidence. Rather than evincing

24

any sort of "comprehensive security," the statutes cited by Plaintiff, *see* Pl. Br. 18, demonstrate that "[l]egislative assemblies, including Congress, were often protected by merely one person, whose duties and abilities would be less-than-adequate to stave off violence." *Schoenthal*, 150 F.4th at 909; *see id.* n.16 (assessing many of same historical statutes).[11] For example, Plaintiff cites statutes permitting payments to "door-keepers"—which, in almost all cases, were just one or two individuals for a legislative house. *See, e.g.*, PA:56 (New Jersey statute providing for payment to single door-keeper); PA:70-71 (South Carolina statute, two door-keepers); PA:79-80 (Georgia statute, one individual in dual role of "messenger and door-keeper" for each chamber). None of these statutes, however, mandated how often these door-keepers

---

[11] Plaintiff relies on the same historical evidence that the plaintiffs-appellees in *Schoenthal* presented to the Seventh Circuit. *Compare* Pl. Br. 18-20, *with* Br. Pls.-Appellees 53-59, *Schoenthal*, 150 F.4th 889 (No. 24-2643), Dkt. 54. Plaintiff and his counsel also presented this historical evidence and argument in a separate challenge to the federal prohibition on firearms in post offices. *Compare* Pl. Br. 18-20, *with* Mem. Law Supp. Pls.' Mot. Summ. J. 19-21, *Nastri*, 2026 WL 821682 (No. 3:24-cv-00222), Dkt. 26. The U.S. Department of Justice detailed many of the flaws in Plaintiff's evidence and argument. *See* Defs. Combined Mot. Summ. J. & Opp. Pls.' Mot. Summ. J. 12-20, *Nastri*, 2026 WL 821682 (No. 3:24-cv-00222), Dkt. 28. And the district court thoroughly analyzed the evidence and rejected the argument. *See Nastri*, 2026 WL 821682, at *11-12.

attended the legislative buildings, explained their duties when they did so, or ensured that these positions were constantly (or ever) filled.

It is not even clear that a door-keeper routinely provided security. A source from the Maryland State Archives, for example, indicates that the regular tasks of one of Maryland's legislative door-keepers included "supplying wood for the use of the General Assembly and maintaining the furniture." Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823), *available at* https://tinyurl.com/yc3nfzzv (describing the tasks of Mr. Cornelius Mills as door-keeper in October 1778 (footnotes omitted)); *see id.* ("During this time, Mills also worked on the James Brice House in Annapolis as a carpenter/joiner, ran a boardinghouse, and advertised his experience as an auctioneer."); *see also Nastri*, 2026 WL 821682, at *11.

Even if the duties of door-keepers did include security, moreover, a tiny contingent of door-keepers for an entire legislative house would not amount to meaningful, let alone "comprehensive," security. Observations John Quincy Adams made about a number of 19th-century door-keepers of the U.S. House of Representatives further undermine any such suggestion. For example, in 1831, the final year of

26

Benjamin Burch's 10-year service as House door-keeper, Adams noted that the 70-year-old Burch "has been for several years and yet is an invalid, confined to his house"—suggesting that Burch had spent several years employed as door-keeper without even being present in the House. *See John Quincy Adams Digital Diary, Dated 7 December 1831*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/yjvusktm; Burch, Benjamin, *History, Art, & Archives – United States House of Representatives*, https://tinyurl.com/46wbn2cr. Burch's successor, Overton Carr, died from ill health while still employed in his position—and Adams described him as having been "many mo[n]ths in decline." *John Quincy Adams Digital Diary, Dated 22 March 1838*, Primary Source Cooperative at the Massachusetts Historical Society, https://tinyurl.com/25am8xmk; *see also* J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1, 14 (1990) (explaining that Benton Miller, who served as door-keeper in Georgia House from 1873 to 1883, had lost "more than four inches of his left leg" in the Civil War and walked with crutch and cane). *See generally Schoenthal*, 150 F.4th at 909 (describing the

27

"security practices in our nation's past" at legislative assemblies and courthouses as "lax and irregular").

Further, even such indisputably sensitive places as the U.S. Capitol and the White House lacked serious security for decades. *See* United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission) (explaining that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); *Schoenthal*, 150 F.4th at 909 n.16 (quoting same); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw rocks at President John Tyler…. Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off."); *Guarding the White House*, White House Hist. Ass'n, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house (timeline describing no guards at White House before 1830, other than militia presence on White House

28

grounds during War of 1812, and no permanent security force until a four-man guard was established in 1842). Accordingly, it cannot be the case that a place is "sensitive" only if, as Plaintiff contends, it is protected by "comprehensive, government-provided security." Pl. Br. 22. This Court should reject that argument here.

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated: April 22, 2026     Respectfully submitted,

/s/ Sana S. Mesiya
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044
smesiya@everytown.org
(202) 517-6620

Janet Carter
William J. Taylor
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

*Counsel for amicus curiae*
*Everytown for Gun Safety*

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 5,625 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: April 22, 2026

/s/ Sana S. Mesiya

Sana S. Mesiya
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2026, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

<u>/s/ Sana S. Mesiya</u>
*Counsel for amicus curiae*
*Everytown for Gun Safety*

31