# 25-2413

## IN UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DAVID J. NASTRI, ESQ.

*Plaintiff-Appellant*

v.

KATIE DYKES,

*Defendant-Appellee*,

On Appeal from the United States District Court for the
Connecticut, No. 3:23-cv-00056-VAB

**REPLY BRIEF OF THE PLAINTIFF-APPELLANT**

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
Fax: (203) 672-6551
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiff-Appellant*

May 6, 2026

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ..............................................................................................1

ARGUMENT .....................................................................................................3

I.    Dykes' And The District Court's Interpretation Of *Antonyuk* Contains No Limiting Principle And Directly Violates *Bruen*'s "Sensitive Places" Holding. ...3

II.    Dykes May Not Violate The Second Amendment In The Name Of Protecting The First Amendment ................................................................7

III.    Dykes Misreads *Antonyuk*: *Antonyuk* Concluded That Rural Parks Did Not Resemble Quintessential Public Squares. ...............................................9

IV.    *Antonyuk*'s Discount Of Historical Silence Also Applies To The Lack Of Historical Challenges Under State Constitutional Provisions. ...........................12

V.    Dykes' Argument That Connecticut Has A Property Right And A Conservation Interest In Prohibiting The Carriage Of Firearms Does Not Carry The Day. ...................................................................................13

CONCLUSION ................................................................................................17

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ................................................................................................18

CERTIFICATE OF SERVICE .........................................................................19

i

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)................................ 1, 2, 10, 11, 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................7

*Hague v. Committee for Indus. Organization*, 307 U.S. 496 (1939)......................14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..............................................12

*NYSRPA v. Bruen*, 597 U.S. 1 (2022)..................................... 3, 4, 5, 8, 16, 17

*Perry v. Sindermann*, 408 U.S. 593 (1972) .............................................................8

*United States v. Miller*, 307 U.S. 174 (1939) ........................................................13

**Statutes**

Conn. Gen. Stat. § 29-35...........................................................................................9

**Other Authorities**

St. George Tucker, View of the Constitution of the United States, in 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA at 300 n.2 (William Young Birch & Abraham Small, 1803)......................................................................................16

William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES

OF AMERICA, at 122 (Philadelphia, H.C. Carey &I. Lea 1825) .......................16

## INTRODUCTION

No dispute exists in this case that David Nastri is a law-abiding Connecticut citizen, attorney, and veteran who wishes to carry a handgun for self-defense in Connecticut state parks and forests. Connecticut prohibits him from doing so under Conn. Agency Regs. § 23-4-1(c). The district court rejected Nastri's Second Amendment challenge to that regulation, and the Defendant-Appellee, Katie Dykes, now asks the Court to affirm. The Court should decline to do so.

Nastri discusses five points in this reply brief.

First, the district court's interpretation of *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)'s as setting a binding precedent that crowding in a quintessential public square is sufficient under the Supreme Court's "sensitive places" doctrine is wrong. While *Antonyuk* was a preliminary decision, the Court now has a full record in this case that shows that rationale is ahistorical and has no limiting principle. Thus, the Court should not blindly apply *Antonyuk*'s preliminary reasoning.

Second, Dykes may not extinguish the Second Amendment in the name of protecting the First Amendment. The First and Second Amendments are co-equal provisions of the Bill of Rights, and conditioning access to a public forum on the abandonment of Second Amendment rights violates the Supreme Court's unconstitutional conditions doctrine and reduces the Second Amendment to a second-class right.

1

Third, *Antonyuk* does not foreclose Nastri's as-applied challenge to Connecticut's rural parks. To the contrary, *Antonyuk* expressly reserved the rural parks questions, noting that such locations "do not as neatly resemble quintessential public squares in that they are not primarily designed for peaceable assembly." 120 F.4th at 1025. The two parks at issue in Nastri's as-applied challenge are trail-designed parks – neither of which was designed for the kind of public assembly contemplated by *Antonyuk*.

Fourth, historical silence works both ways. The absence of state constitutional challenges to prohibitions on carrying firearms in parks during the Reconstruction Era is not probative of whether those prohibitions comported with the Second Amendment's understanding. The absence of those challenges does nothing to illuminate what the contemporary understanding of state constitutional provisions was or how they differed from the Second Amendment.

Lastly, Connecticut's property-right and conservation rationales fail on their own terms. The government does not shed its constitutional obligations when it becomes a landowner and opens land to the public, and a law enforcement convenience rationale – that a blanket firearms prohibition makes it easier to catch poachers – is not supported by our nation's history and tradition. The Founding generation was acutely aware of how the English Crown and aristocracy used game

2

laws and proprietorial claims as instruments of disarmament, and they rejected that tradition when they ratified the Second Amendment.

For these reasons and those contained in Nastri's opening brief, David Nastri, respectfully asks the Court to reverse the judgment of the district court, and remand with instructions for the district court to enter judgment in his favor and for further proceedings to determine the appropriate scope of permanent injunctive relief.

## **ARGUMENT**

I.  **Dykes' And The District Court's Interpretation Of *Antonyuk* Contains No Limiting Principle And Directly Violates *Bruen*'s "Sensitive Places" Holding.**

*Bruen* held that "sensitive places" do not include "all places of public congregation that are not isolated from law enforcement." *NYSRPA v. Bruen*, 597 U.S. 1, 30 (2022). It explained that finding a historical tradition of preventing public carry in places of "public congregation" "would eviscerate the general right to publicly carry arms for self-defense." *Id*. at 31. Dykes argues, and the district court erroneously agreed, that *Antonyuk* categorically authorizes the government to ban public carry of firearms in "quintessential crowded areas or public forums." Dykes Br. pp. 43-52. If *Antonyuk* truly means what Dykes and the district court thinks it means, this Court has openly defied the Supreme Court and authorized banning the lawful public carry of firearms for self-defense in virtually every location in our society.

3

The district court's and Dykes' interpretation blatantly defies *Bruen* because it is more extreme than the argument that *Bruen* rejected. *Bruen* rejected an argument that contained a limiting principle: "not isolated from law enforcement." 597 U.S. at 30. On its face, this argument contemplated bans on public carry in places where law enforcement could easily respond. To the contrary, the district court's and Dykes' interpretation of *Antonyuk* removes any and all limiting principles. It vests unrestricted authority in government to disarm law-abiding citizens in any area that it deems crowded. It contains no instructions on what constitutes crowding. In our modern society, "crowded" encompasses every place from the street corner to the town green. This vague test ultimately results in a rule of law that prohibits lawful public carry virtually anywhere and everywhere.

Perhaps *Antonyuk* intended to empower governments within this circuit to completely ban any lawful public carry of firearms. If so, this Court needs to make that clear so the Supreme Court has a plain idea of the constitutional stakes that this case presents.

The Court still has the opportunity to choose a different path though. *Bruen* still binds the Court, and *Antonyuk*'s historical conclusions are not unassailable. *Antonyuk* reached its conclusions on a historically thin, preliminary injunction record. Withholding preliminary relief on precious few historical examples may be appropriate, but it is not appropriate on a fully developed historical record. *Bruen*

4

points the Court toward a far narrower definition of "sensitive places," and the historical record simply does not support *Antonyuk*'s conclusion.

*Bruen* explained that "the historical record yields *relatively few* 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited – *e.g.*, legislative assemblies, polling places, and courthouses…." 597 U.S. at 30 (emphasis added). If public congregation or crowding were a suitable metric, *Bruen* could not have accurately stated that "the historical records yields relatively few 18th- and 19th-century 'sensitive places'" because public congregation and crowding are not new modern social phenomena. The historical record would have yielded many more "sensitive places" that were treated as "sensitive places" due to public congregation and crowding.

Nastri presented a more complete historical record below that demonstrates that *Antonyuk*'s conclusion is historically unsupported. Nastri's expert historian, Professor Joyce Malcolm, explained that the Statute of Northampton and their American copycats prohibited a manner of carry rather than imposing a locational restriction. App.8-12. She supported this conclusion by pointing to a wealth of historical evidence confirming that these laws prohibited carrying arms in a manner that would breach the peace. App.8-12. Nastri solidified this historical evidence by pointing to American cases limiting the Statute of Northampton and its American copycats to conduct amounting to breach of peace. Nastri Br., pp. 33-40.

Instead of meeting this wealth of evidence with evidence from the Founding Era and going forward, Dykes starts her rebuttal of that evidence in 1870. Dykes Br., pp. 44-46. Her examples of broader prohibitions stretch past 1900. *Id*. She, however, does not offer a single example prior to the Civil War, let alone one that stands for the sweeping interpretation *Antonyuk* found on a sparse historical record. Her efforts fall woefully short of showing a well-established and representative historical tradition of banning the public carry of firearms in crowded places simply because they are crowded.

Nastri's well-developed historical record not only permits departure from *Antonyuk*'s preliminary holding, but it also compels it. *Bruen*'s historical analysis requires courts to make determinations on the historical evidence presented by the parties. Thus, if one panel of this Court makes a determination based on a preliminary historical record, another panel of this Court is entitled to make a different determination based on a full historical presentation.

The wisdom underlying this rule is that it gives courts an opportunity to make the right decision. What may be the right decision on a preliminary injunction may not be the right decision on a full historical record. *Antonyuk*'s preliminary decision is plainly not the right decision here. Thus, the Court should decline to find that there is a well-established and representative tradition of prohibiting public carry of firearms for self-defense in crowded places.

6

**II. Dykes May Not Violate The Second Amendment In The Name Of Protecting The First Amendment.**

*Antonyuk*'s preliminary discovery of historical tradition of prohibiting the public carry of firearms in crowded places designed for public assembly does not survive deeper scrutiny – both under historical tradition and the Supreme Court's precedents. At its core, Dykes' argument – derived from *Antonyuk* – is that wherever people gather to exercise First Amendment rights – to assemble, to petition, or to otherwise in educational and civic life – the Second Amendment evaporates. Not because of conduct, but because of abstract fears. That cannot be the law. The First and Second Amendments are coordinate and co-equal provisions of the Bill of Rights, and neither one silences the other.

If Dykes – and by extension, every government within the Second Circuit – may eliminate Second Amendment rights wherever large numbers of people engaged in First Amendment activity, the right to carry for self-defense is effectively confined to locations where no one is present – which is no right at all. The Second Amendment's core guarantee is the right to armed self-defense, *see District of Columbia v. Heller*, 554 U.S. 570 (2008), and neither the guarantee nor the need diminishes because a person is standing in a crowd assembled for First Amendment purposes. If anything, it may be heightened there.

Again, there is no limiting principle to this approach. It structurally subordinates the Second Amendment to the First Amendment by treating any

7

location associated with assembly or education as presumptively arms-free. Under this approach, any location becomes a Second Amendment-free zone the moment First Amendment activity occurs within in them. The government could, on this logic, eliminate public carry rights entirely simply by characterizing any public space as a forum for assembly and expression.

*Bruen* and other Supreme Court precedents are clear that this approach is not the law, and can never be. "The constitutional right to bear arms in public for self-defense is not "a second class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (cleaned up). That promise encompasses pretextual government attempts to extinguish the exercise of the Second Amendment in the name of protecting the First Amendment right. This promise is also consistent with the unconstitutional conditions doctrine, which prohibits government from denying public benefits and rights to someone if they decline to surrender a constitutional right. *Perry v. Sindermann*, 408 U.S. 593 (1972).

Both the First and Second Amendments operate simultaneously in public spaces and, in this case, Dykes bears the burden of demonstrating a historical tradition that actually restricts firearms in the specific type of location at issue – not merely in locations where people happen to assemble for First Amendment purposes. As Nastri explained in his opening brief and will elaborate further on below, Dykes

has not carried that burden in this case. Its analogues establish, at best, that governments historically restricted firearms in certain defined civic spaces with particular functions: courthouses administering justice, legislative chambers conducting the business of law-making, and polling places facilitating decisions of self-government.

What those locations share is not simply that people assembled there for First Amendment purposes, but that specific governmental functions required a particular kind of order that was incompatible with armed presence. Connecticut's state parks and forests share none of those functional characteristics. People do not go to Sleeping Giant State Park to exercise First Amendment rights that require the suppression of Second Amendment rights.[1] They go to hike and enjoy nature. The constitutional calculus is fundamentally different, and it cannot be collapsed by invoking a concern about protecting First Amendment activity.

## III. Dykes Misreads *Antonyuk*: *Antonyuk* Concluded That Rural Parks Did Not Resemble Quintessential Public Squares.

Dykes's contention that *Antonyuk* requires affirmance of the district court is flawed for two reasons: (1) *Antonyuk* never made any findings about industrialization, *contra* Dykes Br., pp. 29-30, and (2) *Antonyuk* concluded that rural parks did not resemble quintessential public squares.

---

[1] This is particularly true since Connecticut has banned the open carry of firearms in public. *See* Conn. Gen. Stat. § 29-35(a)(2).

First, Dykes' claim that the "Founding generations could not have imagined the needs for modern parks" wars with history. Dykes Br., p. 29. Both colonial and Founding generations did imagine the need to set aside public spaces for recreation and other uses – both in urban areas and in rural areas – and they did set aside many public parks and spaces before 1800. Nastri Br., pp. 43-45 (compiling examples). Even Dykes' own expert testified that colonial New England reserved land for common purposes, including recreation. App.629-34.

Second, *Antonyuk* specifically distinguished urban and rural parks based on their design, not the number of people who frequent them. *Antonyuk v. James*, 120 F.4th 941, 1025 (2d Cir. 2024). It described "rural parks" as bearing a closer resemblance to "the commons of yore than the historical and often-crowded public squares, *i.e.*, fairs, markets, and urban public parks, regulated under [New York's] historical analogues." *Id*. at 1025. It then explained that "[r]ural parks do not as neatly resemble quintessential public squares in that they are nor primarily designed for peaceable assembly." *Id*. at 1025. In other words, the design is the cornerstone of *Antonyuk*'s historical analysis for rural parks.

Despite *Antonyuk*'s clear reasoning, Dykes suggests that the relevant inquiry should not be "one of physical similarity but rather regulatory principles and traditions." Dykes Br, pp. 73-74. The only regulatory principle and tradition that *Antonyuk* identified for parks though is banning public carry of firearms in crowded

places of public assembly. *Antonyuk*, 120 F.4th at 1025. Dykes defends that rationale, Dykes Br., pp. 43-52, but also argues for a broader tradition of banning public carry in public parks to preserve peaceful and quiet enjoyment. Dykes Br., pp. 32-43. While Nastri will address the latter argument below, Dykes merges both theories into an argument that the Court should not look to physical similarity, but broader principles, in analyzing rural parks. Dykes Br., pp. 73-74.

If *Antonyuk* controls this case as a matter of law, its controlling effect cuts both ways. It plainly found, as a historical matter, that rural parks do not resemble public squares. *Antonyuk*, 120 F.4th at 1025. It referenced Adirondack Park as an example and credited New York's description of that park as "containing vast forests, rolling farmlands, towns and villages, mountains and valleys, lakes, ponds and free-flowing rivers, private lands and public forest." *Id*. at 1025 (cleaned up). While the vastness of Adirondack Park did play a small role in this analysis, the central component for *Antonyuk*'s use of it as an example was that it *was not designed for public assembly*.

If *Antonyuk*'s finding that there is a historical tradition of prohibiting public carry in crowded areas that resemble quintessential public squares controls as a matter of law, its holding that rural parks do not resemble these spaces also survives.

This requires the reversal of the district court's rejection of Nastri's as-applied challenge to the prohibition on carrying in Sleeping Giant State Park and the

11

Farmington River Canal Trail. Neither place is designed for public assembly. Sleeping Giant State Park is a 32-mile backcountry trial system. App.431. The Farmington River Canal Trail is a simple trail. App.454. Both parks' popularity is incidental, and neither park was designed for crowded public assemblies of the kind that normally took place in public squares. Thus, the Court should reverse the district court's rejection of Nastri's as-applied challenge to these two parks.

**IV.** *Antonyuk***'s Discount Of Historical Silence Also Applies To The Lack Of Historical Challenges Under State Constitutional Provisions.**

Nastri has already addressed why Dykes' argument for a free-standing tradition of banning the public carry of firearms in public parks fails. Nastri Br., pp. 43-52. He rests on that argument and responds to Dykes' argument that the lack of judicial review of parks laws prior to *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) is unpersuasive because state constitutional provisions were available to mount challenges. Dykes Br., pp. 41-43. That argument fails for the same reason that *Antonyuk* held that "the absence of a distinctly similar historical regulation… can only prove so much." *Antonyuk*, 120 F.4th at 969.

*Antonyuk* reasoned that "[l]egislatures past and present have not generally legislated to their constitutional limits." *Id*. at 969. It explained that "[t]here are many reasons why the historical record may not evidence statutory prohibitions on a given practice." *Id*. at 969-70. It cited "custom, universal practice, or private warning" that might have obviated the need for regulation." *Id*. at 970.

Likewise, the absence of state constitutional litigation challenging prohibitions on carrying in public parks can only prove so much. Prior to *Bruen*, most legal minds hotly disputed whether the Second Amendment protected an individual right to publicly carry arms for self-defense – a dispute that *United States v. Miller*, 307 U.S. 174 (1939) contributed to by summarizing the Second Amendment's historical purpose as protecting only the militia. The national legal consensus at the time of *Miller* – mistaken as it was – undoubtedly also reflected on state constitutional arms bearing protections too. Thus, the lack of challenges under state constitutional provisions does not provide strong evidence that prohibitions on carrying arms in public parks were understood to comport with the rights to keep and bear arms.

**V.**     **Dykes' Argument That Connecticut Has A Property Right And A Conservation Interest In Prohibiting The Carriage Of Firearms Does Not Carry The Day.**

Dykes argues that the district court did not address her argument that Connecticut has property rights equivalent to private landowners under the historical prong of the *Bruen* analysis. Dykes Br., pp. 58-66. The district court considered Dykes' property argument at the textual stage of the *Bruen* analysis and properly rejected it. SPA.33-35. Nothing that Dykes offered the district or is now offering this Court compels a different conclusion under *Bruen*'s historical prong.

The district court first reasoned that Dykes had not identified any "post-*Bruen* binding precedent treating the government as a private landowner for purposes of evaluating the plain text of the Second Amendment." SPA.34. It then turned to the Second Amendment's plain text and the textual analysis that this Court mandated in *Antonyuk*. SPA.34-35. It found that Nastri easily satisfied that he was an ordinary law-abiding citizen, that his conduct was protected by the Second Amendment's plain text, and the weapon at issue – handguns – were in common use. SPA.34. Thus, it rejected Dykes' textual arguments.

While the district court did not reach this question under *Bruen*'s historical prong, Dykes' historical arguments do not carry the day.

First, *Hague v. Committee for Indus. Organization*, 307 U.S. 496, 515 (1939) recognized that, "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." It further held that "[s]uch use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Id*. at 515. In other words, *Hague* recognized a general principle that the government, acting as property owner in title, does not have the authority condition the use of public spaces held open to the public upon a forsaking of their constitutional rights.

14

The Second Amendment is no less a constitutional right than the First Amendment rights at stake in *Hague*, and the principle of *Hague* applies with equal force here.

Second, even Dykes acknowledges that most of her historical analogues "often related to lands held by private individuals." Dykes Br. p. 63. Her proffered laws mainly prohibited poaching on private land, not public land. Few, if any, contained sweeping prohibitions about hunting on public property, let alone categorical bans on the carrying of firearms for other lawful purposes like self-defense.

Third, Dykes' attempt to tie the property owner argument to conservation goals is precisely the type of regulation that the Founding generations rejected through the Second Amendment. Both the colonists and the Founding Fathers were well aware of how the English aristocracy used proprietorship and gaming laws (usually poaching laws) as a pretext to engage in widespread disarmament of law-abiding citizens, and they rejected that tradition when they adopted the Second Amendment. *See, e.g.,* St. George Tucker, View of the Constitution of the United States, in 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA at 300 n.2 (William Young Birch & Abraham

15

Small, 1803); William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, at 122 (Philadelphia, H.C. Carey &I. Lea 1825).

Dykes, however, continues to avoid confronting or rebutting this evidence because it is irrebuttable. Even if she did, she still could not overcome *Bruen*'s command that "post-ratification adoption or acceptance of laws that are *inconsistent*" with the Second Amendment's original meaning cannot supersede it. *Bruen*, 597 U.S. at 36 (cleaned up).

Ultimately, the natural conclusion from Dykes' logic is that, as long as the government owns the property (and/or has employees regularly working there, although it is unclear why the presence of employees would matter) upon which a hapless individual stands, the government can persecute that person because of his religion or political views, subject him to humiliating and unnecessary searches without probable cause, confine him without probable cause indefinitely, deny him an attorney, extract confessions via torture, convict him of a crime without a jury trial, and impose drawing and quartering as his punishment—all in the name of safety and order, of course.

Where does that argument end? Of course, Dykes will likely vehemently deny that this parade of horribles is the logical conclusion of her argument, but then her argument turns into a wink-wink nod-nod proposition: The Second Amendment does not offer any protection on government property.

16

Not so. "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (cleaned up). In other words, if other constitutional rights apply in Connecticut parks and forests, then the Second Amendment does, absent a well-established and representative historical analogue demonstrating that it does not.

Thus, the Court should reject Dykes' proprietorship and conservation arguments.

## **CONCLUSION**

For these reasons and those contained in his opening brief, the Plaintiff-Appellant, David Nastri, respectfully asks the Court to reverse the judgment of the district court, and remand with instructions for the district court to enter judgment in his favor and for further proceedings to determine the appropriate scope of permanent injunctive relief.

Dated: May 6, 2026                         *//s//  Cameron L. Atkinson*

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*Attorney for Plaintiff-Appellant*

17

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

I hereby certify that:

1.  This brief complies with the type-volume limitation of Local R. 32.1 because it contain 3,780 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: May 6, 2026

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

18

## CERTIFICATE OF SERVICE

I hereby certify that, on May 6, 2026, an electronic copy of the foregoing Reply Brief Of The Plaintiff-Appellant was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson